# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
# 23-80211-CR-MARRA/MCCABE
Case No.

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

FILED BY_____ *MP* ____D.C.

Dec 13, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES OF AMERICA

vs.

## ROBERT LEON SMITH III,

**Defendant.**

_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each Medicare beneficiary was given a unique Medicare identification number.

4.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, durable medical equipment ("DME"), and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. Medicare Part C, also known as "Medicare Advantage," provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations. Medicare Part D covered prescription drugs.

5.      Health care providers, such as DME suppliers, laboratories, and pharmacies, that provided and supplied items and services to Medicare beneficiaries were referred to as "providers." Medicare providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, or services provided to beneficiaries.

6.      When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual. Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number or Medicare Beneficiary Identifier; (b) the date on which the benefit, item, or service was

2

provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

7.      Medicare would only pay for items and services that were medically reasonable and necessary, eligible for reimbursement, and provided as represented. Medicare would not pay claims for items and services that were procured through the payment of illegal kickbacks and bribes.

### Medicare Part B

8.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

9.      CGS Administrators, LLC was the DME MAC that covered Florida and Texas. Noridian Healthcare Solutions, LLC was the DME MAC that covered Maryland.

10.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855S, was required to be signed by an authorized representative of the provider. CMS Form 855S contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider]. The Medicare laws, regulations, and program instructions are available through the [MAC]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction

complying with such laws, regulations, and program instructions
(including, but not limited to, the Federal Anti-Kickback Statute...).

11.     CMS Form 855S contained additional certifications that the provider "will not

knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare,"

and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

12.     CMS Form 855S also required applicants to disclose to Medicare any individual or

organization with an ownership interest, partnership interest, or managing control of a DME

supplier.  This included: (a) all individuals and organizations with five percent or more of an

ownership stake, either direct or indirect, in the DME supplier; (b) all individuals or organizations

with a partnership interest in the DME supplier, regardless of the partner's percentage of

ownership; (c) all organizations with "managing control" of the DME supplier; and (d) all

"managing employees."

13.     CMS Form 855S defined an organization with "managing control" of a DME

supplier as "[a]ny organization that exercises operational or managerial control" over the DME

supplier, or "conducts the day-to-day operations" of the DME supplier.  CMS Form 855S defined

"managing employee" as "a general manager, business manager, administrator, director, or other

individual who exercises operational or managerial control over, or who directly or indirectly

conducts the day-to-day operations" of the DME supplier, "either under contract or through some

other arrangement, whether or not the individual is a W-2 employee" of the DME supplier.

14.     CMS Form 855S also required the disclosure of "Adverse Legal Actions" against

individuals or organizations with an ownership interest, partnership interest, or managing control

of a DME supplier. CMS Form 855S defined "Adverse Legal Actions" as, among other things,

any federal or state felony conviction within the previous ten years, and any felony or misdemeanor

4

conviction, under federal or state law, relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance.

15. Payments under Medicare Part B were often made directly to the provider rather than to the beneficiary. For this to occur, the beneficiary would assign the right of payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Medicare Part C – Medicare Advantage

16. Medicare Advantage, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans ("Medicare Advantage Plans"), rather than through Medicare Parts A and B.

17. Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Part A and Part B. To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

18. A number of private health insurance companies, along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans. These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, and often made payments directly to providers, rather than to the beneficiaries who received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

19. To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms to the

5

beneficiary's Medicare Advantage Plan.  The claim forms were typically submitted electronically via the internet.

20.     When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare.  Providers also certified that the services being billed were medically necessary and were in fact provided as billed.

21.     The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary received.  These payments by Medicare to the health insurance companies were known as "capitation" payments.  Thus, every month, CMS paid the health insurance companies a predetermined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month. CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence.  CMS adjusted the capitation rates annually, taking into account each beneficiary's previous complaints, diagnoses, and treatments.  Beneficiaries with more illnesses or more serious conditions would generally rate a higher capitation payment than healthier beneficiaries.

22.     Medicare Advantage Plans were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

## Medicare Part D

23.     In order to receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private health care insurance companies, known as "sponsors," approved by Medicare.

24.     A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.  CMS compensated the Medicare drug plan sponsors for providing prescription drug benefits to beneficiaries.  CMS paid Medicare drug plan sponsors a monthly capitation fee for each beneficiary enrolled in the plan.  In addition, in some cases where a Medicare drug plan sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare drug plan sponsor for a portion of those additional expenses.

25.     Typically, Medicare did not process its insureds' prescription claims directly. Instead, Medicare drug plans were administered by pharmacy benefit managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies.   PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

26.     A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Medicare drug plan sponsor or with a PBM.  Pharmacies entered into contractual agreements with PBMs either directly or indirectly.  If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers.   By contracting with Medicare drug plan sponsors or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

27.     Upon receiving prescriptions, pharmacies submitted claims to Medicare drug plan sponsors or to PBMs for dispensing prescription drugs.  Medicare drug plan sponsors and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

28.     Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication."  42 U.S.C. § 1395w-102(e). Medicare generally did not cover drugs meant for prevention of disease and only covered drugs meant to treat an existing illness or injury.

29.     To prevent fraud, waste, and abuse, Medicare, Medicare drug plans, and PBMs required providers, including pharmacies, to collect copayments from beneficiaries prior to or soon after the service or item was provided and specified that copayments could not be systematically waived or reduced.   Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries financial incentives to reject medications that were medically unnecessary or had little or no value to beneficiaries' treatments.

30.     Medicare drug plans were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

**Durable Medical Equipment**

31.     Medicare Part B covered an individual's access to DME, such as off-the-shelf ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces").  Off-the-shelf braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

32.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician or other qualified health care provider.

## Genetic Testing

33.     Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future, including certain types of cancers (known as cancer genetic or "CGx" testing), cardiovascular disease, diabetes, obesity, Parkinson's disease, Alzheimer's disease, and dementia. Pharmacogenetic tests ("PGx" tests) were laboratory tests that used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications.

34.     Except for certain statutory exceptions, Medicare did not cover laboratory testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

35.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem" and "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

36.     Because CGx testing did not detect whether someone presently has cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary previously

had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## Foot Baths

37.     Providers sometimes prescribed antibiotic and antifungal drugs to be used in foot baths. These foot bath medications were prescribed, purportedly, to treat a variety of fungal, bacterial, or other types of foot infections.

38.     Beneficiaries were prescribed a cocktail of expensive drugs (including capsules, creams, and powders), provided with a plastic foot tub free of charge, and instructed to mix the medications with warm water to soak their feet.

39.     These foot bath cocktails routinely included vancomycin capsules, calcipotriene cream, clindamycin phosphate solution, ketoconazole cream, and other expensive drugs. Typically, the drugs selected for use in foot baths did not require pre-authorization from Medicare prior to prescribing them to a beneficiary. Additionally, the majority of these drugs were not subject to utilization management, meaning there was no limit on the quantity of drugs that could be ordered in a single prescription.

## Telemedicine

40.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or a telephone, to interact with a patient. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.

41.     Medicare covered expenses for specific telehealth services if certain requirements were met. These requirements included that: (a) the beneficiary was located in a rural or health

10

professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.  In or around March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

**The Defendant and Related Entities and Individuals**

42.     **ROBERT LEON SMITH III ("SMITH")** was a resident of Archer County, Texas, in the Northern District of Texas.

43.     Victor Van Vickery ("Vickery") was a resident of Palm Beach County, Florida, in the Southern District of Florida.

44.     Co-Conspirator 1 was a resident of the Philippines.

45.     TB Interests LLC ("TB Interests") was a company formed under the laws of Texas with its principal place of business in Archer City, Texas.  TB Interests was owned by **SMITH** and Vickery, and it purportedly provided marketing services.  TB Interests held an account at Bank 1 ending in 5194 ("TB Interests Account").

46.     Trojan Medical Supply Corp. ("Trojan") was a company incorporated under the laws of Florida with its principal place of business in Stuart, Florida.  Trojan held an account at Bank 1 ending in 9537 ("Trojan Account").  **SMITH** was the listed owner of Trojan.  Vickery was a beneficial owner, operator, and/or manager of Trojan.  Trojan was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

47.     Victory Medical Supply LLC ("Victory") was a company formed under the laws of Florida with its principal place of business in Stuart, Florida. Victory held an account at Bank 1 ending in 9375 ("Victory Account"). **SMITH** was the listed owner of Victory. Vickery was a beneficial owner, operator, and/or manager of Victory. Victory was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

48.     BC Medical Supply LLC ("BC Medical") was a company formed under the laws of Florida with its principal place of business in Stuart, Florida. BC Medical held an account at Bank 1 ending in 9413 ("BC Medical Account"). **SMITH** was the listed owner of BC Medical. Vickery was a beneficial owner, operator, and/or manager of BC Medical. BC Medical was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

49.     Trusted Medical Supply LLC ("Trusted") was a company formed under the laws of Texas with its principal place of business in Graham, Texas. **SMITH** was a beneficial owner, manager, and/or operator of Trusted. Trusted was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

50.     Sunshine Senior Solutions LLC ("Sunshine") was a company formed under the laws of Florida with its principal place of business in Delray Beach, Florida. **SMITH** and Vickery were beneficial owners, operators, and/or managers of Sunshine. Sunshine was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

51.     Med-Care Supplies, LLC ("Med-Care") was a company formed under the laws of Maryland with its principal place of business in Bethesda, Maryland. **SMITH** and Vickery were beneficial owners, operators, and/or managers of Med-Care. Med-Care was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

52.     Optimum Medical Supplies LLC ("Optimum") was a company formed under the laws of Florida with its principal place of business in Boca Raton, Florida. **SMITH** was a beneficial owner, manager, and/or operator of Optimum. Optimum was a DME supplier that purportedly provided braces to patients, including Medicare beneficiaries.

53.     Company 1 was a purported call center and marketing company located in the Philippines. Company 1 was owned by Co-Conspirator 1.

#### Other Entities

54.     Upon Demand, LLC ("Upon Demand") was a company formed under the laws of Florida with its principal place of business in Coral Springs, Florida. Upon Demand was owned and operated by Charles Schwartz ("Schwartz").

55.     GoLiveWell Pharmacy LLC ("GoLiveWell") was a company formed under the laws of Missouri with its principal place of business in St. Louis, Missouri. GoLiveWell was owned and operated by Michael McCormac ("McCormac").

56.     Medtech Worldwide, Inc. ("Medtech") was a company incorporated under the laws of Florida with its principal place of business in Boca Raton, Florida. Medtech was owned and operated by Marc Sporn ("Sporn").

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around August 2018, and continuing through in or around December 2022, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### ROBERT LEON SMITH III,

13

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Vickery, Co-Conspirator 1, Schwartz, Sporn, McCormac, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicare Advantage Plans, and Medicare drug plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

**Purpose of the Conspiracy**

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for the referral of Medicare and Medicare Advantage beneficiaries and doctors' orders for DME, foot bath medications, and genetic testing; (b) offering,

14

paying, and causing the payment of kickbacks and bribes to purported telemedicine companies, including Medtech, and to marketing companies in exchange for ordering and arranging for the ordering of DME, foot bath medications, and genetic testing for Medicare and Medicare Advantage beneficiaries, without regard to whether the items were medically necessary and eligible for reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare, Medicare Advantage Plans, and Medicare drug plans through DME companies, laboratories, and pharmacies, including Trojan, Victory, BC Medical, Trusted, Sunshine, Med-Care, Optimum, GoLiveWell, and others, for DME, foot bath medications, and genetic tests that were medically unnecessary and ineligible for reimbursement; (d) concealing and causing the concealment of false and fraudulent claims to Medicare, Medicare Advantage Plans, and Medicare drug plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy, included, among other things:

4.    **ROBERT LEON SMITH III**, Vickery, and their co-conspirators acquired DME companies, including Trojan, Victory, BC Medical, Trusted, Sunshine, Med-Care, and Optimum. **SMITH**, Vickery, and others agreed that **SMITH** and others would be the listed owners of these companies and agreed to conceal Vickery's beneficial ownership interest.

5.    **ROBERT LEON SMITH III** falsely certified to Medicare that he, as well as Trojan, Victory, and BC Medical, would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute, the requirement not to knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and the

requirement not to submit claims with deliberate ignorance and reckless disregard of their truth or falsity.

6.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators agreed to refer Medicare and Medicare Advantage beneficiaries, and doctors' orders for medically unnecessary DME, foot bath medications, and genetic testing, to DME companies, marketers, laboratories, and pharmacies in exchange for illegal kickbacks and bribes paid to TB Interests.

7.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators acquired Medicare beneficiary information by using deceptive offshore call centers, including Company 1, to recruit Medicare and Medicare Advantage beneficiaries for medically unnecessary DME, foot bath medications, and genetic testing.

8.      **ROBERT LEON SMITH  III** Vickery, and their co-conspirators knew that the call centers employed deceptive and misleading tactics to pressure the beneficiaries to accept the medically unnecessary products and to provide the personal information needed to bill Medicare, Medicare Advantage Plans, and Medicare drug plans.  In some instances, telemarketers at the call centers pretended to be Medicare representatives calling the beneficiaries, or they impersonated Medicare beneficiaries on recorded calls to make it appear as if the Medicare beneficiaries had agreed to accept the items and services.

9.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators paid and caused to be paid illegal kickbacks and bribes to the offshore call centers in exchange for referring Medicare and Medicare Advantage beneficiaries and doctors' orders for DME, foot bath medications, and genetic testing to TB Interests and DME companies owned, managed, and operated by **ROBERT LEON SMITH III**, including Trojan, Victory, BC Medical, Trusted, Sunshine, Optimum, and Med-Care.

10.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators paid illegal kickbacks and bribes to purported telemedicine and telemarketing companies, including Medtech and Company 1, in exchange for doctors' orders for braces and foot bath medications that were medically unnecessary and ineligible for reimbursement.  In many instances, these doctors' orders were written by doctors who did not have a preexisting doctor-patient relationship with the beneficiaries, were not treating the beneficiaries, did not conduct a physical examination of the beneficiaries, and did not conduct a proper telemedicine visit.  In some instances, the signatures on doctors' orders were forged.

11.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators negotiated the illegal kickback and bribe arrangements, and concealed and disguised the scheme and the existence and source of these illegal kickbacks and bribes, including by entering into sham contracts and agreements, and falsely describing them in contracts, invoices, and other documents as purported payments for legitimate services.

12.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators caused DME companies, laboratories, and pharmacies—including Trojan, Victory, BC Medical, Trusted, Sunshine, Med-Care, Optimum, GoLiveWell, and others—to submit over $60 million in false and fraudulent claims to Medicare, via interstate wire communications, for DME, genetic testing, and foot bath medications that were: (a) induced through illegal kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for reimbursement.  Medicare paid over $30 million for these claims.

13.      **ROBERT LEON SMITH III**, Vickery, and their co-conspirators used the fraud proceeds received from Medicare, Medicare Advantage Plans, and Medicare drug plans, and the

Case 9:23-cr-80211-KAM   Document 1   Entered on FLSD Docket 12/14/2023   Page 18 of 30

kickback and bribe payments received from DME companies, marketers, laboratories, and pharmacies, to benefit themselves and others, and to further the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
### Health Care Fraud
### (18 U.S.C. § 1347)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around August 2018, and continuing through in or around December 2022, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### ROBERT LEON SMITH III,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicare Advantage Plans, and Medicare drug plans, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit programs.

### Purpose of the Scheme and Artifice

3.     It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for the referral of Medicare and Medicare Advantage beneficiaries and doctors' orders for DME, foot bath medications, and genetic testing; (b) offering, paying, and causing the payment of kickbacks and bribes to purported telemedicine companies and marketing companies in exchange for ordering and arranging for the ordering of DME, foot

18

bath medications, and genetic testing for Medicare and Medicare Advantage beneficiaries, without regard to whether the items were medically necessary and eligible for reimbursement; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare, Medicare Advantage Plans, and Medicare drug plans through DME companies, laboratories, and pharmacies—including Trojan, Victory, BC Medical, Trusted, Sunshine, Med-Care, Optimum, GoLiveWell, and others—for DME, foot bath medications, and genetic tests that were medically unnecessary and ineligible for reimbursement; (d) concealing and causing the concealment of false and fraudulent claims to Medicare, Medicare Advantage Plans, and Medicare drug plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## The Scheme and Artifice

4.     The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## Acts in Execution or Attempted Execution
## of the Scheme and Artifice

5.     On or about the dates specified below as to each count, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, Medicare Advantage Plans, and Medicare drug plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in that the defendant submitted and caused the submission of false and fraudulent claims to Medicare, seeking

19

the identified dollar amounts, and representing that such benefits, items, and services were medically necessary and eligible for Medicare reimbursement:

| Count | Medicare Beneficiary | Billing Entity | Approx. Date of Claim Submission | Claim No.; Product Codes | Total Approx. Amount Billed |
|-------|---------------------|----------------|----------------------------------|--------------------------|------------------------------|
| 2 | K.R. | Victory | 7/6/2020 | 120188734380000; L1851, L2397, L1851, L2397 | $2,300 |
| 3 | K.R. | Trojan | 8/4/2020 | 120217734528000; L3960, L3916, L0650 | $3,100 |
| 4 | A.D. | Trojan | 12/4/2020 | 120339743714000; L0180 | $800 |
| 5 | A.D. | Trojan | 12/28/2020 | 120363727993000; L1851, L2397, L1851, L2397 | $2,300 |
| 6 | J.S. | BC Medical | 3/23/2021 | 121085715346001; L0637, L3960 | $2,400 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 7
**Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around August 2018, and continuing through in or around December 2022, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERT LEON SMITH III,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Vickery, Co-Conspirator 1, Schwartz, Sporn, McCormac, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in their administration and oversight of Medicare;

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A) by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, Medicare Advantage Plans, and Medicare drug plans;

c.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B) by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, the Medicare, Medicare Advantage Plans, and Medicare drug plans; and

d.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care benefit program, that is, Medicare, Medicare Advantage Plans, and Medicare drug plans.

e.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly

and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, Medicare Advantage Plans, and Medicare drug plans.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in exchange for referring Medicare and Medicare Advantage beneficiaries and doctors' orders for DME, foot bath medications, and genetic testing to purported marketers, DME suppliers, laboratories, and pharmacies; (b) offering, paying, and causing the payment of kickbacks and bribes to purported marketers and call centers in exchange for the referral of Medicare and Medicare Advantage beneficiaries and doctor's orders for DME, foot bath medications, and genetic testing; (c) offering, paying, and causing the payment of kickbacks and bribes to telemedicine companies in exchange for ordering and arranging for the ordering of DME, foot bath medications, and genetic testing for Medicare and Medicare Advantage beneficiaries; (d) submitting and causing the submission of claims to Medicare, Medicare Advantage Plans, and Medicare drug plans through Trojan, Victory, BC Medical, Trusted, Sunshine, Med-Care, Optimum, GoLiveWell, and others that were procured through the use of kickbacks and bribes; (e) concealing and causing the concealment of kickbacks and bribes; and (f) diverting kickback and bribe proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

22

## Manner and Means

4.      The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about March 27, 2019, a co-conspirator caused $12,404.50 to be transferred from GoLiveWell's bank account to **ROBERT LEON SMITH III** and Vickery, through the TB Interests Account.

2.      On or about April 2, 2019, a co-conspirator caused $30,250.75 to be transferred from GoLiveWell's bank account to **ROBERT LEON SMITH III** and Vickery, through the TB Interests Account.

3.      On or about May 29, 2019, **ROBERT LEON SMITH III** sent an email to the Vice President of Medtech with the subject line "Scripts for Week of June 2, 2019." The email contained lists of beneficiaries, including Medicare beneficiaries, and translated the number of scripts to "hours," such as "20 Florida Scrips=80hrs," "3 Az Scripts=12hrs," "6 Ky Scripts=24hrs," "14 OH Scripts=56hrs," "4 NJ Scripts=16hrs," and "3 NC Scripts=12hrs."

4.      On or about July 11, 2019, the Vice President of Medtech sent an email to **ROBERT LEON SMITH III** stating "tb dme 26 completed $2,600 […] tb rx 9 completed $900 […] please wire $3,500[.]"

23

5.     On or about July 17, 2019, **ROBERT LEON SMITH III** replied to the July 11, 2019, email that the Vice President of Medtech sent to **ROBERT LEON SMITH III** with a screenshot of a wire transfer for $3,500 from the TB Interests Account.

6.     On or about October 15, 2019, **ROBERT LEON SMITH III**, through the TB Interests Account, transferred approximately $11,000 by wire to an offshore call center.

7.     On or about October 16, 2019, after receiving the wire of approximately $11,000, the owner of the offshore call center emailed **ROBERT LEON SMITH III** a screenshot of the wire and an invoice stating that the payment was for "80 HRS" of "MARKETING SERVICES."

8.     On or about December 12, 2019, **ROBERT LEON SMITH III** submitted a CMS Form 855S to Medicare for Victory that omitted Vickery from the list of individuals who had ownership or management control over Victory, when in fact Vickery was a beneficial owner and participated in managing Victory.

9.     On or about January 22, 2020, a co-conspirator caused $120,000 to be transferred from Upon Demand's bank account to **ROBERT LEON SMITH III** and Vickery, through the TB Interests Account.

10.     On or about January 28, 2020, a co-conspirator caused $120,000 to be transferred from Upon Demand's bank account to **ROBERT LEON SMITH III** and Vickery, through the TB Interests Account.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 8-9
### Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

24

2.      On or about the dates set forth below as to each count, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**ROBERT LEON SMITH III,**

did knowingly and willfully solicit and receive any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare, as set forth below:

| Count | Approximate Date of Kickback Payment | Approximate Amount of Kickback Payment | Description of Kickback Payment |
|---|---|---|---|
| 8 | 1/22/2020 | $120,000 | Wire Transfer from Upon Demand to the TB Interests Account |
| 9 | 1/28/2020 | $120,000 | Wire Transfer from Upon Demand to the TB Interests Account |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 982(a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendant, **ROBERT LEON SMITH III**, has an interest.

2.      Upon conviction of a violation, or a conspiracy to commit a violation, of Title 18, United States Code, Sections 1343, 1347, 1349, and Title 42, United States Code, Sections 1320a-7b(b)(1)(A), 1320a-7b(b)(1)(B), 1320a-7b(b)(2)(A), and 1320a-7b(b)(2)(B), as alleged in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the

commission of such violation pursuant to Title 18, United States Code, Section 982(a)(7).

        3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        a.  cannot be located upon the exercise of due diligence;

        b.  has been transferred or sold to, or deposited with, a third party;

        c.  has been placed beyond the jurisdiction of the court;

        d.  has been substantially diminished in value; or

        e.  has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures outlined

at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code,

Section 982(b)(1).

A TRUE BILL

FOREPERSON

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ANDREA SAVDIE
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ROBERT LEON SMITH III,

_____/
Defendant.

**Court Division** (select one)
☐ Miami    ☐ Key West    ☐ FTP
☐ FTL      ☒ WPB

CASE NO.: _____

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3.  Interpreter: (Yes or No) No _____
    List language and/or dialect: _____

4.  This case will take 7-10 days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)                    (Check only one)
    I    ☐ 0 to 5 days                  ☐ Petty
    II   ☒ 6 to 10 days                 ☐ Minor
    III  ☐ 11 to 20 days                ☐ Misdemeanor
    IV   ☐ 21 to 60 days                ☒ Felony
    V    ☐ 61 days and over

6.  Has this case been previously filed in this District Court? (Yes or No) No _____
    If yes, Judge _____ Case No. _____

7.  Has a complaint been filed in this matter? (Yes or No) No _____
    If yes, Magistrate Case No. _____

8.  Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes _____
    If yes, Judge Rosenberg _____ Case No. 23-CR-80140

9.  Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No _____

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No _____

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No _____

15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No _____

By: _____
ANDREA SAVDIE
DOJ Trial Attorney
Court ID No.    A5502799

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

Defendant's Name: _____ **ROBERT LEON SMITH III** _____

Case No: _____

Count #:   1

  Title 18, United States Code, Section 1349 _____

  Conspiracy to Commit Health Care Fraud and Wire Fraud _____
* **Max. Term of Imprisonment:    20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 6

  Title 18, United States Code, Section 1347 _____

  Health Care Fraud _____
* **Max. Term of Imprisonment:    10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**

Count #:   7

  Title 18, United States Code, Section 371 _____

  Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks ____
* **Max. Term of Imprisonment:    5 years**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:    3 years**
* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense** _____

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

Defendant's Name: _____ **ROBERT LEON SMITH III**_____

Case No: _____

Counts #:    8 – 9

__Title 42, United States Code, Section 1320a-7b(b)(1)(A)_____

__Solicitation and Receipt of Kickbacks in Connection with a Federal Health Care Program__
_____

\* **Max. Term of Imprisonment:    10 years as to each count**
\* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
\* **Max. Supervised Release:    3 years**
\* **Max. Fine:    $250,000 or twice the gross gain or loss from the offense**_____

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**