# NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Twenty-two     Month: Twelve     Year: 2024 CE

Case 9:23-cr-80211-KAM



FILED BY_____ D.C.

JAN 15 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Angela Emilia Noble, Clerk of Court
United States District Court, Southern District of Florida
Wilkie D. Ferguson, Junior U.S. Courthouse
400 North Miami Avenue
Miami, Florida 33128

In reply to: "Document 186 Entered on FLSD Docket 12/13/2024 Page 1 of 68 **NOTICE OF FILING EXPERT DISCLOSURES**, Page 2 of 68 **CERTIFICATE OF SERVICE**, Page 3 of 68 **U.S. Department of Justice** Dear Mr. Smith…, Page 4 of 68 Sincerely, GLENN S. LEON, Page 5 of 68 **Disclosure as to Expert Witness Stephen Quindoza** Page **1**, Page 6 of 68 Page **2**, Page 7 of 68 Page **3**, Page 8 of 68 Page **4**, Page 9 of 68 Page **5**, Page 10 of 68 Page **6**, Page 11 of 68 Page **7**, Page 12 of 68 **II. Qualifications** Page **8**, Page 13 of 68 Stephen Quindoza *12/11/2024* Page **9**, Page 14 of 68 **Testimony at…Civil Proceedings – 2021 to present Stephen Quindoza**, Page 15 of 68 Defendant(s) Case # Judicial District, Page 16 of 68 **SafeGuard Services LLC**, Page 17 of 68 SafeGuard Services LLC, Page 18 of 68 **Disclosure as to Expert Witness Johanna L. Sullivan, Pharm. D.** Page **1** of 2, Page 19 of 68 *12/12/2024* Johanna L. Sullivan, Pharm. D. Page **2** of 2, Page 20 of 68 **Johanna L. Sullivan, Pharm.D.**, Page 21 of 68 Senior Pharmacist/Pharmacist Lead…, Page 22 of 68 *Major Projects:*, Page 23 of 68 *Major Projects/Research:*, Page 24 of 68 Outcomes Research Manager, Page 25 of 68 *Teaching:*, Page 26 of 68 **PUBLICATIONS AND POSTERS**…, Page 27 of 68 *Intramural*, Page 28 of 68 **PRESENTATIONS (CONTINUED)**, Page 29 of 68 *Introduction to Drug*…, Page 30 of 68 **TRACKING, MONITORING, AND ADVISING**, Page 31 of 68 **REFERENCES**, Page 32 of 68 **Disclosure as to Expert Witness Dr. Warren Joseph**, Page 33 of 68 Dr. Joseph may also review…, Page 34 of 68 **II. Qualifications**, Page 35 of 68 *12/11/24* Warren S. Joseph, DPM, FIDSA, Page 36 of 68 **CURRICULUM VITAE**, Page 37 of 68 Warren S. Joseph, D.P.M. Curriculum Vitae -2-, Page 38 of 68 HOSPITAL -3-, Page 39 of 68 *PROFESSIONAL ACTIVITIES* -4-, Page 40 of 68 -5-, Page 41 of 68 -6-, Page 42 of 68 *COMMITTEES* -7-, Page 43 of 68 *PUBLICATIONS* -8-, Page 44 of 68 -9-, Page 45 of 68 -10-, Page 46 of 68 -11-, Page 47 of 68 -12-, Page 48 of 68 -13-, Page 49 of 68 -14-, Page 50 of 68 -15-, Page 51 of 68 -16-, Page 52 of 68 -17-, Page 53 of 68 -18-, Page 54 of 68 -19-, Page 55 of 68 **Disclosure as to Expert Witness Dr. Robert Hoover** Page **1**, Page 56 of 68 Page **2**, Page 57 of 68 Page **3**, Page 58 of 68 Page **4**, Page 59 of 68 Dr. Robert Hoover 12/11/2024 Page **5**, Page 60 of 68 **CURRICULUM VITAE ROBERT D. HOOVER, JR., M.D., M.P.H., F.A.C.P.**, Page 61 of 68 **LICENSURE**, Page 62 of 68 **PRESENTATIONS**, Page 63 of 68 **Disclosure as to Expert Witness Mr. Justin Cain**, Page 64 of 68 Page **4** of 6, Page 65 of 68 **II. Qualifications**, Page 66 of 68 12/11/2024 Justin A. Cain,, Page 67 of 68 **JUSTIN CAIN, CFE**, Page 68 of 68 **EDUCATION/CERTIFICATIONS 2**"

**PLEASE TAKE NOTICE** that I, Robert Leon Smith III, a sentient moral being, accept your Presentment "Document 186 Entered on FLSD Docket 12/13/2024 Page 1 of 68 **NOTICE OF FILING EXPERT DISCLOSURES**, Page 2 of 68 **CERTIFICATE OF SERVICE**, Page 3 of 68 **U.S. Department of Justice** Dear Mr. Smith…, Page 4 of 68 Sincerely, GLENN S. LEON, Page 5 of 68 **Disclosure as to Expert Witness Stephen Quindoza** Page **1**, Page 6 of 68 Page **2**, Page 7 of 68 Page **3**, Page 8 of 68 Page **4**, Page 9 of 68 Page **5**, Page 10 of 68 Page **6**, Page 11 of 68 Page **7**, Page 12 of 68 **II. Qualifications** Page **8**, Page 13 of 68 Stephen Quindoza *12/11/2024* Page **9**, Page 14 of 68 **Testimony at…Civil Proceedings – 2021 to present Stephen Quindoza**, Page 15 of 68 Defendant(s) Case # Judicial District, Page 16 of 68 **SafeGuard Services** LLC, Page 17 of 68 **SafeGuard Services** LLC, Page 18 of 68 **Disclosure as to Expert Witness Johanna L. Sullivan, Pharm. D.** Page **1** of 2, Page 19 of 68 *12/12/2024* Johanna L. Sullivan, Pharm. D. Page **2** of 2, Page 20 of 68 **Johanna L. Sullivan, Pharm.D.**, Page 21 of 68 **Senior Pharmacist/Pharmacist Lead**…, Page 22 of 68 *Major Projects:*, Page 23 of 68 *Major Projects/Research:*, Page 24 of 68 **Outcomes Research Manager**, Page 25 of 68 *Teaching:*, Page 26 of 68 **PUBLICATIONS AND POSTERS**…, Page 27 of 68 *Intramural*, Page 28 of 68 **PRESENTATIONS (CONTINUED)**, Page 29 of 68 *Introduction to Drug*…, Page 30 of 68 **TRACKING, MONITORING, AND ADVISING**, Page 31 of 68 **REFERENCES**, Page 32 of 68 **Disclosure as to Expert Witness Dr. Warren Joseph**, Page 33 of 68 Dr. Joseph may also review…, Page 34 of 68 **II. Qualifications**, Page 35 of 68 *12/11/24* Warren S. Joseph, DPM, FIDSA, Page 36 of 68 **CURRICULUM VITAE**, Page 37 of

NON-NEGOTIABLE NOTICE OF ACCEPTANCE

Notice Date:   Day: Twenty-two      Month: Twelve      Year: 2024 CE

Case 9:23-cr-80211-KAM

Angela Emilia Noble, Clerk of Court
United States District Court, Southern District of Florida
Wilkie D. Ferguson, Junior U.S. Courthouse
400 North Miami Avenue
Miami, Florida 33128

68 **Warren S. Joseph, D.P.M. Curriculum Vitae** -2-, Page 38 of 68 **HOSPITAL** -3-, Page 39 of 68 ***PROFESSIONAL ACTIVITIES*** -4-, Page 40 of 68 -5-, Page 41 of 68 -6-, Page 42 of 68 ***COMMITTEES*** -7-, Page 43 of 68 ***PUBLICATIONS*** -8-, Page 44 of 68 -9-, Page 45 of 68 -10-, Page 46 of 68 -11-, Page 47 of 68 -12-, Page 48 of 68 -13-, Page 49 of 68 -14-, Page 50 of 68 -15-, Page 51 of 68 -16-, Page 52 of 68 -17-, Page 53 of 68 -18-, Page 54 of 68 -19-, Page 55 of 68 **Disclosure as to Expert Witness Dr. Robert Hoover** Page **1**, Page 56 of 68 Page **2**, Page 57 of 68 Page **3**, Page 58 of 68 Page **4**, Page 59 of 68 Dr. Robert Hoover 12/11/2024 Page **5**, Page 60 of 68 **CURRICULUM VITAE ROBERT D. HOOVER, JR., M.D., M.P.H., F.A.C.P.,** Page 61 of 68 LICENSURE, Page 62 of 68 PRESENTATIONS, Page 63 of 68 **Disclosure as to Expert Witness Mr. Justin Cain**, Page 64 of 68 Page **4** of **6**, Page 65 of 68 **II. Qualifications**, Page 66 of 68 *12/11/2024* Justin A. Cain,, Page 67 of 68 **JUSTIN CAIN, CFE**, Page 68 of 68 **EDUCATION/CERTIFICATIONS** 2" and return your offer herein attached to you.

I indicate my acceptance of your offer by my signature and date.

- I do not argue the facts, jurisdiction, law, or venue;
- I request you issue me the Appearance Bond and waive all Public costs;
- I request you close the Account 9:23-cr-80211-KAM and issue the Order of the Court to me immediately;
- I request you adjust and set-off all Public Charges by the exemption in accord with Public Policy;
- I request discharge.

**Please respond within three (3) days from the date you receive this NON-NEGOTIABLE NOTICE OF ACCEPTANCE. Dishonor may result if you fail to respond.**

Sincerely,

*Robert Leon Smith III*

Robert Leon Smith III
c/o P.O. Box 853
Archer City, Texas

Attachment: "Document 186 Entered on FLSD Docket 12/13/2024 Page 1 of 68 **NOTICE OF FILING EXPERT DISCLOSURES**, Page 2 of 68 **CERTIFICATE OF SERVICE**, Page 3 of 68 **U.S. Department of Justice** Dear Mr. Smith…, Page 4 of 68 Sincerely, GLENN S. LEON, Page 5 of 68 **Disclosure as to Expert Witness Stephen Quindoza** Page 1, Page 6 of 68 Page **2**, Page 7 of 68 Page **3**, Page 8 of 68 Page **4**, Page 9 of 68 Page **5**, Page 10 of 68 Page **6**, Page 11 of 68 Page **7**, Page 12 of 68 **II. Qualifications** Page **8**, Page 13 of 68 Stephen Quindoza *12/11/2024* Page **9**, Page 14 of 68 **Testimony at…Civil Proceedings – 2021 to present Stephen Quindoza**, Page 15 of 68 Defendant(s) Case # Judicial District, Page 16 of 68 **SafeGuard Services**

**NON-NEGOTIABLE NOTICE OF ACCEPTANCE**

Notice Date:   Day: Twenty-two     Month: Twelve     Year: 2024 CE

Case 9:23-cr-80211-KAM

Angela Emilia Noble, Clerk of Court
United States District Court, Southern District of Florida
Wilkie D. Ferguson, Junior U.S. Courthouse
400 North Miami Avenue
Miami, Florida 33128

LLC, Page 17 of 68 **SafeGuard Services** LLC, Page 18 of 68 **Disclosure as to Expert Witness Johanna L. Sullivan, Pharm. D.** Page **1** of **2**, Page 19 of 68 *12/12/2024* Johanna L. Sullivan, Pharm. D. Page **2** of **2**, Page 20 of 68 **Johanna L. Sullivan, Pharm.D.,** Page 21 of 68 **Senior Pharmacist/Pharmacist Lead**…, Page 22 of 68 *Major Projects:*, Page 23 of 68 *Major Projects/Research:*, Page 24 of 68 **Outcomes Research Manager,** Page 25 of 68 *Teaching:*, Page 26 of 68 **PUBLICATIONS AND POSTERS**…, Page 27 of 68 *Intramural*, Page 28 of 68 **PRESENTATIONS (CONTINUED)**, Page 29 of 68 *Introduction to Drug*…, Page 30 of 68 **TRACKING, MONITORING, AND ADVISING**, Page 31 of 68 **REFERENCES**, Page 32 of 68 **Disclosure as to Expert Witness Dr. Warren Joseph**, Page 33 of 68 Dr. Joseph may also review…, Page 34 of 68 **II. Qualifications**, Page 35 of 68 *11/11/24* Warren S. Joseph, DPM, FIDSA, Page 36 of 68 **CURRICULUM VITAE,** Page 37 of 68 **Warren S. Joseph, D.P.M. Curriculum Vitae -2-**, Page 38 of 68 HOSPITAL -3-, Page 39 of 68 *PROFESSIONAL ACTIVITIES* -4-, Page 40 of 68 -5-, Page 41 of 68 -6-, Page 42 of 68 *COMMITTEES* -7-, Page 43 of 68 *PUBLICATIONS* -8-, Page 44 of 68 -9-, Page 45 of 68 -10-, Page 46 of 68 -11-, Page 47 of 68 -12-, Page 48 of 68 -13-, Page 49 of 68 -14-, Page 50 of 68 -15-, Page 51 of 68 -16-, Page 52 of 68 -17-, Page 53 of 68 -18-, Page 54 of 68 -19-, Page 55 of 68 **Disclosure as to Expert Witness Dr. Robert Hoover** Page 1, Page 56 of 68 Page **2**, Page 57 of 68 Page **3**, Page 58 of 68 Page **4**, Page 59 of 68 Dr. Robert Hoover 12/11/2024 Page **5**, Page 60 of 68 **CURRICULUM VITAE ROBERT D. HOOVER, JR., M.D., M.P.H., F.A.C.P.,** Page 61 of 68 LICENSURE, Page 62 of 68 PRESENTATIONS, Page 63 of 68 **Disclosure as to Expert Witness Mr. Justin Cain**, Page 64 of 68 Page **4** of **6**, Page 65 of 68 **II. Qualifications**, Page 66 of 68 *12/11/2024* Justin A. Cain,, Page 67 of 68 **JUSTIN CAIN, CFE**, Page 68 of 68 **EDUCATION/CERTIFICATIONS** 2"

**Also Noticed:**
Judge Kenneth Anthony Marra, Paul G. Rogers Federal Building and U.S. Courthouse, 701 Clematis Street, Courtroom #4, Chambers 316, West Palm Beach, Florida 33401
Markenzy Lapointe, DOJ-USAO, 99 Northeast 4th Street, Miami, Florida 33132
Gabrielle Raemy Charest-Turken, DOJ-USAO, 99 Northeast 4th Street, Miami, Florida 33132
Glenn S. Leon, Chief, U.S. Department of Justice, Criminal Division, Fraud Section, 950 Pennsylvania Avenue, NW, Washington, DC 20530
Emily M. Gurskis, U.S. Department of Justice, Fraud Section, Criminal Division, 1400 New York Avenue NW, Bond Building 8th Floor, Washington, DC 20005
Andrea Savdie, U.S. Department of Justice, Criminal Division, Fraud Section, 1400 New York Avenue NW, Washington, DC 20005
Evan Noah Schlom, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20005
Ralf Owen Dunn, U.S. Department of Justice, 1400 New York Avenue NW, Washington, DC 20005
Michael Paul McCarthy, U.S. Department of Justice, Bond Building, 8th Floor, 1400 New York Avenue NW, Washington, DC 20530
Stephen Quindoza, c/o Angela Emilia Noble, Clerk of Court, United States District Court, Southern District of Florida, Wilkie D. Ferguson, Junior U.S. Courthouse, 400 North Miami Avenue, Miami, Florida 33128
Johanna L. Sullivan, c/o Angela Emilia Noble, Clerk of Court, United States District Court, Southern District of Florida, Wilkie D. Ferguson, Junior U.S. Courthouse, 400 North Miami Avenue, Miami, Florida 33128
Warren Steven Joseph, c/o Angela Emilia Noble, Clerk of Court, United States District Court, Southern District of Florida, Wilkie D. Ferguson, Junior U.S. Courthouse, 400 North Miami Avenue, Miami, Florida 33128
Robert D. Hoover, Junior, c/o Angela Emilia Noble, Clerk of Court, United States District Court, Southern District of Florida, Wilkie D. Ferguson, Junior U.S. Courthouse, 400 North Miami Avenue, Miami, Florida 33128
Justin A. Cain, c/o Angela Emilia Noble, Clerk of Court, United States District Court, Southern District of Florida, Wilkie D. Ferguson, Junior U.S. Courthouse, 400 North Miami Avenue, Miami, Florida 33128

**"Accepted"**

DEC 2 2 2024

*Robert Leon Smith III*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CR-80211-MARRA/MCCABE**

**UNITED STATES OF AMERICA,**

> **v.**

**ROBERT LEON SMITH III,**

> **Defendant.**

_____/

## NOTICE OF FILING EXPERT DISCLOSURES

The United States of America, through the undersigned counsel, hereby files expert disclosures that the Government sent to the Defendant on December 13, 2024.

Dated: December 13, 2024

> Respectfully submitted,
>
> MARKENZY LAPOINTE
> UNITED STATES ATTORNEY
>
> GLENN S. LEON
> U.S. DEPARTMENT OF JUSTICE
> CRIMINAL DIVISION, FRAUD SECTION
>
> By:   */s/ Andrea Savdie*
>         ANDREA SAVDIE
>         Trial Attorney
>         FL Special Bar No. A5502799
>         U.S. Department of Justice
>         Criminal Division, Fraud Section
>         1400 New York Avenue, NW
>         Washington, D.C. 20005
>         Phone: (202) 262-6453
>         Andrea.Savdie@usdoj.gov

1

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2024, I served and filed the foregoing document with

the Clerk of the Court via CM/ECF.

By:     */s/ Andrea Savdie*
        Andrea Savdie
        Trial Attorney
        U.S. Department of Justice

2



**"Accepted"**

**U.S. Department of Justice**
Criminal Division
Fraud Section

DEC 2 2 2024

*Robert Leon Smith III*

*1400 New York Avenue NW*
*Washington, DC 20005*

December 13, 2024

<u>Via Certified Mail</u>

Robert Leon Smith
91598-510
P.O. Box 853
Archer City, TX 76351
940-378-5555
Email: jobooks32@gmail.com

      Re:    *United States v. Robert Leon Smith, III*
            <u>Case No. 23-cr-80211-KAM</u>

Dear Mr. Smith:

      Enclosed please find signed expert disclosures for Stephen Quindoza, Johanna Sullivan, Dr. Warren Joseph, Dr. Robert Hoover, and Justin Cain, provided in accordance with Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure.   The Government reserves the right to supplement and/or correct this disclosure if appropriate.   *See* Fed. R. Crim. P. 16(a)(1)(G)(vi). The Government also requests reciprocal discovery from you pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure.

      In sending this notice, the government does not contend or concede that every portion of the testimony described below necessarily qualifies as expert testimony under Federal Rule of Evidence 702 or implicates the disclosure requirements of Federal Rule of Criminal Procedure 16(a)(1)(G), Federal Rule of Evidence 702, or *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).   Nonetheless, the Government provides this notice in the event the Court concludes that any of the testimony constitutes expert testimony.   Further, the Government may choose not to elicit all of the testimony outlined in this notice, but it provides this information in an abundance of caution.

      (Continued on next page.)

**"Accepted"**

DEC 2 2 2024

Sincerely,

*Robert Leon Smith III*

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By:     /s/ *Andrea Savdie*
Andrea Savdie, Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
(202) 262-6453

/s/ *Michael McCarthy*
Michael McCarthy, Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
(202) 923-7822

/s/ *Ralf Owen Dunn*
Ralf Owen Dunn
Criminal Division, Fraud Section
U.S. Department of Justice
(202) 993-4824

Enclosure

**"Accepted"**

DEC 2 2 2024

*Robert Leon Smith III*

## Disclosure as to Expert Witness Stephen Quindoza

### I.   Statement of Opinions, Bases, and Reasons

The following is "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed under [Rule 16](b)(1)(C)," and "the bases and reasons for them." Fed. R. Crim. P. 16(a)(1)(G)(iii).

#### a.   Bases for Testimony

Mr. Quindoza's opinions are based largely upon his more than forty years of experience working as a contractor for the Medicare Program, including his experience interpreting, applying, and ensuring compliance with applicable laws, rules, and regulations governing the payment of claims submitted to the Medicare Program.

Mr. Quindoza's opinions are also based on publicly available statutes, regulations, and guidance, some of which is cited throughout this disclosure.

Mr. Quindoza's opinions are also based on the following records, which the prosecution team has provided to Mr. Quindoza and that also have been provided to the Defendant in this case:

- The Indictment in this case;
- Medicare enrollment records, correspondence, and audit records for the DME companies involved in this case; and
- Part B billing data for the DME companies involved in this case.

Mr. Quindoza may review other documents produced to the Defendant and offer opinions on those documents.

#### b.   Opinions and Summary of Anticipated Testimony

Mr. Quindoza will help the jury understand what Medicare is, what it pays for, and the mechanics of claim processing and reimbursement. Mr. Quindoza's testimony may cover the following topics:[1]

1. Information about the Medicare Program generally, including:

   A. Medicare is a federally funded program that provides below-cost health care benefits to people ages 65 years and older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the

---

[1] In addition to his potentially expert testimony, Mr. Quindoza (like others whose names will appear on the Government's witness list) may also summarize voluminous documents such as claims and financial data. This portion of Mr. Quindoza's testimony will be fact testimony, not expert testimony, and therefore is not summarized herein.

Page 1

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

Medicare Program. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

B.   Medicare is a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

C.   Medicare is divided into four parts: coverage for inpatient care (Part A), coverage for medical items and services (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).

D.   Physicians, other medical professionals, DME companies, clinical laboratories, and other health care providers that provide items and services to Medicare beneficiaries are referred to as Medicare "providers" or "suppliers." To participate in Medicare, a prospective provider is required to submit an application in which it agrees to abide by the Federal Anti-Kickback Statute and other laws, policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers are required to abide by the laws, regulations, and policies governing the program, including, but not limited to, several provisions of the Social Security Act, the regulations promulgated under the Social Security Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Medicare manuals and service bulletins describing proper billing procedures, rules, and regulations are made available to providers.

E.   A prospective provider also must make representations in its Medicare enrollment application regarding its ownership and management structure as well as the eligibility of its owners, managers, delegated officials, and/or authorized officials to serve in such roles.

F.   Medicare relies on providers and suppliers to be truthful in attesting to their obligations and making representations about ownership, management, and other matters in their enrollment application.

G.   CMS assigns a unique identifier to each provider called a National Provider Identifier ("NPI"). The NPI is the standard unique health identifier for health care providers and suppliers and is assigned by the National Plan and Provider Enumeration System ("NPPES"). To enroll in Medicare, a provider must obtain an NPI and furnish it on their application prior to enrolling in Medicare or when submitting a change to their existing Medicare enrollment information. Applying for the NPI is a process separate from Medicare enrollment.

H.   If Medicare approves a provider's enrollment application, Medicare assigns the provider a Provider Transaction Access Number ("PTAN"). A provider who is assigned a Medicare PTAN and provides items or services to beneficiaries is able to order, among other things, durable medical equipment and laboratory testing. A provider may file claims to Medicare for reimbursement (i.e., "bill" Medicare) for items and services provided to beneficiaries based on these orders.

Page 2

"Accepted"   DEC 2 2 2024   *Robert Leon Smith III*

I.  A claim for payment from Medicare is generally required to set forth, among other things, the beneficiary's name, the date the items or services were provided, the beneficiary's diagnosis, the name of the physician or provider who ordered the items or services, and the name of the physician or provider who provided the items or services. Providers convey this information to Medicare by submitting claims electronically using billing codes and modifiers.

J.  When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary and eligible for reimbursement.

K.  Medicare payments are often made directly to the supplier or provider who provided the item or service, rather than to the Medicare beneficiary. Payments occur when the provider submits a claim to Medicare or a Part C plan administrator for payment, either directly or through a billing company.

L.  After a claim is submitted and processed, Medicare will generate a remittance advice notice indicating what was submitted, what was processed, and what was paid by Medicare. The remittance advice notice is sent electronically to the provider who billed Medicare in order to provide notice of the adjudicated claim.

M.  Medicare regulations require providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the provider. Generally, providers must disclose where such records are kept and maintain them for a period of 6 years. Medicare requires complete and accurate patient medical records so that Medicare can verify that the services were provided as described in the claim form. These records are required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

N.  Mr. Quindoza will testify to the claims adjudication process, including the time in which Medicare processes claims and the extent to which claims are, or are not, reviewed by Medicare. He will testify that it is a physical impossibility for every claim to be reviewed before it is paid by Medicare. Instead, Medicare relies on the provider's representation that claims are true and accurate. He will describe Medicare as a "trust-based system."

O.  Claims are covered by Medicare if the items or services are accurately described, medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare.

P.  Medicare publishes guidance regarding what services it does and does not cover in a variety of publications, including, but not limited to, National Coverage

Page 3

Determinations ("NCDs"), Local Coverage Determinations ("LCDs"), and CMS program manuals.

Q.  Medicare beneficiaries typically have the choice as to which provider will provide services or items prescribed to them. Medicare generally prohibits a provider from directing an order or prescription to a particular company not of the patient's choosing.

R.  Medicare does not pay for items or services that are procured through kickbacks and bribes. Mr. Quindoza will provide examples of payment arrangements which would constitute kickbacks and bribes under Medicare regulations such that Medicare would not pay for items or services procured through those payment arrangements, including a provider being paid to refer orders to a particular supplier or laboratory.

S.  Mr. Quindoza will discuss the Medicare enrollment applications and other documentation submitted by providers in this case, including representations contained within the forms as to providers' ownership, management, location(s), and promises made in those forms to comply with applicable rules and regulations and to not submit false claims.

2.  Information about Medicare audits, including:

A.  Medicare (or its contractors) conducts audits if a healthcare provider or a patient questions how their claim was processed or if Medicare identifies claims that may not be appropriately billed. Medicare analyzes billing data to identify anomalies.

B.  Regardless of who initiates an audit, audits typically have several steps. Medicare requests medical records that support the particular claim, such as doctors' orders and records from the supplier. Once the documentation is received, Medicare may use licensed clinicians to review the records to determine whether the service was medically necessary for the diagnosis or treatment of the patient and whether the medical records support the code billed.

C.  Following an audit, corrective actions can be put in place. One type of corrective action is an overpayment recovery where Medicare seeks repayment of what should not have been paid to the provider. Another type of corrective action is educating the provider on what they should be doing. A third type of corrective action is initiating an investigation of potential fraud. Medicare can also suspend payments to a provider or place a provider on prepayment review. It can also refer a provider to law enforcement for criminal or civil investigation.

D.  Providers can appeal Medicare's audit determinations.

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

3.  Medicare's coverage and reimbursement for durable medical equipment, prosthetics, orthotics, and supplies (hereinafter, "DME"), including:

    A.  A claim for DME generally must be based on an order or referral by a medical provider enrolled with Medicare in order for Medicare to reimburse the DME supplier for the claim. Medicare does not cover DME unless there is a written order from a licensed clinical professional prescribing the DME.

    B.  An order or referral for DME must come from the beneficiary's treating provider.

    C.  The Social Security Act generally restricts coverage of services and items, including DME, to those that are medically reasonable and necessary "for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed member." Part 410 of Title 42 of the Code of Federal Regulations more specifically defines what services and items are medically necessary.

    D.  The scope and conditions of coverage for DME are contained in Title 42, Code of Federal Regulations, Section 410.38.

    E.  DME has period-of-use limits. If Medicare covers a piece of DME for a beneficiary, the beneficiary generally is not eligible to get coverage/reimbursement for another piece of DME of the same or similar type within a certain time frame.

    F.  When ordering certain DME items, such as certain knee braces, the ordering practitioner generally must examine the patient in order for the DME to be considered reasonable and medically necessary under LCDs. For example, the LCD applicable to knee braces requires a provider to examine a patient's knee in order for a knee brace to be considered medically necessary and covered by Medicare. Prescriptions for certain knee braces also require evaluation and documentation concerning joint stability.

    G.  Medicare reimburses for DME at varying rates.

    H.  Claims for DME are typically submitted and paid through interstate wires.

    I.  Medicare would not cover claims if it knew that the claims were based on kickbacks or bribes.

    J.  Mr. Quindoza may discuss additional guidance, including coverage determinations and articles, issued by CMS that govern coverage for DME.

4.  Medicare's coverage and reimbursement for genetic testing, including:

    A.  As a condition of Medicare payment, a physician or other Medicare provider must certify that any genetic testing services performed were medically necessary as required by Title 42, United States Code, Section 1395n(a)(2)(B).

"Accepted" DEC 2 2 2024 *Robert Lean Smith III*

B.  Congress has specifically authorized the Medicare program to cover certain routine screening tests. This includes screenings designed to detect existing cardiac conditions, as well as screenings such as mammograms, colonoscopies, PAP smears, and digital prostate exams, which are designed to detect existing malignancies.

C.  Mr. Quindoza will contrast routine screening tests expressly covered under statute from genetic testing billed in this case, which is not generally eligible for reimbursement by Medicare on the basis that such testing is not reasonable and not necessary. That is, unlike routine screening tests, cancer genetic testing ("CGx"), pharmacogenetic genetic testing ("PGx"), and cardiovascular genetic testing ("cardio genetic testing") generally are not eligible for reimbursement by Medicare unless specific requirements are met. Among other things, laboratory testing must be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 C.F.R. § 411.15(a)(1); 42 C.F.R. § 410.10(e).

D.  Medicare communicates to providers that it does not reimburse for genetic screening services conducted to determine the likelihood that a beneficiary will develop cancer or other conditions in the future. Such testing is considered an "[e]xamination[] performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury" and is generally excluded from coverage.

E.  Medicare will, however, pay for genetic testing performed to aid in the treatment of a beneficiary for a specific medical problem, such as a personal diagnosis of cancer. Generally, however, the test must be ordered by a physician who is treating the beneficiary, and the test results must be promptly used by the physician in the management of the beneficiary's specific medical problem in order to qualify for reimbursement.

F.  Medicare does not cover items and services that are not ordered by the beneficiary's treating physician because CMS has determined that tests not ordered by the physician treating the beneficiary are not reasonable and necessary. *See* Title 42, Code of Federal Regulations, Section 410.32(a).

G.  Mr. Quindoza will also explain Medicare's rules related to providers' record-keeping requirements and requirements related to documenting medical necessity in the patient record in the context of genetic testing. Specifically, Mr. Quindoza will explain that Medicare requires ordering/referring physicians to document medical necessity and other coverage for genetic testing.

H.  Mr. Quindoza may provide examples of scenarios under which CGx, PGx, and cardio genetic testing ordered by a provider (1) would not be considered reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member or (2) would otherwise be ineligible for reimbursement. For example, CGx, PGx, and cardio genetic testing generally would not be considered reasonable and necessary if ordered by a provider who was not treating the beneficiary at the time the provider ordered the testing.

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

I.  Generally, genetic testing has lifetime limits. If Medicare covers CGx, PGx, or cardiovascular genetic testing for a beneficiary, the beneficiary typically is not eligible to get coverage/reimbursement for such testing again.

J.  Medicare reimburses claims for CGx, PGx, and cardio genetic testing at rates varying from approximately a few hundred dollars to several thousand dollars for a panel of tests. Mr. Quindoza will explain that Medicare does not pay for every potential medical service; rather, many services are expressly excluded from coverage.

K.  Claims for genetic testing are typically submitted and paid through interstate wires.

L.  Medicare would not cover claims if it knew the claims were based on kickbacks or bribes.

M.  Mr. Quindoza may discuss additional guidance, including coverage determinations and articles, issued by CMS that govern coverage for genetic testing.

5.  Medicare rules pertaining to telehealth, including:

A.  Telehealth is medical care delivered by electronic means.

B.  Prior to approximately March 2020, CMS permitted providers to deliver services via telehealth under specific circumstances, with the intent to expand access to care in rural areas where access to health care was more limited. *See* 42 C.F.R. §§ 410.2; 410.78; 414.65. CMS required that the interaction between the patient and the doctor must be in real time (i.e., not recorded and replayed for the provider) and also must be by both audio and visual means. Telephonic contact that did not include a visual component did not constitute telehealth under Medicare regulations. The patient was required to reside in a rural area or a health professional shortage area. The patient also was required to go to a qualifying "originating site," which was typically a hospital or other medical facility, while telehealth services were being delivered.

C.  In approximately March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of CMS's telehealth requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their homes.

6.  Opinions regarding the billing data at issue in this case, including:

A.  Mr. Quindoza will apply his knowledge of Medicare rules and regulations regarding claims and reimbursement to the facts of this case.

B.  Mr. Quindoza will answer hypothetical questions drawn from the facts of this case regarding how Medicare coverage guidelines are applied in different scenarios.

C. Mr. Quindoza may testify regarding summary exhibits explaining billing data and billing patterns in this case.

D. Mr. Quindoza may quantify and summarize the amounts billed and paid for DME for particular beneficiaries, as well as by the top referring providers.

E. Mr. Quindoza may convey specific claims information such as the claim number, date of service, billing date, amount billed, procedure codes billed, and associated diagnoses codes reflected in the billing data. Mr. Quindoza may also explain to the jury additional information about the claims that were submitted during the charged conspiracies, as well as information about the beneficiaries' prior treatment history with the referring physicians, as evidenced in claims data.

F. Mr. Quindoza may discuss audits or reviews that Medicare conducted of the providers described in the Indictment as well as correspondence they exchanged with CMS.

G. Mr. Quindoza will authenticate and summarize Medicare claims data.

H. Mr. Quindoza may testify that the DME claims in this case are unusual because of the lack of variety of braces ordered and the geographic dispersion of beneficiaries and referring providers.

I. Mr. Quindoza may testify about the number of braces ordered per beneficiary.

## II.   Qualifications

The following is a list of "the witness's qualifications, including a list of all publications authored in the previous 10 years." Fed. R. Crim. P. 16(a)(1)(G)(iii).

Mr. Quindoza has worked for several Medicare contractors primarily in fraud investigations and public relations. He is currently employed by SafeGuard Services LLC ("SGS") and supports the Southeast and Northeast Unified Program Integrity Contractors ("UPICs"). In his current role, Mr. Quindoza is responsible for support and education for federal law enforcement agencies, training and development of staff, outreach activities relating to fraud and abuse, and coordinating and sharing information with the Centers for Medicare and Medicaid Services ("CMS"), other contractors, and law enforcement agencies. Mr. Quindoza has decades of experience working with Medicare contractors. In addition, he has experience processing claims for payment to Medicare. In the course of his many years in this industry, Mr. Quindoza has become familiar with Medicare rules and regulations and has overseen fraud investigations for Medicare contractors. He is also familiar with analyzing voluminous claims data. He has testified about Medicare and Medicare coverage dozens of times.

Mr. Quindoza has not authored any publications in the previous ten years. He has, however, spoken at conferences and used visual aids (e.g., Microsoft PowerPoint slides) during such conferences.

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

Mr. Quindoza's CV sets out his qualifications in greater detail. Enclosed with this Disclosure is Mr. Quindoza's current CV.

### III.    List of Cases

Mr. Quindoza's CV includes "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Fed. R. Crim. P. 16(a)(1)(G)(iii). Enclosed with this Disclosure is Mr. Quindoza's current CV.

### IV.    Approval & Signature

I, Stephen Quindoza, have reviewed this Disclosure and approve of its contents.

_____                 _____
Stephen Quindoza                                                        Date   12/11/2024

"Accepted" DEC 12 2024 Robert Leon Smith III.

**Testimony at Criminal and Civil Proceedings – 2021 to present**
**Stephen Quindoza**

| Defendant(s) | Case # | Judicial District |
|---|---|---|
| Michael Kestner | 3:19-cr-00095 | MDTN |
| Fadel Alshalabi et. al | 3:21-CR-00171 | MDTN |
| Kuba Zarobkiewicz et. al | SA:22-CR-659-JKP | WDTX |
| David Young MD | 3:21-CR-00417-X | NDTX |
| Muhamad Aly Rifai | 22-390 | EDPA |
| Sophie Toya MD | 2:20-cr-20452 | EDMI |
| Adarsh Gupta | 20-CR-773 | NJ |
| Rahim Shafa<br>Nahid Tormosi Shafa | 20-CR-40021-TSH | MA |
| Olarewaju James Oladipo MD | 22cr10062 | MA |
| Mohamad Och MD | 21-CR-40026-MRG | MA |
| Jose Goyos | 22-cr-80022-AMC | SDFL |
| Trujillo et. al. | 21-CR-20303 | SDFL |
| Sudipta Mazumder | 3:22-dr-00165-MOC | WDNC |
| Elizabeth Hernandez | 22-CR-20152-KMM | SDFL |
| Nelly Anderson | 23-CR-20124-CMA | SDFL |
| Benjamin T. Toh | 33:22-00392 | MDTN |
| Ronald Elfenbein | 22-0146-JKB | MD |
| Daniel Carver et. al. | 22-cr-80022-Cannon | SDFL |
| Michael Stein | 21-CR-20321-Altonaga | SDFL |
| Colby Joyner | 3:22-CR-180 | WDNC |
| Charles C Adams MD et.al. | 4:18-cv-191-HLM | NDGA |
| Frederick Gooding | 19-cr-00255 | DC |
| Gilbert Ghearing | 2:19-CR-00010 | MDTN |
| Jorge Carballo | 19-10559 CF10A | FL Broward County |
| Lawrence Alexander<br>Dean Zusmer | 21-60253-CR-Moore | SDFL |
| Anita Louise Jackson | 5:21-CR-259-D | EDNC |

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

| Defendant(s) | Case # | Judicial District |
|---|---|---|
| Mark Sorensen Paulina Goncharova | 19 CR 745 | NDIL |
| Furman Ford | 5:20-cr-00448-D-1 | EDNC |
| Frederick Gooding MD | 19-cr-00255 | DC |
| Mark Schena | 5:20-00425 EJD | NDCA |
| Lauren Rosecan | 20-80052-CR-RUIZ/Reinhart(s) | SDFL |
| Jesmina Ramirez | 21-CR-20154-KING | SDFL |
| Stroud et al | 3:19-CR-00439-X | NDTX |
| Alice Chu MD | 19-cr-678 | NJ |
| Mark Murphy et al | 5:20-cr-00291-LSC-SGC | NDAL |
| Sherley Beaufils | 1:20-CR-00063-DHB-BKE | SDGA |
| Robert A Burkich MD et al | 1:19-cv-3510-MLB | NDGA |
| Ruiz, et. al. | 21-20111-CR-CMA | SDFL |
| Francisco Patino MD | 18-CR-20451 | EDMI |
| Samson Orusa MD | 3:18-cr-00342 | MDTN |
| Leah and Michael Hagen | 19-CR-146 | NDTX |
| Alexander Istomin | USAO #2018R00160-131 | RI |
| Charles C Adams MD, et. al. | 4:18-cv-191-HLM | NDGA |
| James Litton | 19-CR-20083 | WDTN |
| Jeffrey G. Hedges et al | 5:16-CV-127-BO | EDNC |
| Ivan Andre Scott | 6:19-cr-002909-PGB-LRH | MDFL |

**SafeGuard Services LLC**

**CMS**
CENTERS FOR MEDICARE & MEDICAID SERVICES

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

3450 Lakeside Dr Suite 201
Miramar FL 33027
(904) 431-6143
*stephen.quindoza@peraton.com*

**Stephen Quindoza**
**Fraud Investigations Advisor**

My experience in the Medicare program started over 43 years ago. I have worked for several Medicare contractors primarily in fraud investigations, public relations and education. I became involved with Medicare program integrity activities in 1997 and Medicaid program integrity activities in 2005.

I am employed by SafeGuard Services LLC and I support the following Unified Program Integrity Contractors (UPICs) which protects the healthcare benefits of Medicare beneficiaries and Medicaid recipients in the following states/territories:

- Southeast UPIC: Alabama, Georgia, Florida, Tennessee, South Carolina, North Carolina, portions of Virginia, West Virginia, Puerto Rico, and US Virgin Islands.
- Northeast UPIC: District of Columbia, Maryland, Delaware, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, and Maine and portions of Virginia.

I am responsible for support and education to federal and state law enforcement agencies, training and development of staff, outreach activities related to fraud and abuse, and coordinating and sharing information with the Centers for Medicare and Medicaid Services, other contractors, and law enforcement agencies. I studied business management at Jones College in Jacksonville, Florida.

**Summary of Medicare Experience**

- Program Integrity Operations (27 years):
  *SafeGuard Services* – 2021 to present
  *HMS Federal Solutions/IntegriGuard* (subcontractor to SafeGuard Services) – 2005 to 2021
  *TriCenturion* – 2002 to 2005
  *First Coast Service Options/Blue Cross Blue Shield of Florida* – 1997 to 2002
  - Subject matter expert for law enforcement agencies (i.e., US Dept. of Justice, US Attorney's Offices, State Attorney's Offices, US Department of Health and Human Services Office of the Inspector General, Federal Bureau of Investigations, etc.)
    - Support of law enforcement efforts involving healthcare oversight activities
    - Expert and lay witness for criminal and civil trials
    - Subject specific training to law enforcement (e.g., coverage, claim filing, documentation requirements, administrative actions, reimbursement, program integrity operations)
    - Information resource regarding the Medicare and Medicaid programs
    - Analysis of claims data in support of law enforcement activities
  - Subject specific training to contractor program integrity staff (e.g., program integrity operations; rules, regulations, and policies of the Medicare and Medicaid programs)

**CMS**
CENTERS FOR MEDICARE & MEDICAID SERVICES

**SafeGuard
Services**
LLC

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

- o Fraud awareness education and outreach to healthcare providers, professional associations, Medicare contractors, Medicare beneficiaries, Medicaid recipients, and senior citizen advocacy groups
- o Manage staff responsible for outreach and education activities, staff training, and support of law enforcement efforts

- Provider Outreach and Education (6 years):
  *Blue Cross Blue Shield of Florida* - 1991 to 1997
  - o Subject specific education and outreach (e.g., healthcare provider enrollment, coverage, documentation, claim filing requirements, reimbursement)
  - o Editor of educational and informational publications for healthcare providers

- Training and development for claims processing and customer service staff (2 years):
  *Blue Cross Blue Shield of Florida* - 1989 to 1991
  - o Subject specific training to contractor staff (e.g., coverage requirements, claim processing and documentation requirements, reimbursement, customer service)
  - o Development and maintenance of contractor claims and customer service user manuals

- Customer Service (6 years):
  *Blue Cross Blue Shield of Florida* - 1983 to 1989
  - o Answered inquiries related to claims submissions and information regarding the Medicare program from healthcare providers and Medicare beneficiaries
  - o Conducted retrospective reviews of claim determinations resulting from appeals requested by healthcare providers and Medicare beneficiaries

- Claims Administration (2 years):
  *Blue Cross Blue Shield of Florida* - 1981 to 1983
  - o Processed claims submitted to the Medicare program

**SafeGuard Services LLC**

SafeGuard Services LLC (SGS) is a Unified Program Integrity Contractor, a private company that engages in contracts with the Centers for Medicare and Medicaid Services to perform specific program integrity functions for the Medicare and Medicaid programs.

<u>**Disclosure as to Expert Witness Johanna L. Sullivan, Pharm. D.**</u>

**I.      Statement of Opinions and the Bases and Reasons for Them**

I anticipate that my testimony will include the introductory allegations in the Indictment, specifically, under the heading "Medicare Part C" at paragraphs 16-22 and "Medicare Part D" at paragraphs 23-30.  In addition, I expect to testify to the following:

1.  The Medicare Program:
    a.  Health care coverage under Medicare, including the prescription drug benefit, Medicare Part D, and Medicare Advantage;
    b.  Medicare beneficiary enrollment in the Medicare Part D benefit program and Medicare Advantage;
    c.  Pharmacy enrollment in the Medicare Part D benefit program;
    d.  Funding for the Medicare Part D program;
    e.  Administration of the Medicare Part D program through private drug plan "sponsors," which are prescription drug plans ("PDPs") and Medicare Advantage prescription drug plans ("MAPDs");
    f.  Administration of the Medicare Part C program through Medicare Advantage plans;
    g.  Medicare payment on prescription drug claims through drug plan sponsors and Pharmacy Benefit Managers ("PBMs");
    h.  Medicare Advantage plans' coverage of DME for Medicare Advantage beneficiaries, including medical necessity requirements;
    i.  Medicare prescription drug claims data, or Prescription Drug Event ("PDE") records, which are stored in Medicare's Integrated Data Repository.

2.  Pharmacy Practice Overview:
    a.  Receipt of patient prescription and patient insurance information;
    b.  Use of prescription processing system to transmit information to PBMs, determine drug coverage, submit claims, and print labels;
    c.  Process for filling prescription drugs; and
    d.  Dispensation of prescription drugs to patients, along with collection of payment or co-payment, and offering counseling on the medication.

3.  Foot Bath Medications:
    a.  Paragraphs 37-39 of the Indictment;
    b.  FDA-approved uses and medically accepted indications of certain drugs, including those referenced in the Indictment; and
    c.  CMS alerts and education regarding foot baths.

4.  Anti-Kickback Statute:
    a.  The applicability of the Anti-Kickback Statute to claims submitted to Medicare Part D and Medicare Advantage plans;

Page 1 of 2

"Accepted"   DEC 2 2 2024   Robert Leon Smith III

b. Whether Medicare Part D and Medicare Advantage plans cover claims, including DME and prescription drug claims, that were procured through kickbacks and bribes.

5. Claims Data:
   a. PDE records for GoLiveWell Pharmacy LLC, and providers associated with that entity;
   b. Encounter data for billing to Part C plans by the DMEs referenced in the indictment.

## II.    Qualifications

My qualifications, education, training, and experience are summarized in my CV, attached hereto as Exhibit A. My testimony will be based on my training and experience as an employee at Qlarant, my familiarity with Medicare Part D and Part C rules, protocols, and procedures, and my familiarity with the specific facts of this case. I have not been retained by government counsel and will testify voluntarily in my capacity as a representative of the victim, the Centers for Medicare and Medicaid Services ("CMS"). Accordingly, the government has no retainer agreement with me.

## III.   Publications Authored in the Previous Ten Years

For a list of publications, please refer to my CV attached hereto as Exhibit A.

## IV.    List of Cases During the Previous Four Years in Which I Testified as an Expert at Trial or by Deposition

- Mokbel, et al. Case No. 4:21-cr-00103. Southern District of Texas.
- Hamaed, et al. Case No. 20-CR-20162. Eastern District of Michigan.
- Adrian Talbot. Case No. 21-cr-111. Eastern District of Louisiana.
- Gilbert Ghearing. Case No. 2:19-CR-00010. Middle District of Tennessee.
- Thomas Sachy. Case No. 5:18-CR-048. Middle District of Georgia.
- Steven J. Valentino, et al. Case No: 20-309 Eastern District of Pennsylvania.
- Chun, et al. Case No. 8:20-CR-120-T-02JSS Middle District of Florida.
- Nathan Lucas., D.P.M. Case No. 21-cr-20199-TLP. Western District of Tennessee.

I have been informed that if I learn of testimony that should be disclosed under this rule to notify the government.

I have reviewed and I approve this disclosure.

Date: 12/12/2024

_Johanna L. Sullivan, Pharm. D._

Enclosures

Page **2** of 2

"Accepted"

DEC 2 2 2024

Robert Lee Smith III

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

## Johanna L. Sullivan, Pharm.D.

**EDUCATION**

| | |
|---|---|
| August 1991-May 1995 | Doctor of Pharmacy, with High Honors<br>University of Florida College of Pharmacy<br>Gainesville, Florida |
| June 1995-June 1996 | Specialty Residency in Drug Information Practice<br>Ambulatory Care Specialty Focus<br>The University of Texas Health Science Center at San Antonio and<br>The University of Texas at Austin College of Pharmacy<br>San Antonio, Texas |
| 1997 | Certification in Smoking Cessation<br>University of Pittsburgh Smoking Cessation Program |

**LICENSURE**

Registered Pharmacist in the states of Florida and Texas
Registered Consultant Pharmacist in Florida

**PROFESSIONAL EXPERIENCE**

In addition to the listed employments below, considerable experience over greater than 25 years as a pharmacist as an independent consultant or contractor in a wide variety of pharmacy professional settings.

**Director of Clinical Operations– Investigations Medicare Drug Integrity Contract**
**(I-MEDIC). Contract was originally part of the NBI MEDIC.**
Qlarant – Baltimore, Maryland  (Remote Employee)                                    2019 – Current
- Key Personnel: Pharmacy Expert on Contract for CMS
- Head a team of 25 clinicians working on reviews of medical and drug claim data as well as medical record reviews.
- Clinical Subject Matter Expert for Medications and Pharmacy for Medicare Part D and C data projects and investigations
- Coordination of Pharmacist Review for Internal Investigations
- Coordination of Pharmacist Reviews for External Law Enforcement Requests
- Coordination of Medicare Part D medical record reviews for Medicare Adminstrative Actions
- Clinical and Subject Matter Expert for Legal Testimony in External Law Enforcement Requests related to clinical subjects, Medicare Part D Policy, and payments.
- Training of new staff, contract, and law enforcement partners
- Extensive writing and communication of complex clinical materials. Serve as main editor for clinical staff on clinical documents for CMS.

Major Projects:
- Creation of a automated work que for submission of review requests by investigators.
- Creation of an automated time tracker tool for clinical reviews.
- Creation and implementation of an automated invoice review tool to match drugs by NDC level for loss calculations.
- Creation of a Medicare Part B invoice review for drug and injection codes to assist UPIC.

"Accepted"

DEC 2 1 2024

Robert Leon Smith III

- Implementation of a Level of Evidence Finding for Adminstrative Revocations for Abusive Prescribing with CMS-PEOG.
- Implementaion of a pharmacist review template to improve efficiency of pharmacist reviews.
- Creation of benchmark data and analysis tools in coordination with analytics team to assist in clinical reviews.
- Creation of a Medicare Part C data template to support efficiency in nursing reviews.
- Growth of clinical staff and team to 200% of levels at start of contract by documenting value and need for increased staffing based on value in investigations and external partner support.

**Senior Pharmacist/Pharmacist Lead – National Benefit Integrity Medicare Drug Integrity Contractor (NBI MEDIC)**
Qlarant (formerly Health Integrity) – Baltimore, Maryland  (Remote Employee)                    2014 - 2018
- Clinical Subject Matter Expert for Medications and Pharmacy for Medicare Part D and C projects and investigations
- Coordination of Pharmacist Review for Internal Investigations
- Coordination of Pharmacist Reviews for External Law Enforcement Requests
- Clinical and Subject Matter Expert for Legal Testimony in External Law Enforcement Requests
- Auditing of Medicare Part D Sponsors for Fraud, Waste, and Abuse Recoveries
- Training of new staff on pharmacist reviews
- Quality review and oversight of pharmacist reviews

**Manager**
Myers & Stauffers LLC – Baltimore, Maryland  (Remote Employee)                    2013 - 2014
- Pharmacist Support of Medicare Part D Compliance Audit Programs
- Auditing of Medicare Contracts in Formulary and Coverage Determinations, Appeals, and Grievances
- Knowledge expert for pharmacist staff in Coverage Determinations, Appeals, and Grievances

**Senior Consultant – Subcontractor to Myers & Stauffers LLC**                    2012 - 2013
IMS Health Government Services – Tampa, Florida (Remote Employee)
- Pharmacist Support of Medicare Part D Compliance Audit Programs
- Auditing of Medicare Contracts in Formulary and Coverage Determinations, Appeals, and Grievances
- Training of new pharmacist staff
- Knowledge expert for pharmacist staff in Coverage Determinations, Appeals, and Grievances

**Clinical Services Manager/Clinical Account Manager**                    2010 - 2012
WellDyneRx – Lakeland, Florida
- Restructuring and management of Prior Authorization Department
- Implementation of computerized system for PA department
- Clinical guideline and drug use criteria development
- Clinical account manager responsibilities for all strategic accounts
- Clinical management and compliance for all Medicaid/Medicare accounts
- Ensure clinical and PA compliance with all state and federal regulations for commercial and government payers
- Created opiate management program to facilitate narcotic dose reductions in inappropriately treated patients
- Revision and evalution of all prospective DUR rules and edits
- Executive clinical management of Disease Management Programs
- Design and implementation of prescriber formulary intervention programs
- Clinical formulary analysis and quarterly reporting for strategic accounts
- Development of value-based formularies for clients
- Clinical and data analysis support for RFP responses

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

- Created and implemented prescriber report cards
- Management of clinical staff in multiple sites and locations
- Formulary management and presentations to groups with closed formularies

*Major Projects:*
- Implemented computerized system for Prior Authorizations for multi-site locations
- Created opiate management program for clients.
  - Outcomes:  client acclaim, patients removed from narcotics, medical licensures under investigation by appropriate authorities
- Key player in team responsible for acquiring the biggest managed care client in company history

**Clinical Pharmacy Infusion Manager**                                    2008-2009
Healix Infusion Services- Tampa, Florida
- Selection and dosing of cost-effective  and clinically effective medication regimens for patients
- Clinical monitoring and dose adjustment of medications
- Ordering and inventory of all medications and supplies
- Marketing of infusion services to health providers and systems
- Patient education and counseling
- Scheduling of patients
- Management of  nursing infusion center staff
- Facilitating approval of medications for patients
- Responsible for USP 797 compliance for site

*Major Projects:*
- Opening of brand new licensed infusion pharmacy
- Creation of marketing programs/dinners for health providers and systems

**Clinical Pharmacist**                                    2005- 2008
Pharmacare/CVS Caremark - Bartow, Florida
Polk County Healthcare Program/Diabetes and Cardiovascular Clinic
- Development of outpatient clinical pharmacy clinic for Polk County Employer Client
- Creation of clinical program for diabetes, hypertension, and smoking cessation
- Monitoring, evaluation, and follow-up of patients in program
- Creation of computerized patient database for monitoring and outcomes
- Data review and statistical analysis of patient outcomes
- Presentation of clinical and data outcomes to client and PBM
- Presentation of clinical and data outcomes at AMCP meeting

*Major Projects/Research:*
- Development from "ground up" of clinic and programs
- Outcomes data analysis and presentations showing cost effectiveness of clinic
- Development of template program to CVS/Caremark for marketing to other clients

**Lead Consultant Pharmacist/Consultant Pharmacist**                                    2003-2006
PharMerica- Sarasota, Florida
- Member of Quality Assurance Committees at all assigned nursing homes
- Continuous Quality Improvement in Delivery of Services to Nursing Homes
- Implementing Cost Saving Protocols for Nursing Homes
- Patient-Specific Drug Regimen Review
- Consultant Pharmacist Staff Training, Education, and Management (Lead Consultant)
- Hiring and Evaluations of Consultant Pharmacist Staff (Lead Consultant)
- Clinical Account Management and Marketing to Health Coalitions Groups
- Medication-related Regulatory Compliance Oversight with Nursing Homes

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

- Deployment of National Clinical, Educational and Formulary Initiatives
- Coordination of Formulary Initiatives with Pharmaceutical Partners
- Presentations to Nursing Home Staff (Education)
- Presentation to Nursing Home Management (Quarterly Reports)

***Major Projects/Research:***
- Creation of New Consultant FTE Staffing Model for Pharmacy
- Acetaminophen Toxicity Clinical Initiative
- Pain Management Clinical Review
- Transdermal Narcotic Patch Destruction Policy
- Application of Type IIb pharmacy license for Transitional Living Facility (TLF)

***Teaching:***
- Development of Regular In-services for Nursing Home Staff
- Training and Development of Pharmacy Consultant Staff
- QA Presentations Quarterly Per Nursing Home

**Customer Service Pharmacist**                                      2002-2003
Merck-Medco Health Services – Tampa, Florida
- Clinical Specialist for Drug Information Questions
- Patient Counseling
- Investigated grievances related to prescription errors

**Director of Pharmacy**                                             2001-2002
Kindred Hospital-Bay Area Tampa
- Secretary of Pharmacy, Nutrition, and Therapeutics Committee
- Member of Adverse Drug Event Committee
- Member of Critical Care Committee
- Member of Infection Control Committee
- Pharmacy Staff Scheduling  (Pharmacists and Technicians)
- Pharmacy Staff Training (Pharmacists and Technicians)
- Hiring and Evaluations of Pharmacy Staff (Pharmacists and Technicians)
- Formulary Development and Management
- Clinical Pharmacy Program Development
- Pharmacy Inventory Management
- Installation and Maintenance of Sure-Med Dispensing Units
- Development and Achievement of Pharmacy Budgets
- Development and Lecturing for Pharmacy, Physician, and Nursing Inservices
- Successful Pharmacy Performance in JCAHO and ACHA Surveys
- Narcotics Management and Monitoring
- Medication Use Processes QA/QI to Improve Administrative Processes

***Major Projects/Research:***
- Approval and Installation of Sure-Med Dispensing System
- Creation of Pharmacy Night Cabinet
- Re-Implementation of Nursing Floor Stock
- Re-Implementation of ICU Floor Stock
- Reengineering of Outdated Pharmacy Charge System to Capture Lost Hospital Revenue
- Automatic Interchange Protocols for Epogen/Aranesp, Primaxin/Merrem, and Levaquin/Cipro
- Development and Implementation of Formulary and Non-Formulary Processes
- Creation of Clinical Pharmacy Monitoring Protocols for Antibiotics and Epogen/Aranesp
- Development of Herbal Medication Policy
- Development of IV to PO Policy
- Rewriting Policy and Procedure Manual

***Teaching:***
- Development of Regular Inservices for Nursing, Pharmacy, and Physician Staff

**"Accepted"**
DEC 2 2 2024
*Robert Leon Smith III*

- Training and Development of Pharmacy Staff **(Pharmacists, Technicians)**
- Competency Assessments for Pharmacy Staff (Pharmacists, Technicians), Nursing Supervisors

**Outcomes Research Manager**                                                          1998- 2001
Global Health Outcomes Unit-North America Division
Pharmacia Corporation
- Held Position of Cardiovascular Specialist within Global Health Outcomes Unit
- Market Plans and Analysis for Product Teams (Liaison to Corvert and Fragmin Brand Teams)
- Development of National Yearly Business Plan for GHO Support for Cardiovascular Products
- Assignment of Cardiovascular Projects to other Research Managers for Implementation
- Dissemination of Cardiovascular Study Results within Company and Unit
- Project Manager for Phase IIIb and IV Health Economic and Outcomes Market Support Studies
- Qualification of Investigators/Sites for Company Studies
- Development, Design, and Tracking of Research Protocols
- Consultant on Health Economic and Outcomes Literature for External Customers
- Design and Development of Newsletters, Treatment Guidelines, and Algorithms
- Design and Development of Health-System and MCO-Specific Research Projects
- Market Plans and Analysis for Regional Sales Teams (Four States and National Accounts)
- Market Plans and Analysis for Product Teams (Liaison to Corvert and Fragmin Brand Teams)
- Development of National Yearly Business Plan for GHO Support for cardiovascular products
- Pharmacoeconomic and Research Presentations to Internal and External Customers

*Major Projects/Research:*
- Evaluation of the Effect of Overactive Bladder on Workplace Productivity
- Economic Model for Impact of Overactive Bladder on Employer Groups
- Evaluation and Implementation of a DVT Prophylaxis Guideline
- Implementation and Evaluation of an Outpatient DVT Management Program to Decrease LOS in a MCO
- Creation of a Electronic Ophthalmology Patient Database for Retrospective Research Queries
- Creation of a Computerized DUE for SNF Glaucoma Patients
- Physician Survey on Factors Related to Hospital Discharge on Outpatient Antibiotics
- Implementation and Evaluation of a Depression Treatment Guideline in a Physician Practice Group
- Outcomes Assessment of LMWH Therapeutic Interchange in Multiple Community Hospitals
- Medical and Pharmaceutical Claims Analysis of Glaucoma Patients in a Managed Care Plan
- Compliance and Persistency Evaluation of Overactive Bladder Agents in a Managed Care Plan
- Impact of Patient Adherence on Cost-effectiveness of Drug Therapy in Overactive Bladder
- Practice Use of Pharmacoeconomics in Florida Managed Care Plans and Institutions

**Teaching:**
- Preceptor for UF Pharmaceutical Administration Ph.D. student for industry research project.

**Acting Chief/Assistant Chief**                                                          1996 - 1998
Drug Information and Pharmacoepidemiology Center
The University of Pittsburgh Medical Center and The University of Pittsburgh College of Pharmacy
- Management of clinical pharmacist staff
- Management of drug information pharmacy resident
- Scheduling and coordination of projects and deadlines with clinical pharmacy staff
- Adverse Drug Reaction Subcommittee Secretary
- Drug Information Questions/Consults
- Development of Drug Use and Disease State Management Protocols
- Evidence-Based and Pharmacoeconomic Evaluations of Medications for Formulary Management
- Medication Use Evaluations and Outcomes Evaluations for Formulary Management
- Forecast Assessments for New Pharmaceuticals Impact on Hospital Budget

*Major Projects/Research:*
- Development of a Pharmacy Department Webpage for Information Dissemination
- Pharmacoeconomic Evaluation of Ganciclovir Intravitreal Implant

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

- Pharmacoeconomic Evaluation of Amphotericin B versus ABCD
- Evaluation of CD-ROM Patient-Oriented Pharmaceutical Databases

**Teaching:**

- Main Preceptor in Drug Information Clerkship Rotation for University of Pittsburgh Doctor of Pharmacy Program
- Co-coordinator for Medication Information and Literature Evaluation class for University of Pittsburgh Bachelor of Science in Pharmacy Students
- Course Instructor for Profession of Pharmacy 3 class for University of Pittsburgh Doctor of Pharmacy Students
- Course Instructor in Contemporary Pharmacy Practice class for University of Pittsburgh Bachelor of Science in Pharmacy students
- Journal Club Coordinator for University of Pittsburgh Residency Programs
- Faculty Advisor for Pharmacy Policy Awareness Association for University of Pittsburgh School of Pharmacy
- Faculty Advisor for Doctor of Pharmacy Student

## GRANTS

Unrestricted Grant, Hoechst Marion Roussel, 1996.
Unrestricted Grant, Sequus Pharmaceuticals, 1997.

## PUBLICATIONS AND POSTERS

Odedina FT, Sullivan JL, Nash R, et al.  *Use of Pharmacoeconomic Data in Making Hospital Formulary Decisions.*  American Journal of Health-System Pharmacy.  Vol. 59, Number 15, 2002:1441-1444.

Yaldo A, Sullivan JL, and Li Zhiming.. *Factors Affecting Physicians' Decision Making to Discharge Patients From the Hospital Setting:  A Case Study of Patients with Methicillin Resistant Staphylococcus Aureus (MRSA) Infections.*  American Journal of Health-System Pharmacy.  Vol. 58, 2001:1756-1759.

Yaldo A, Li J, Sullivan JL, and Mozzafarri E. *Factors Affecting Physicians' Decision Making to Discharge Patients From the Hospital Setting:  A Case Study of Patients with Methicillin Resistant Staphylococcus Aureus (MRSA) Infections.*  Abstract and Poster Presentation at American Society of Health-System Pharmacists Annual Meeting, Philadelphia, Pennsylvania, June 2000 and Drug Information Association 36th Annual Meeting, San Diego, CA, June 2000.

Pankaskie M, Sullivan JL.  *Health Care Web Portals.,* Journal of the American Pharmaceutical Association, Vol. 40, Number 1, January-February 2000, pgs. 117-188.

Margheim J, Stroup JW, Sullivan JL, and Vermeulen L.  *Evaluation of Deep-Vein Thrombosis Prophylaxis and Outcomes of Orthopedic Surgical Patients in a 300-Bed Acute Care Hospital,* (P359E), American Society of Health-System Pharmacists Midyear Clinical Meeting, December 8, 1999.

Choi JA, Sullivan JL, Pankaskie M, Brufsky J.  *Evaluation of Consumer Drug Information Databases.,* Journal of the American Pharmaceutical Association, Vol. 39, Number 5, September-October 1999, pgs. 683-687.

Pankaskie M, Sullivan JL.  *On-Line Learning:  Issues and Implications for Pharmacy Practice.,* Journal of the American Pharmaceutical Association, Vol. 38, Number 4, July-August 1998, pg. 508.

Pankaskie M, Sullivan JL.  *On-Line Learning:  Trends in Continuing Education,* Journal of the American Pharmaceutical Association, Vol. 38, Number 3, May-June 1998, pg. 382.

Pankaskie M, Sullivan JL.  *Medical Information on the Internet:  Fool's Gold or 24 Karat?,* Journal of the American Pharmaceutical Association, Vol. 38, Number 2, March-April 1998, pg. 237.

Pankaskie M, Sullivan JL. *Computers Open New Worlds, Pose New Problems,* Journal of the American Pharmaceutical Association, Vol. 38, Number 1, January-February 1998, pg. 101.

Ansani N, Sullivan JL.  *Do Natural Products Guarantee Harmlessness?* , CME in Clinical Practice, UPMC Physician, Vol. 6, Number 8, September 1997, pgs.15-18.

Sullivan JL.  *Strategies for Evaluation of Current Therapeutic Controversies in the Face of Information Overload* , Career Manager, APHA Publication for New Practitioners, On-line Publication, August 1997. (http://www.aphanet.org/APHA/main/quality/carman.html)

"Accepted"   DEC 2 2 2024   Robert Lena Smith III

## PUBLICATIONS AND POSTERS  (CONTINUED)

Sullivan JL.  *Treating Systemic Fungal Infections with Amphotericin B Products* , CME in Clinical Practice, UPMC Physician, Vol. 5, Number 11, November 1996, pgs.13-15.

Sullivan JL, Knodel LC. *Caffeine Toxicity:  Is it Time to Switch to Decaffeinated?*,  Toxic Substance Mechanisms, Vol. 15, Number 2, April-June 1996, pgs. 145-147.

Sullivan JL. *Foscarnet*, Nursing Newsletter, H. Lee Moffitt Cancer Center, June 1993.

## SCIENTIFIC REVIEW/EDITOR

Co-Editor, Pharmacoinformatics Column, *Journal of the American Pharmaceutical Association*.  1998-2001.

Reviewer, *Journal of the American Pharmaceutical Association* 1997-2001.

Editor, Current Therapeutic Issues, *UTHSCSA Drug Information Newsletter*, Vol. 10, Number 2, Fall 1995.

## PUBLIC INTERVIEWS

*Stability and Proper Storage of Medications,* tip sheet developed for UPMC News Bureau for Press Release, Pittsburgh, Pennsylvania, August 1, 1997.

*Ocular Side Effects of Drugs*, telephone interview for HealthWise  a consumer information magazine for Blue Cross/Blue Shield of Pennsylvania, Pittsburgh, Pennsylvania, April 2, 1997.

*DHEA and Melatonin*,  AgeWise Weekly , television program, WQEX 16, Pittsburgh, Pennsylvania, March 19, 1997.

*Aspirin*, Our Healthy Community , radio program, WCXJ 1550, Pittsburgh, Pennsylvania, February 7, 1997.

## PRESENTATIONS

*Invited*

*DEA Listening Sessions: Telemedicine Regulations on Prescribing Controlled Substances.* September 12, 2024.

*Generic Cost Manipulation. (co-presented)* Schemes for Health Care Fraud Investigators and Analysts Program. National Health Care Anti-Fraud Association (NHCAA). April 2022.

*I-MEDIC Invoice Reconciliation Training. (co-presented)* Presented to Department of Justice and Office of the Inspector General staff nationally via Zoom, January 2022.

*Generic Cost Manipulation. National Health Care Anti-Fraud Association (*NHCAA) Annual Training. Co-Presented Virtually. November 2021.

*Generic Cost Manipulation.*Co-Presented at CMS-Center for Program Integrity Meeting. August 2021.

*I-MEDIC Overview.* Presented Virtually to Federal Employee Program Special Investigations Unit Staff. April 2021.

*Fraud Investigation Challenges During COVID-19..* Co-Presented at CMS-Center for Program Integrity Meeting to Medicare Part C and D Sponsors. July 2020.

*Department of Justice EDPA Training: Invoice Reviews.* Presented Virtually May 2020.

*HHS/OIG/OI Part C and D Trainings: Invoice Reviews.* Multiple sessions presented virtually to different geographic regions. May 2020.

*Telemarketing/Telemedicine Schemes.* CMS-CPI Virtual Meeting. January 2020.

*Footbath Scheme:* 2019 Medicare Advantage Organizations & Prescription Drug Plans Fraud, Waste, and Abuse Training. CMS-CPI. Miami, Florida. July 2019.

*Transmucosal Immediate Release Fentanyl (TIRF) Project and Investigations:* 2019 Medicare Advantage Organizations & Prescription Drug Plans Fraud, Waste, and Abuse Training. CMS-CPI. Miami, Florida. July 2019.

*CMS Opioid Collaboration Missions:* Tampa, Florida. April 2019.

*Opioid Presentation.* Medicare Parts C&D Fraud, Waste, and Abuse Collaboration Missions. Baltimore, MD. October 2018.

*NBI MEDIC Opioid Related Pharmacist Reviews.* Presented on HHS-OIG community of practice call per invitation. October 2018.

"Accepted"

DEC 2 7 2024

*Robert Leon Smith III*

*CMS Opioid Collaboration Missions:* Miami, Florida. August 2018.

*Fraud in Compounding.* Annual Training to State of Florida Pharmacy Inspectors. Orlando, Florida. May 2018.
*Prescriber Risk Score: Schedule II Controlled Substances,* a breakout group discussion at CMS Fraud, Waste, and Abuse Meeting. Miami, Florida, September 2016.
*Controlled Substance Refills,* a breakout group discussion at Centers for Medicare and Medicaid Services (CMS) Fraud, Waste, and Abuse Meeting. Baton Rogue, Louisiana, September 2014.
*Cost-Effective Medication Management in Medicare Populations,* a presentation to Florida Healthcare Association, Miami Chapter. Miami, Florida, May 2004.
*Cost-Effective Medication Management in Medicare Populations,* a presentation to Florida Healthcare Association, Sarasota Chapter. Sarasota, Florida, March, 2004.
*Outcomes Research Exchange: An Interactive Discussion of Challenges and Solutions,* an ACPE presentation given at the Academy of Managed Care Pharmacy Annual Meeting. Phoenix, Arizona, April 6, 2000.
*Outcomes Research: A Pharmaceutical Industry Perspective,* Department of Pharmacy Administration Seminar at the University of Florida College of Pharmacy. Gainesville, Florida, March 29, 2000.
*Outcomes Research Forum: A Proposal,* given to the Pharmaceutical Industry Relations Committee (PIRC) of the Academy of Managed Care Pharmacy. Minneapolis, Minnesota, April 29, 1999.
*Age and Gender Specific Pharmacy: Incontinence,* ACPE Presentation at the Florida Society of Health-System Pharmacists Annual Meeting in Orlando, Florida, August 20, 1999.
*Skills Enhancement Workshop: Technology for the Patient Care Pharmacist.* Gave presentation on CD-ROM Databases at American Pharmaceutical Association Meeting in San Antonio, Texas, March 7, 1999.
*Health Economics and Outcomes Research,* ACPE Presentation at Perspectives in Healthcare, a MedEcon Regional Meeting for Hospital Administrators and Pharmacists, Atlanta, GA, October 15, 1998.
*Herbal Information Resources,* part of Herbal Science Symposium at the American Pharmaceutical Association Meeting in Miami, Florida, March 12, 1998.
*Documenting Your Teaching,* part of Welcome and Orientation for Incoming Professors at the University of Pittsburgh. Given to University of Pittsburgh Faculty Hired in the Last Five Years, Pittsburgh, Pennsylvania, August 25, 1997.
*Pharmacologic Treatment of Nicotine Addiction,* part of CE symposium Tobacco Use: Prevention & Cessation Strategies for Health Care Professionals for Pittsburgh Cancer Institute. Given to Dentists and Dental Hygienists, Pittsburgh, Pennsylvania, April 30, 1997.
*Pro-Active Career Planning for Junior Faculty,* Junior Faculty at the University of Pittsburgh, Pittsburgh, Pennsylvania, January 27, 1997.
*Cost-effective Prescribing of Antibiotics,* CME Presentation to Physicians in UPMC outreach hospital, PA, October 9, 1996.
*Physician s Online,* Dolph Briscoe Medical Librarians, San Antonio, Texas, May 2, 1996.
*Drug Treatment of Parkinson's Disease,* Parkinson's Disease Support Group, Gainesville, Florida,         June 1995.
*Drug Treatment of Parkinson's Disease,* Parkinson's Disease Support Group, Inverness, Florida, February 1995.
*Careers in the Health-Care Field,* Junior High School Students, Jacksonville, Florida, January 1995.
*Drug Treatment of Parkinson's Disease,* Parkinson's Disease Support Group, Ocala, Florida, August 1994.
*Butorphanol-Should It Be a Schedule Drug?,* FPA House of Delegates, Naples, Florida, July 1994.
*Opportunities in Pharmacy,* students at Hawthorne High School, Hawthorne, Florida, October, 1993.

**Intramural**

*Revocations Training. I-MEDIC Clinical Team.* Presented via Zoom. August 2021.
*Invoice Review Process.* I-MEDIC Annual Training. Presented via Zoom. June 2022.
*SME Open Forum/Panel.* I-MEDIC Annual Training. Presented via Zoom. November 2021.
*Emerging Trends in Clinical Fraud Investigations.* I-MEDIC Annual Training. Easton, Maryland. Noevumber 2019.
*Investigators and Clinical Reviews.* I-MEDIC Annual Training. Easton, Maryland. Novermber 2019.
*How to be a Witness. Co-presented with legal counsel. I-MEDIC Clinical Team.* Presented via Zoom. August 2021.
*Revocation Assessment for Clinical Staff.* I-MEDIC Clinical Team. Presented via Zoom. February 2021.

"Accepted"   DEC 2 2 2024   Robert Leon Smith III

*Collaboration and Challenges in the Time of COVID-19.* Qlarant All Associates Meeting. Co-Presented Virtually with UPIC SW, UPIC W, and NBI MEDIC. May 2020.

**PRESENTATIONS (CONTINUED)**

*Poison Prevention Presentations.* Dale Mabry Elementary School and Seaborn Day School. March-May 2009.

*Quality Assurance Quarterly Presentations: Various Nursing Homes,* Florida. March 2003-July 2005.

*The Economic Impact of OAB,* UroNet Program for Urologists from State of New York, Bal Harbour, Florida, March 5, 1999.

*Medical Economics and the Impact of Oaveractive Bladder: An Update,* Pinnacle Program for Urologists for States of Florida and Alabama. Miami, Florida, August 14, 1999.

*Pharmacoeconomics,* Pharmaceutical Outcomes Management Class for Doctor of Pharmacy Students at the University of Florida College of Pharmacy, Gainesville, FL, October 28, 1998.

*Tizanadine Review*, UPMC Formulary Subcommittee, Pittsburgh, PA, August 26, 1997.

*Pharmacoeconomics*, University of Pittsburgh Pharmacy Residents, Pittsburgh, PA, July 10, 1997.

*Donepezil Review*, UPMC Pharmacy and Therapeutics Committee, Pittsburgh, PA, July 8, 1997.

*Literature Evaluation and Journal Club*, University of Pittsburgh Pharmacy Residents, Pittsburgh, PA, July 1, 1997

*Donepezil Review*, UPMC Formulary Subcommittee, Pittsburgh, PA, June 24, 1997.

*Computerized Pharmacy Resources*, Introduction to Medical Informatics Class for the University of Pittsburgh School of Information Sciences, Pittsburgh, PA, June 13, 1997.

*Amphotericin B Lipid Products*, UPMC Pharmacy and Therapeutics Committee, Pittsburgh, PA, May 13, 1997.

*Amphotericin B Lipid Products*, UPMC Formulary Subcommittee, Pittsburgh, PA, April 22, 1997.

*Natural Products: Part 2*, Contemporary Pharmacy Practice Class for Bachelor of Science in Pharmacy students, Pittsburgh, PA, March 28, 1997.

*Natural Products: Part 1*, Contemporary Pharmacy Practice Class for Bachelor of Science in Pharmacy students, Pittsburgh, PA, March 26, 1997.

*Diabetes: Glucose Monitoring*, Contemporary Pharmacy Practice Class for Bachelor of Science in Pharmacy students, Pittsburgh, PA, March 21, 1997.

*Use of TPA in Stroke*, UPMC Pharmacy and Therapeutics Committee, Pittsburgh, PA, February 11, 1997.

*Ganciclovir Intravitreal Implant*, UPMC Pharmacy and Therapeutics Committee, Pittsburgh, PA, November 12, 1996.

*The Clinical Trial: Discussion, Bibliography, Application in Clinical Practice*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, December 2, 1997.

*The Clinical Trial: Interpreting Graphs and Tables*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 25, 1997.

*The Clinical Trial: Results, p-values, Type I and Type II errors*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 20, 1997.

*The Clinical Trial: Methods, Sampling, Sample Size, Randomization, Blinding*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 18, 1997.

*The Clinical Trial: Methods, Study Design, Inclusion and Exclusion Criteria, Controls, Outcome Variables*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 13, 1997.

*The Clinical Trial: Title, Abstract, Introduction, The question* , with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 11, 1997.

*Meta-analysis/Review Articles*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 6, 1997.

*Descriptive Papers and Descriptive Statistics*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, November 4, 1997.

*Variables/Types of Data, Descriptive Statistics*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, October 30, 1997.

"Accepted"

DEC 2 2 2024

Robert Len Smith III

*Introduction to Drug Literature Evaluation/Categorizing Primary Literature*, with Gary Stoehr to Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy Students, Pittsburgh, PA, October 28, 1997.

*Maximizing the Utility of Information Provided by Pharmaceutical Manufacturers*, Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy students, Pittsburgh, PA, September 23, 1997.

*Searching the Internet for Medical Information*, Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy students, Pittsburgh, PA, September 17, 1997.

*On-Line Drug Information Resources*, Medication Information and Literature Evaluation Class for Bachelor of Science in Pharmacy students, Pittsburgh, PA, September 16, 1997.

*Evaluation of Information from Pharmaceutical Manufacturers*, Biostatistics and Literature Evaluation Class for Doctor of Pharmacy students, San Antonio/Austin, TX, April 29, 1996.

*Meta-analysis: Powerful evaluative tool or meta-mess?*, Biostatistics and Literature Evaluation Class for Doctor of Pharmacy students, San Antonio/Austin, TX, April 22, 1996.

*Toxicity of Nutraceuticals*, South Texas Poison Center Specialists, San Antonio, TX, April 9 and 12, 1996.

*Peripheral Vasculature and Pulses Laboratory*, Physical Assessment Laboratory Class for Doctor of Pharmacy students, Austin, TX, March 1, 1996.

*Postmenopausal Hormone Replacement Therapy and the Risk of Breast Cancer*; Resident Rounds presentation to Pharmacy Faculty, San Antonio/Austin, TX, January 12, 1996.

*Drug Information Centers*, South Texas Poison Center Specialists, San Antonio, TX, April 2, 1996.

*Adverse Drug Reaction Reporting,* Pharm.D. students in Introduction to Drug Information Course, PHR 180T, The University of Texas at Austin College of Pharmacy, Austin/San Antonio, Texas, November 28, 1995.

*Asthma,* Advanced Pharmacotherapy I Laboratory session with Pharm.D. students, The University of Texas at Austin College of Pharmacy, Austin, Texas, November 21, 1995.

*ASHP Midyear,* Pharm.D. Students at The University of Texas at Austin College of Pharmacy, Austin/San Antonio, Texas, November 17, 1995.

*Formulary Inservice,* Clinic Staff at The Community Clinic, Inc., San Antonio, Texas, October 25, 1995.

*Use of the "Morning-after" Pill in a Pediatric Emergency Room:  Practical Guidelines,* Hospital Staff at All Children's Hospital, St. Petersburg, Florida, April 1995.

*Hypertension Treatment in the Elderly,* Pharmacy Staff at Driftwood Pharmacy Services, Lake Mary, Florida, March 1995.

*Therapeutic Advances in the Treatment of Depression,* Pharmacy Staff at Florida Hospital, Orlando, Florida, March 1995.

*Poison Prevention,* Kindergarten through Sixth Grade Students at Ochwilla Elementary, Ochwilla, Florida, January 1995.

*IV Magnesium in Acute Asthma,* University Medical Center Pharmacy Staff, Jacksonville, Florida, January 1995.

*Common Chemotherapeutic Regimens,* Internal Medicine Team at V.A.M.C., Gainesville, Florida, November 1994.

*Adverse Drug Reactions with Chemotherapy,* Internal Medicine Team at V.A.M.C., Gainesville, Florida, November 1994.

*Famvir Drug Monograph,* H. Lee Moffitt Cancer Center Clinical Pharmacists, Tampa, Florida, September 1994.

*Treatment of Post-Herpetic Neuralgia,* H. Lee Moffitt Cancer Center Clinical Pharmacists, Tampa, Florida, September 1994.

*Nitrate-Free Intervals,* Outpatient Pharmacy Staff at Shands Hospital, Gainesville, Florida, August 1994.

*Antidiabetic and Antihyperlipidemic Agents,* Cardiac Rehabilitation Patients at JFK Medical Center, Atlantis, Florida, July 1994.

*Current Treatment Guidelines for Hypertension,* Pharmacy Staff at JFK Medical Center, Atlantis, Florida, July 1994.

*Gabapentin Monograph,* H. Lee Moffitt Cancer Center Clinical Pharmacists, Tampa, Florida, June 1994.

*Butorphanol-Should it be a schedule drug?,* H. Lee Moffitt Cancer Center Clinical Pharmacists, Tampa, Florida, June 1994.

*Drug Treatment of Parkinson's Disease,* University of South Florida Family Practice Physicians and Medical Students, Tampa, Florida, May 1994.

*Ask First: Poison Prevention Presentation,* kindergarten and first-grade students in elementary schools, Gainesville, Florida, April 1994.

## TEACHING, MENTORING, AND ADVISING

- Faculty Advisor, WPPD (Working Professional Pharm.D. Program), University of Florida College of Pharmacy, 2009.
- Clinical Affiliate Assistant Professor, Department of Health Care Administration at the University of Florida College of Pharmacy, 2000 to present
- Faculty Advisor, UF College of Pharmacy Graduate Student, Department of Health Care Administration at the University of Florida College of Pharmacy, 2000-2001.
- Adjunct Assistant Professor, Division of Economic, Social & Administrative Sciences, FAMU College of Pharmacy & Pharmaceutical Sciences, 2000-2003
- National Lecturer, University of Pittsburgh Smoking Cessation Program, 1997-2001
- Assistant Professor, Department of Pharmacy Practice, College of Pharmacy at the University of Pittsburgh, 1996-1997
- Clinical Instructor, Clinical Pharmacy Program, College of Pharmacy at the University of Texas Health Science Center at San Antonio and the University of Texas at Austin, 1995-1996
- Organic Chemistry Laboratory Teaching Assistant, Department of Chemistry, University of Florida, 1991

## PROFESSIONAL ORGANIZATIONS

*National*

Academy of Managed Care Pharmacy
Member of the Taskforce on Outcomes Research Forum
American College of Clinical Pharmacy
American Pharmaceutical Association
Delegate for APPM at annual convention in Miami, FL, March 1998.
Delegate for APPM at annual convention in Los Angeles, CA, March 1997.
American Society of Health-System Pharmacists
Consortium for the Advancement of Medication Information, Policy, and Research
Kappa Epsilon
Phi Lambda Sigma
Delegate for University of Florida at annual convention in Dallas, TX, March 1993.
Speaker of the House of Delegates in Orlando, Fl, March 1994.
Rho Chi
Delegate for University of Florida at annual convention in Seattle, WA, March 1994.

*State and Local*

Alachua County Association of Pharmacists
Florida Pharmacy Association
Member of the Educational Committee 1999-2000
Member of the Florida Foundation Board, 2000-2002
Florida Society of Hospital Pharmacists
Delegate for University of Florida at Annual Convention in Orlando, Fl

## COMMUNITY SERVICE

Troop Leader for Girl Scout Troop #640, 2010-2016
Children's Family Resource Advisory Board, Central Tampa 2014-2021
(Served as Vice-President and Treasurer of Board)
H.B. Plant High Danceros Team Communications Parent 2022-2023

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

**REFERENCES**
Available Upon Request

"Accepted" DEC 2 2 2024 Robert Lean Smith III

## Disclosure as to Expert Witness Dr. Warren Joseph

### I.    Statement of Opinions, Bases, and Reasons

The following is "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed under [Rule 16](b)(1)(C), and the bases and reasons for them."  Fed. R. Crim. P. 16(a)(1)(G)(iii).

#### a.  *Bases for Testimony*

Dr. Joseph's opinions are based on his education, personal medical training, research, interactions with patients, interactions with other physicians, and experience in the fields of podiatric medicine and infectious diseases.  Dr. Joseph will help the jury understand the nature and appropriate uses of the medications contained in the foot bath prescriptions at issue in this case.  He will also help the jury understand the risks and limitations of prescribing these medications in the foot bath form.  Dr. Joseph may also review foot bath prescriptions and recordings of conversations between the Defendant and beneficiaries in this case concerning the foot bath medications.  If asked to do so, he may provide his opinion as to whether the records demonstrate that the foot bath medications were medically reasonable and medically necessary.

#### b.  *Opinions and Summary of Anticipated Testimony*

The Government anticipates Dr. Joseph's testimony may cover the following topics.   The Government anticipates Dr. Joseph's testimony will bear on whether the foot bath medications in the prescriptions the Defendant sold to pharmacies were medically unnecessary and ordered in the absence of a valid practitioner-patient relationship and examination.

- The Government anticipates that Dr. Joseph's testimony (1) will describe what vancomycin, clindamycin phosphate, and ketoconazole are, (2) will explain the purpose of these medications and their clinically appropriate use, (3) will explain the conditions for which foot bath medications were prescribed in this case, how those conditions are diagnosed, and what the clinically appropriate treatment for those conditions is, and (4) will discuss his review and analysis of the manner in which the foot bath medications were prescribed and used in this case and render an opinion on the propriety of the same.

- Dr. Joseph may answer hypothetical questions based on the facts of this case and opine whether the foot bath medication prescriptions described in hypotheticals were medically necessary and prescribed in accordance with an appropriate practice of medicine.

- Dr. Joseph will explain that the foot bath prescriptions in this case instructed patients to fill a soaking device with warm water, dissolve antibiotic medications (vancomycin capsules and a clindamycin phosphate solution) in the device, soak their feet in the device, and then apply ketoconazole cream on their feet after drying them.  Dr. Joseph will explain that aside from the application of ketoconazole on dry feet, which can treat fungal foot

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

infections, there is no scientific medical evidence to support the use of such foot baths in the treatment of bacterial or fungal infections of the foot.   He will testify that dissolving capsules of antibiotics meant to be taken orally or adding other antibiotics or antifungals to these foot baths has not been researched for efficacy or safety and has no place in the practice of podiatric medicine.

- Dr. Joseph may also review documents and recordings that have been produced to the Defendant and offer opinions on those documents and recordings based on his extensive relevant training and experience as described in Dr. Joseph's curriculum vitae ("CV"). For example, Dr. Joseph may offer opinions on the lack of medical necessity of foot baths prescribed to patients in this case for conditions such as general foot pain, foot swelling, ingrown nails, and diabetic neuropathy.   The government anticipates that Dr. Joseph will testify that the foot baths would not be medically necessary or appropriate for such conditions and that the medications contained in the foot baths—even if used as intended—cannot be properly prescribed without a medical professional examining a patient to determine the need for the antibiotic or antifungal medications.

- The Government anticipates Dr. Joseph will testify that the way the foot bath medications were used in this case could be harmful to patients.  Inappropriate uses of antibiotics and antifungals can lead to drug resistant organisms which is a growing problem throughout the world.   Vancomycin is one of the most commonly used antibiotics to treat methicillin resistant Staphylococcus aureus (MRSA), a significant drug resistant bacterium. Exposing patients to this antibiotic in a foot bath, for which it is not indicated, could cause a change in that patient's skin flora selecting out organisms resistant to the drug if needed in the future.  Additionally, there is the concern of having a patient with diabetes soak their feet at all. Soaking the feet of patients with diabetes for any reason has not been recommended since the 1980s. There is the risk of the patient with diabetic neuropathy (loss of feeling) burning themselves with water that is too hot. There is also the risk of causing skin breakdown because of over hydration (maceration) of the tissues, particularly between the toes, or excessive drying of the skin. This can lead to the possibility of secondary bacterial infection from the tissue break down.

- Dr. Joseph may also testify concerning the impropriety and risks of the Defendant, who is not a medical professional, explaining the foot bath medications to patients and answering patient questions about their need for the medications.   He may listen to recordings of the Defendant's calls with patients and provide his opinion on whether the Defendant provided medically misleading information or advice to patients.

- Dr. Joseph may also testify regarding the lack of individualization across the foot bath prescription forms in this case.   He will explain what types of progress notes and information he would expect to see in records where a valid patient-practitioner encounter

"Accepted"   DEC 2 2 2024   Robert Leon Smith III

took place and will contrast that with the templated and barebones prescription forms in this case.

## II.   Qualifications

The following is a list of "the witness's qualifications, including a list of all publications authored in the previous 10 years."  Fed. R. Crim. P. 16(a)(1)(G)(iii).

### a.   Qualifications

Dr. Joseph is a podiatrist who specializes in the field of infectious diseases ("ID").  He graduated from the Wm. Scholl College of Podiatric Medicine in Chicago, IL with a Doctor of Podiatric Medicine (DPM) degree in 1982.  Following graduation, he served a two-year residency in podiatric medicine and surgery at St. Joseph Hospital in Philadelphia.  Upon completion of his residency, Dr. Joseph was the first podiatrist to ever complete a formal fellowship in infectious diseases (ID) at Hahnemann University Hospital.

After his ID fellowship, Dr. Joseph joined the faculty of what is now the Temple University School of Podiatric Medicine in Philadelphia.  For 15 years he taught a course on lower extremity infectious diseases and ran a diabetic ulceration clinic.  During this time, he was on hospital staff with both podiatric and ID privileges at hospitals in Philadelphia including Temple University Hospital and Presbyterian Medical Center.  He also maintained a faculty appointment in ID at the Temple Univ. School of Medicine where he assisted in the training of MD students, residents and fellows. He was the first podiatrist ever elected as a Fellow of the Infectious Diseases Society of America (FIDSA) for recognition of his work in the field of ID.

Dr. Joseph left Temple University in 2000 and has been on staff at a number of hospitals in the Philadelphia region including the Veterans Affairs Medical Center in Coatesville, PA and Roxborough Memorial Hospital.  He now resides part-time in Arizona and is an Adjunct Clinical Professor at the Arizona College of Podiatric Medicine at Midwestern University, Glendale, AZ where he teaches lectures on ID and is the Director for the course on Research and Evidence Based Medicine.

### b.   Publications

Dr. Joseph has authored around 100 scientific papers, abstracts, monographs, book chapters and 3 editions of his own book, all dealing with the treatment of bacterial and fungal infections of the lower extremity.  He is an author of the Infectious Diseases Society of America Diabetic Foot Infection Clinical Practice Guidelines, which are widely accepted for guidance on the treatment of foot infections in patients with diabetes.  For a list of Dr. Joseph's publications, please refer to his CV, which is attached to this disclosure as Exhibit A.

III.    **List of Cases During the Previous Four Years in Which Witness has Testified as an Expert at Trial or by Deposition (Fed. R. Crim. P. 16(a)(1)(G)(iii))**

Within the last four years, Dr. Joseph has testified as an expert in one trial, *United States v. Nathan Lucas, D.P.M.*, Case No. 21-cr-20199-JTF (WDTN).

Dr. Joseph has been informed that if he learns of testimony that should be disclosed under this rule to notify the government.

Sincerely,

GLENN S. LEON
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By:    /s/ Andrea Savdie
Andrea Savdie, Trial Attorney
Michael McCarthy, Trial Attorney
Ralf Owen Dunn, Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
Savdie: (202) 262-6453
McCarthy: (202) 923-7822
Dunn: (202) 993-4824

I have reviewed and I approve this disclosure.

Date: 12/11/24

Warren S. Joseph, DPM, FIDSA

Enclosures

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

# C U R R I C U L U M   V I T A E

## Warren S. Joseph, D.P.M., FIDSA

### *PERSONAL*

| | | |
|---|---|---|
| Business Address: | 420 S York Rd., Unit 17C<br>Hatboro, PA 19040 | |
| Business Phone: | (215) 680-3339 | |
| Email | wsjoseph@comcast.net | |
| Home Addresses: | 420 S York Rd., Unit 17C<br>Hatboro, PA 19040 | 940 W Park Ridge Dr<br>Sedona, AZ 86336 |
| NPI Number: | 1801907340 | |
| Birthplace: | Philadelphia, PA | |
| Date of Birth: | May 5, 1956 | |
| Citizenship: | USA | |

### *EDUCATION AND TRAINING*

| UNDERGRADUATE SCHOOL | DATES | DEGREE/YR/SUBJECT |
|---|---|---|
| University of Pennsylvania<br>Philadelphia, Pennsylvania | 1974-78 | B.A. 1978, Biology |

| PROFESSIONAL SCHOOL | | |
|---|---|---|
| William M. Scholl College<br>Of Podiatric Medicine<br>Chicago, Illinois | 1978-82 | D.P.M. magna cum laude, 1982 |

"Accepted" DEC 2 2 2024 Robert Leon Smith III

**Warren S. Joseph, D.P.M.**                                    **Curriculum Vitae**

GRADUATE MEDICAL EDUCATION

|  |  |  |
|---|---|---|
| Residency, Podiatric Medicine/Surgery | 1982-84 | St. Joseph's Hospital<br>Philadelphia, PA |
| Fellowship, Infectious Diseases | 1984-85 | Hahnemann University<br>School of Medicine |

LICENSURE

| | | |
|---|---|---|
| Arizona | 0796 | 2014-present |
| Pennsylvania | SC-002447-L | 1982-present |
| Illinois | 016-003375 | 1982(Inactive) |
| Florida | PO-0001691 | 1985(Inactive) |

BOARD CERTIFICATION

| | | |
|---|---|---|
| American Board of Podiatric<br>Medicine | #1840 | 1994 |

***APPOINTMENTS***

ACADEMIC

| | |
|---|---|
| Clinical Professor (Adjunct)<br>Dept. of Podiatric Medicine and Orthopedics<br>Temple University School of Podiatric Medicine | 2006-2011 |
| Adjunct Professor in Podiatric Medicine<br>Midwestern University<br>College of Health Sciences<br>Podiatric Program (AzPod) | 2007-2009 |
| Adjunct Clinical Associate Professor<br>Dr. William Scholl College of Podiatric<br>Medicine at Rosalind Franklin Univ of<br>Medicine and Science | 2005-2006 |

-2-

"Accepted"   DEC 2 2 2024   Robert Lon Smith III.

**Warren S. Joseph, D.P.M.**                                   **Curriculum Vitae**

Adjunct Associate Professor of Internal Medicine                1999-2002
Section of Infectious Diseases
Temple University School of Medicine
Philadelphia, PA

Associate Professor of Medicine                                 1990-2000
Chief, Section of Infectious Diseases
Temple University School of Podiatric Medicine

Adjunct Clinical Professor                                      2019- present
Arizona College of Podiatric Medicine (AZCPM)
Midwestern University
Glendale, AZ

HOSPITAL

Podiatric Infectious Disease Consultant
    St. Joseph's Division - North Philadelphia Health System
    Philadelphia, PA                                            1984-1994

Podiatric Infectious Disease Consultant.
Attending in Division of Podiatric Surgery
    Cooper Hospital/Center City
    Philadelphia, PA                                            1985-1993

Attending in Division of Podiatric Surgery
    Hospital of the Philadelphia College of
    Osteopathic Medicine - Parkview Division
    Philadelphia, PA                                            1985-1994

Podiatric Infectious Diseases Consultant
    Girard Division - North Philadelphia Health System
    Philadelphia, PA                                            1990-1994

Div. of Podiatric Medicine/Dept. of Surgery
    University of Pennsylvania Health System
    Presbyterian Medical Center
    Philadelphia, PA                                            1994-2021

-3-

**Warren S. Joseph, D.P.M.**                                   **Curriculum Vitae**

"Accepted" DEC 2 2 2024 *Robert Leon Smith M*

> Section of Infectious Diseases/Dept. of Internal Medicine
> > Temple University Hospital
> > Philadelphia, PA                                    1990-2001

> Podiatric Consultant/Department of Primary Care
> > Veterans Administration Medical Center
> > Coatesville, PA                                    2001-2011

> Div. of Podiatric Surgery/Dept. of Surgery          2007-2022
> > Roxborough Memorial Hospital
> > Philadelphia, PA

> Consulting Staff                                    2020-2023
> > Verde Valley Medical Center
> > Northern Arizona Healthcare
> > Cottonwood, AZ

### _PROFESSIONAL ACTIVITIES_

> EDUCATIONAL – 1st PROFESSIONAL DEGREE LEVEL

> > Course Director - Podiatric Infectious Diseases
> > Spring Trimester, 3rd year curriculum                1987-2000

> > Wound Dressing Workshop-Principles of Primary Care Course
> > Spring Trimester, 2nd year curriculum                1989-2000

> > Course Director – Evidence Based Medicine/Research    2020 – present
> > Arizona College of Podiatric Medicine
> > Midwestern University, Glendale, AZ

> > "PROFESSOR OF THE YEAR" AWARD –Class of 2001          2000

-4-

"Accepted" DEC 2 2 2024 *Robert Leon Smith III*

**Warren S. Joseph, D.P.M.**                                    **Curriculum Vitae**

EDUCATION – RESIDENCY LEVEL

    Director of Podiatric Medical Education                            1995-1998
    Primary Podiatric Medicine Residency Training Program
    Presbyterian Medical Center/University of Pennsylvania Health System

CLINICAL

    Co-Director Ulceration/Vascular Clinic                             1986-1999
    Foot and Ankle Institute

    Attending Faculty – Foot & Ankle Institute                         1986-2000
    Diagnosis Section

    Attending Faculty – Foot & Ankle Institute                         1995-1999
    Presbyterian Med. Center Satellite

PROFESSIONAL PUBLICATIONS

    Editor:
    Journal of the American Podiatric Medical Association              1991 – Present

    Editorial Advisor:                                                 2005-Present
    Foot and Ankle Quarterly

    Editorial Board Memberships:                                       2000-Present
    Therapy (A Future-drugs journal)
    Podiatry Today
    Podiatry Management

    Special Editor:
    Microbiology and Infectious Diseases
    Journal of the American Podiatric Medical Association              1986-1991

    Editor:
    Infections and Other Disorders of the Lower Extremities
    New Jersey Podiatric Medical Association,                          1997

    Co-Editor:
    Journal of Foot Surgery Supplement:  A Team approach to
    Infections of the Lower Extremity in the Diabetic Patient          1987

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

**Warren S. Joseph, D.P.M.**                              **Curriculum Vitae**

Infectious Disease Editor
Yearbook of Podiatric Medicine                              1987-1990

Editor: Special Issue in Infectious Diseases
Journal of the American Podiatric Medical Association       1989

Guest Editor:  Infectious Diseases Issue.
Clinics in Podiatric Medicine and Surgery                   1990

Editorial Contribution: Diabetes and Your Feet.
Krames Communications                                       1990

RESEARCH

"The Comparative Efficacy of Clindamycin vs. Cephalexin in the
Treatment of Diabetic Foot Ulcers."                         1988

"Safety and Efficacy of Naftifine Cream 1% vs. Clotrimozole Cream
1% in Tinea Pedis."                                         1990

PRESENTATIONS

Too numerous to list as I average >50 lectures per year.  I have lectured on various
aspects of the treatment of lower extremity infections in all 50 states, Puerto Rico, the
District of Columbia, Spain, Turkey, Canada & Great Britain.  Current lecture topics
include:

Diabetic Foot Infections – The IDSA Classification
Update on Methicillin Resistant *Staphylococcus aureus*
Antibiotics for Osteomyelitis
Antibiotic Prophylaxis
Treatment of Onychomycosis
Treatment of Tinea Pedis

**_PROFESSIONAL SOCIETIES_**

LOCAL, REGIONAL, NATIONAL

Arizona Foot & Ankle Medical Association                    2024

-6-

**"Accepted" DEC 2 2 2024** *Robert Leon Smith III*

**Warren S. Joseph, D.P.M.**                                    **Curriculum Vitae**

| | |
|---|---|
| Fellow, Infectious Diseases Society of America (elected) | 2000 |
| Fellow, College of Physicians of Philadelphia (elected) | 1996 |
| Fellow, American College of Foot & Ankle Orthopedics and Medicine | 1995 - 2002 |
| American Diabetes Association | 2005 |
| Member, Infectious Diseases Society of America (elected) | 1989 |
| BuxMont Podiatric Medical Association | 1989 |
| American Diabetes Association - Foot Health Council | 1987 |
| American Society for Microbiology | 1986 |
| Philadelphia County Podiatric Medical Association | 1985 |
| Pennsylvania Podiatric Medical Association | 1985 |
| American Podiatric Medical Association | 1985 |
| Arizona Foot & Ankle Medical Association | 2024 |

## _COMMITTEES_

### PROFESSION/NATIONAL

| | |
|---|---|
| Diabetic Foot Infection Guidelines Committee<br>Infectious Diseases Society of America | 1999-present |
| Deliberative Group 3 (Primary Podiatric Medicine)<br>Educational Enhancement Project, APMA | 1996-1997 |
| Faculty Representative to American Association<br>Colleges of Podiatric Medicine | 1990-1993 |
| Podiatric Medicine Test Committee<br>National Boards of Podiatric Medicine | 1986-1991 |

### UNIVERSITY

| | |
|---|---|
| HIV Policy Committee<br>Temple Univ. Health Science Center | 1998-2003 |
| Graduate Medical Education Committee<br>University of Pennsylvania Health System | 1997-1999 |

### SCHOOL

Hearing Committee

-7-

**Warren S. Joseph, D.P.M.**                                   **Curriculum Vitae**

| | |
|---|---|
| Temple University School of Podiatric Medicine | 1997-2000 |
| Appointment, Promotion, Tenure Committee TUSPM | 1997-2000 |
| Quality Assurance Committee TUSPM | 1985-2000 |
| Institutional Review Board Pennsylvania College of Podiatric Medicine | 1985-1996 |
| Chairman, Infection Control Sub-Committee Pennsylvania College of Podiatric Medicine | 1986-1995 |
| Curriculum Committee Pennsylvania College of Podiatric Medicine | 1988-1996 |
| Chairman, Faculty Affairs Committee Pennsylvania College of Podiatric Medicine | 1989-1993 |
| Continuing Education Committee Arizona College of Podiatric Medicine | 2021-present |

HOSPITAL

| | |
|---|---|
| Infection Prevention & Control Committee Roxborough Memorial Hospital | 2009-2021 |
| Antibiotic Subcommittee, Pharmacy Therapeutics Committee North Philadelphia Health System | 1986-1991 |
| Infection Control Committee North Philadelphia Health System | 1990-1993 |

**_PUBLICATIONS_**

PEER REVIEWED, INDEXED ARTICLES

-8-

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

**Warren S. Joseph, D.P.M.**                                                **Curriculum Vitae**

1. Smith, B., Joseph, W., Weber, S.: Ciprofloxacin: Comparative In Vitro Antimicrobial Activity. 85th American Society for Microbiology Meeting, Las Vegas, 1985.

2. LeFrock, J.L., Joseph, W.: Infections in Diabetic Patients. Infections in Surgery, Vol 5:3, 1986.

3. LeFrock, J.L., Smith, B.R., Joseph, W., et al: Comparative in Vitro Antimicrobial Activity of Carumonam, A New Monocylic Beta-Lactam. Antimicrobial Agents and Chemotherapy. Vol 29:2, pgs. 346-349, Feb. 1986

4. Smith, B.R., LeFrock, J.L., Joseph, W., et al.: In Vitro Activity A-56619 and A-56620,, Two New Aryl-Fluoroquinolone Antimicrobial Agents. Antimicrobial Agents and Chemotherapy. Vol 29:2, pgs. 335-358, Feb. 1986

5. Joseph, W.S.: Pathogenesis of Diabetic Foot Infection. Journal of Foot Surgery. Supplement 26 (1), pgs. S7-S11, Jan/Feb 1987

6. Joseph, W.S.: LeFrock, J.L.: Infections Complicating Puncture Wounds of the Foot. Journal of Foot Surgery. Supplement 26 (1), S30-S33, Jan/Feb 1987.

7. Simon, W.H., Joseph, W.S.: Clinical Imaging With Indium-111-oxine Labeled Leukocyte Scan: (Review and Case Report) Clinics of Podiatric Medicine and Surgery 5:329, 1988

8. Joseph, W.S.: Clinical and Laboratory Diagnosis of Lower Extremity Infections. Journal American Podiatric Medical Assn. 79 (10) 1989

9. Joseph, W.S., Axler, D.A.: Microbiology and Antimicrobial Therapy of Diabetic Foot Infections. Clinics in Podiatric Medicine and Surgery. Vol. 7 (3) July 1990

10. Myers, R.A., Littel, M.L., Joseph, W.S.: Bite Wound Infections of the Lower Extremity. Clinics in Podiatric Medicine and Surgery. Vol 7 (3) July 1990

11. Joseph, W.S., Treatment of Lower Extremity Infections in Diabetics. Drugs Vol. 42 (6) 1991

*"Accepted" DEC 2 2 2024 Robert Leon Smith III*

**Warren S. Joseph, D.P.M.**                                       **Curriculum Vitae**

12. <u>Joseph WS</u>, Kosinski M.  Prophylaxis in Lower Extremity Infectious Diseases. In Kosinski, M, Special Editor, Clinics in Podiatric Medicine and Surgery.  13:647, October, 1996

13. <u>Joseph WS</u>, LeFrock JL.  Oral Antibiotics in Lower Extremity Infections. In Kosinski, M, Special Editor, Clinics in Podiatric Medicine and Surgery. 13:683, October, 1996

14. <u>Joseph WS.</u>  Oral Treatment Options for Onychomycosis.  Journal of the American Podiatric Medical Assoc.  87:520, 1997

15. <u>Joseph WS</u>, Sabo M.  Cutaneous Hyperpigmentation and Minocycline. Journal of the American Podiatric Medical Association. 90:5, 2000

16. Gupta AK, <u>Joseph WS</u>.  Ciclopirox 8% Nail Lacquer in the Treatment of Onychomycosis of the Toenails in the United States.  Journal of the American Podiatric Medical Association.  90:10, 2000

17. Schein JR, Gause D, <u>Joseph WS</u>, et.al.  Patient Satisfaction with Oral vs. Nonoral Therapeutic Approaches in Onychomycosis.  Journal of the American Podiatric Medical Association.  91:521-528, 2001

18. <u>Joseph WS</u>, Tan JS.  Infections in Diabetic Foot Ulcerations.  Current Infectious Disease Reports. Vol 5 (5):391-397, 2003

19. Tan JS, <u>Joseph WS</u>.  Common Fungal Infections of the Feet Among Patients with Diabetes Mellitus.  Drugs & Aging.  21(2)101-112, 2004

20. Lipsky BA, Berendt AR, Deery HG, Embil JM, <u>Joseph WS</u>, Karchmer AW, LeFrock JL, Lew DP, Mader JT, Norden C, Tan JS.  IDSA Guideline: Diagnosing and Treating Diabetic Foot Infections.  Clinical Infectious Diseases, 39:885-910, 2004

21. <u>Joseph WS</u>.  The oral antifungal patient.  Clin Podiatr Med Surg, 21:591-604. 2004

22. Scher RK, Elston DM, Hedrick JA, <u>Joseph WS</u>, Maurer T, Murakawa GJ. Treatment Options in the Management of Uncomplicated Skin and Skin Structure Infections.  Report from a Clinical Roundtable. Cutis 75:1S 2005

-10-

"Accepted"

DEC 2 2 2024

*Robert Lon Smith III*

**Warren S. Joseph, D.P.M.**                                                    **Curriculum Vitae**

23.   Joseph WS.  Optimal Management of Uncomplicated Skin and Skin
      Structure Infections of the Lower Extremity.  Current Infectious Disease
      Reports. 8:384-389. 2006

24.   Scher RK, Tavakol A, Sigurgeirsson B, Hay RJ, Joseph WS, et al.
      Onychomycosis:  Diagnosis and Definition of Cure.  J Am Acad
      Dermatol. Jun;56(6):939-44  2007

25.   Kosinski MA, Joseph WS.  Update on the Treatment of Diabetic Foot
      Infectons. Clin Podiatr Med Surg 24:383-396. 2007

26.   Fitzgerald RH, Mills JL, Joseph W, Armstrong DG. The diabetic rapid
      response acute foot team: 7 essential skills for targeted limb salvage.
      Eplasty. 2009;9:e15. Epub 2009 May 5

27.   Joseph WS, Lipsky BA. Medical Therapy of Diabetic Foot Infections.
      Journal of the American Podiatric Medical Assoc. 2010 Sep-
      Oct;100(5):395-400  (simultaneously published in #28 below)

28.   Joseph WS, Lipsky BA. Medical Therapy of Diabetic Foot Infections.
       J Vasc Surg. 2010 Sep;52(3 Suppl):67S-71S

29.   Lipsky BA, Itani KM, Weigelt JA, Joseph W, Paap CM, Reisman A,
      Myers DE, Huang DB. The role of diabetes mellitus in the treatment of
      skin and skin structure infections caused by methicillin-resistant
      Staphylococcus aureus: results from three randomized controlled trials. Int
      J Infect Dis. 2010 Dec 4.

30.   Smith R, Joseph WS.  Antibiotic Stewardship: The lower extremity
      physician's prescription for effectively treating infections.  Journal
      American Podiatric Medical Assoc. 2013 (in press)

31.   Lipsky BA, Berendt AR, Cornia PB, Pile JC, Peters EJG, Armstrong DG,
      Deery HG, Embil JM, Joseph WS, Karchmer AW, LeFrock JL, Pinzur M,
      Senneville E.  2012 IDSA clinical practice guideline for the diagnosis and
      treatment of diabetic foot infections.   Clinical Infectious Diseases.
      2012;54(12):132–173

32.   Joseph WS, Lamp K, Quast T, Cogo A, Cromopton M, Jung Yoon M,
      Culshaw D, Chaves R.  Daptomycin for Methicillin resistant
      Staphylococcus aureus Diabetic Foot Infections.  Journal American
      Podiatric Medical Assoc.  2014:104(2) 159

-11-

**Warren S. Joseph, D.P.M.**                                                    **Curriculum Vitae**

33.     Joseph WS, Vlahovic T, Pillai R, Olin J. Efinaconazole 10% Solution in
        the Treatment of Onychomycosis of the Toenails. Journal American
        Podiatric Medical Assoc. 2014

34.     Vlahovic TC, Joseph WS. Efinaconazole topical 10% for the treatment of
        onychomycosis in patients with diabetes. *J Drugs Dermatol*
        2014;13(10):1186-1190.

35.     Huang ET, Mansouri J, Murad MH, Joseph WS, Strauss MB,
        TettelbachW, Worth ER. A clinical practice guideline for the use of
        hyperbaric oxygen therapy in the treatment of diabetic foot ulcers.
        Undersea & Hyperbaric Medicine 2015; 42 (3)

36.     Scher RK, Tosti A, Joseph WS, Vlahovic TC, Plasencia J, Markinson BC,
        Pariser DM. Onychomycosis diagnosis and management: perspectives
        from a joint dermatology-podiatry roundtable. *J Drugs Dermatol.*
        2015;14(9):1016-21

37.     Markinson BC, Vlahovic TC, Joseph WS, Scher RK, Tosti A, Plasencia J,
        Pariser DM. Diagnosis and Management of Onychomycosis: Perspectives
        from a Joint Podiatry-Dermatology Roundtable. J Am Podiatr Med Assoc.
        2015 Sep 25

38.     Snyder RJ, Jensen J, Applewhite AJ, Couch K, Joseph WS, Lantis Ii JC,
        Serena TE. A Standardized Approach to Evaluating Lower Extremity
        Chronic Wounds Using a Checklist. Wounds. 2019 May;31(5 Suppl):S29-
        S44.

39.     Rogers LC, Lavery LA, Joseph WS, Armstrong DG. All Feet On Deck-
        The Role of Podiatry During the COVID-19 Pandemic: Preventing
        hospitalizations in an overburdened healthcare system, reducing
        amputation and death in people with diabetes. J Am Podiatr Med Assoc.
        2020 Mar 25. doi: 10.7547/20-051

40.     Rogers LC, Snyder RJ, Joseph WS. Diabetes-Related Amputations: A
        Pandemic within a Pandemic. J Am Podiatr Med Assoc 20-248 2020 Nov
        3 (ePub).  DOI: 10.7547/20-248

41.     Lipner SR, Joseph WS, Vlahovic TC, Scher RK, Rich P, Ghannoum M,
        Daniel CR, Elewski B: Therapeutic Recommendations for the Treatment
        of Toenail Onychomycosis in the US. J Drugs Dermatol. 2021;20(10)
        DOI:10.36849/JDD.6291

-12-

**Warren S. Joseph, D.P.M.**                                    **Curriculum Vitae**

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

42.   Snyder RJ, Driver V, Cole W, Joseph WS, Reyzelman A, Lantis II JC,
      Kaufman J, Wild T. Topical autologous blood clot therapy: an introduction
      and development of consensus panel to guide use in the treatment of
      complex wound types. Wounds. 2022 Sep;34(9):223-228.
      DOI:10.25270/wnds/22011

43.   Joseph WS. The Peer Review System: A Journal Editor's 30-year
      Perspective. Meyr A, Editor, Clinics in Podiatric Medicine and Surgery (*in
      press*)

44.   Joseph WS, Kosinski MA, Rogers LC. Parenteral Vancomycin in the
      Treatment of MRSA-Associated Diabetic Foot Infections: An
      Unnecessary Risk. The International Journal of Lower Extremity Wounds.
      2023;0(0). doi:10.1177/15347346231207553

45.   Benedict, K, Gold, JAW, Jones, CT, Tushla LA, Lipner SR, Joseph WS, et
      al. Concerning rates of laboratory-confirmed antifungal-resistant
      onychomycosis and tinea pedis: an online survey of podiatrists, United
      States. Health Sci Rep. 2023; 6:e1694. doi:10.1002/hsr2.1694

46.   Gupta AK, Elewski B, Joseph WS, et al. Treatment of onychomycosis in
      an era of antifungal resistance: Role for antifungal stewardship and topical
      antifungal agents. Mycoses. 2024; 67:e13683. doi:10.1111/myc.13683

47.   Feldman SR, Vlahovic TC, Joseph WS, et al. Number of Affected Nails Is
      the Primary Determinant of Efinaconazole 10% Solution Usage for
      Onychomycosis. J Drugs Dermatol. 2024;23(2):110-112.
      doi:10.36849/JDD.7676

48.   Lipner SR, Vlahovic T, Ghannoum MA, Elewski B, Joseph WS.
      Dermatophytomas in Onychomycosis: A Scoping Review of Prevalence,
      Diagnosis, and Treatment. J Am Podiatr Med Assoc. 2024 Mar-
      Apr;114(2):22-161. doi: 10.7547/22-161. PMID: 38753536.

49.   Elabbasi, A., Kadry, A., Joseph, W. *et al.* Transungual Penetration and
      Antifungal Activity of Prescription and Over-the-Counter Topical
      Antifungals: Ex Vivo Comparison. *Dermatol Ther (Heidelb)* (2024).
      https://doi.org/10.1007/s13555-024-01237-6

-13-

Warren S. Joseph, D.P.M.                                    **Curriculum Vitae**

ABSTRACTS, POSTERS

1.  LeFrock, J.L., Smith, B.R., <u>Joseph, W.,</u> et al: Comparative In Vitro Evaluation of RO-172301, A New Monobactam Antibiotic. 14th International Congress of Chemotherapy, Kyoto, Japan, 1985. POSTER

2.  Smith, B.R., LeFrock, J.L., <u>Joseph, W.:</u> et al: Comparative In Vitro Evaluation of Four Quinolone Antimicrobials, A-55619, Congress of Chemotherapy, Kyot, Japan, 1985. POSTER

3.  <u>Joseph, W.S.:</u> Use and Abuse of Antibiotics in the Treatment of Lower Extremity Infections. Abstract, American Public Health   Association, 119th Annual Meeting, Atlanta, GA., Nov. 1991 PLATFORM

4.  AK Gupta, <u>WS Joseph</u>. Evaluation of the mycological cure rates when ciclopirox nail lacquer is used in combination with oral terbinafine to treat toenail onychomycosis. APMA "The National", Boston, MA, August 2004

5.  <u>Joseph WS</u>, Culshaw D, Boening A, Lamp KC. Clinical experience with daptomycin for the treatment of methicillin resistant *Staphylococcus aureus* diabetic foot infections. L1-984, 49th ICAAC, San Francisco, CA, September 2009 POSTER

6.  <u>Joseph WS</u>, Culshaw D, Miller B, Anuskiewicz S, Anda C, Prokocimer P. Tedizolid versus Linezolid for Treatment of Acute Bacterial Skin and Skin Structure Infections of the Lower Extremity –Pooled, Retrospective Analysis of Two Recent Phase 3 Trials.  Poster 1311.  ECCMID Copenhagen.  April 25-28, 2015  POSTER

8.  Lipsky PA, Silverman MH, <u>Joseph WS</u>. Challenges of Designing a Placebo Controlled Trial for Treatment of Mild Diabetic Foot Infections: The Pexiganin Cream "One Step" Trial.  Poster P28.09. 7th International Symposium on the Diabetic Foot.  The Hague.  May 20-23, 2015 POSTER

9.  Scher R, Vlahovic T,  Stein Gold L, <u>Joseph WS</u>, et. al. Topical Treatments for Pediatric Toenail Onychomycosis: Overview of Efficacy in Three Clinical Trials.  Maui Derm for Dermatologists 2021.  January 25-29, 2021. Maui, HI and virtually.  POSTER

-14-

**Warren S. Joseph, D.P.M.**                                        **Curriculum Vitae**

BOOKS, CHAPTERS, MONOGRAPHS

1.  Joseph, W.S.: "Osteomyelitis," Chapter in Current Therapy in Podiatric Medicine.  Editor, Richard Jay, D.P.M.

2.  Joseph, W.S.: Infections Following Lower Extremity Trauma.  Chapter in Foot and Ankle Trauma, Ed. Barry Scurran, D.P.M. Churchill Livingstone Inc., New York, NY, 1989

3.  Joseph, W.S.: Bacterial Infections of the Lower Extremity.  Chapter in Principles and Practice of Podiatric Medicine, ed. Levy, L. and Hetherington, V. Churchill Livingstone Inc., New York, 1989

4.  Joseph, W.S.: Handbook of Lower Extremity Infections.  Churchill Livingstone Inc., New York, NY 1990

5.  Stienstra, J., Lamy, C., Joseph, W.S.:  Septic Arthritis. Chapter in Oloff L, Musculoskeletal Disorders of the Lower Extremities (in press)

6.  Joseph, W.S.:  Lower Extremity Infections.  Chapter in:  Robbins, J, Editor, Primary Podiatric Medicine. W. B. Saunders Company, Philadelphia, PA  1994

7.  LeFrock, JL, Joseph, WS:  Diabetic Foot Infections.  Chapter in Lavery LA, Dennis KJ; Special Editors, Clinics in Podiatric Medicine and Surgery-The Diabetic Foot. 12:87, 1995

10. Joseph WS.  The Podiatric Approach to Onychomycosis.  In Scher R, Daniels R. (eds)  The Nail .  WB Saunders & Co., Philadelphia, PA  1997

11. Joseph WS.  Ethics in Medical Journal Editing.  In Madjumdar SK, Ethics in Academia, Pennsylvania Academy of Science, Philadelphia, PA  2000

12. Joseph WS., Werchler WP, Galitz, J, Feldman SR, Goldsmith H, Burgess CM. Rethinking Onychomycosis.  Supplement to Podiatry Today and Skin & Aging.  July, 2000

13. Wolf JE, Joseph WS, Rich PE.  The Diabetic Foot:  Infectious and Noninfectious Cutaneous Disorders.  Clinical Symposia (Monograph) Vol 53 (1), 2002.  Icon Learning Systems

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

"Accepted" DEC 2 2 2024 Robert Leon Smith III

**Warren S. Joseph, D.P.M.**                                    **Curriculum Vitae**

14. Joseph WS, Jennings M, Landsman A, Pollak R, Kosinski M.  How to Treat Lower Extremity Infections.  Supplement to Podiatry Today, March 2002

15. Elewski B, Jorizzo J, Leyden J, Markinson B, Odom R, Scher R, Dockery G, Joseph WS. Novel Therapeutic Strategies in the Management of Fungal Foot Conditions.  CME Monograph.  The Institute for Medical Information.  March 2002.

16. Joseph WS:  Handbook of Lower Extremity Infections, Second Edition. Churchill Livingstone (Elsevier Scientific), St. Louis, MO. 2002

17. Armstrong DG, Boulton AJM, Joseph WS, Lipsky BA.  Managing Diabetic Foot Infections.  Supplement to Podiatry Today. January 2003

18. Scher R, Joseph WS, Robbins J.  Progression and Recurrence of Onychomycosis.  CME Monograph on www.medscape.com. April, 2003

19. Joseph WS, Blass BC, Gupta A, Shin HT, Spielfogel WD.  Treating Fungal Infections.  Supplement to Podiatry Today, March 2004

20. Armstrong DG, Joseph WS, Lavery L, Lipsky BA.  Treating MRSA Infections.  Supplement to Podiatry Today, April 2004

21. Joseph WS, Armstrong DG, Cervantes H, Malay S, Malkin KF, Mozena J. Managing Onychomycosis.  Supplement to Podiatry Today, June 2004

22. Joseph WS, Scher RK.  Understanding the Realities of Antifungal Therapy.  Supplement to Podiatry Today, November 2004

23. Joseph WS.  Diagnosis, Treatment of Diabetic Foot Infections.  Diabetic Microvascular Complications Today 1:20-23, 2004

24. Joseph WS, Mozena, JD.  The Podiatric Approach to Onychomycosis.  In Scher R, Daniels R. (eds)  The Nail, 3rd Edition.  Elsevier Scientific, Philadelphia, PA  2005

25. Joseph WS, Zgonis T, Roukis TS.  A Closer Look at Diabetic Foot Infections.  Podiatry Today.  July 2005

26. McElgunn PS, Friedlander SF, Joseph WS.  Not Just a Cosmetic Problem: Best Practices in the Prevention and Treatment of Onychomycosis.  Johns Hopkins Advanced Studies in Medicine.  Vol 5 (6D). June 2005

**Warren S. Joseph, D.P.M.**                    **Curriculum Vitae**

27. Joseph WS. Onychomycosis in the Patient with Diabetes. Diabetic Microvascular Complications Today. Vol 2(4). July/Aug 2005

28. Vinik AI, Bril V, Friedlander M, Joseph WS, Molitch ME, Tuttle KR, Zinman B. Cross Specialty Management of Diabetic Patients. Supplement to: Diabetic Microvascular Complications Today. Sept/Oct 2005

29. Joseph WS, Kosinski M. The Widening Challenge: How to Manage MRSA. Podiatry Management. November/December 2005

30. Joseph WS. Treatment of Uncomplicated Skin Infections: A Novel Algorithm. Podiatry Management. November/December 2005

31. Armstrong DG, Joseph WS, Lavery L, Lipsky BA. Treating Diabetic Foot Infections. Supplement to Wounds. November 2005

32. Armstrong DG, Joseph WS, Lavery L, Lipsky BA, Sheehan P. New Concepts in Managing Diabetic Foot Infections. Supplement to Podiatry Today (also published in Wounds, Clinical Geriatrics, Vascular Disease Management). April 2006

33. Rich P, Joseph WS. Pictorial Guide to the Differential Diagnosis of Uncomplicated Skin and Skin Structure Infections. American Academy of CME, Inc. April 2006

34. Andros G, Armstrong DG, Attinger C, Boulton AJM, Frykberg RG, Joseph WS, Lavery LA, Morbach S, Niezgoda JA, Toursarkissian B. Consensus Statement on Negative Pressure Wound Therapy (VAC Therapy) for the Management of Diabetic Foot Wounds. Supplement to Podiatry Today (also published in Wounds). July 2006

35. Joseph, WS. Guest Editor. Infectious Diseases. In: Foot and Ankle Quarterly. Vol 19(1) Spring 2007

36. Elewski BE, Del Rosso JQ, Draelos ZD, Jorizzo JL, Joseph WS, Ribotsky BM, Rich P. Modern Methods to Treat Superficial Fungal Disease. Supplement to: Cutis Vol 79 (2S), February 2007

37. Kosinski M, Joseph WS, Markinson B. Advances in the treatment of tinea pedis. CME Monograph. Podiatry Management Magazine. June/July 2007

-17-

**Warren S. Joseph, D.P.M.**                                **Curriculum Vitae**

"Accepted" DEC 2 2 2024  Robert Leon Smith III

38.   Joseph WS, Mozena JW.  Approche podologique de l'onychomycose.
      Chapter in Scher RK, Daniel CR. Onychologie, Edition Francaise.
      Elsevier 2007

39.   Joseph WS, Tan JS.  Foot Infections in Patients with Diabetes Mellitus.
      Chapter in Tan, JS, File TM, Slata RA, Tan MJ (eds). Expert Guide to
      Infectious Diseases. American College of Physicians, Philadelphia, PA.
      2008

40.   Armstrong DG, Boulton JM, Joseph WS, Lipsky BA, Rogers LC.  Current
      concepts in diagnosing and treating MRSA in the diabetic foot.  CME
      Monograph.  Podiatry Management Magazine. December 2008

41.   Sumpio BE, Attinger CE, Driver VR, Gibbons GW, Holloway GA, Joseph
      WS, et.al. A Multidisciplinary Approach to Limb Preservation: The Role
      of VAC Therapy. Supplement to Wounds, September 2009

42.   Kosinski MA, Joseph WS.  Lower Extremity Infections.  Chapter in
      Southerland JT, Boberg JS, Downey MS, Nakra A, Rabjohn KV (eds).
      McGlamry's Comprehensive Textbook of Foot and Ankle Surgery.
      Wolters Kluwer/Lippincott, Williams & Wilkins.  Philadelphia, PA 2013

41.   Joseph WS (chair), Pollak R, Vlahovic T, Caldwell B, et. al.
      Onychomycosis and the Role of Topical Antifungals.  Supplement to
      Podiatry Today, November 2013

43.   Snyder RJ, Driver V, Cole W, Joseph WS, et al. Topical autologous blood
      clot therapy: an introduction and development of consensus panel to guide
      use in the treatment of complex wound types. *Wounds*. Published online
      July 7, 2022. doi:10.25270/wnds/22011

OTHER PUBLICATIONS (Commentary)

1.    Joseph, WS.  Frequent Questions Asked About the Need for Prophylaxis in a
      Patient at Risk for Endocarditis.  Journal of the American Podiatric Medical
      Assoc.  88:92, 1998

2.    Joseph, WS  Podiatric Medical Research.  Journal of the American Podiatric
      Medical Association  90:279, 2000

**Warren S. Joseph, D.P.M.**                                    **Curriculum Vitae**

3. <u>Joseph WS</u>  Introduction to the Special Issue:  Ciclopirox 8% Nail Lacquer. Journal of the American Podiatric Medical Association.  90:10, 2000

4. <u>Joseph WS</u>.  Probe to Bone: Is it the Best Test for Osteomyelitis.  Point – Counterpoint.  Podiatry Today.  January 2007.

5. <u>Joseph WS</u>.  Should You Cover MRSA?  Point – Counterpoint.  Podiatry Today.  March 2007

6. <u>Joseph WS</u>.  A closer look at topical for tinea pedis.  Podiatry Today. September 2009

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

-19-

"Accepted"   DEC 2 2 2024.   Robert Leon Smith III.

### Disclosure as to Expert Witness Dr. Robert Hoover

**I.**      **Statement of Opinions, Bases, and Reasons**

The following is "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed under [Rule 16](b)(1)(C)," and "the bases and reasons for them." Fed. R. Crim. P. 16(a)(1)(G)(iii).

#### a. *Bases for Testimony*

Dr. Hoover's opinions are based upon his education, personal medical training, research, experience prescribing durable medical equipment ("DME"), prosthetics, orthotic braces ("braces"), and supplies as a clinician, his interactions with other physicians, his experience reviewing medical records, and his experience working as a contractor for the Medicare Program, including his experience interpreting, applying, and ensuring compliance with the applicable laws, rules, and regulations governing the payment of claims for DME submitted to the Medicare Program.

Dr. Hoover's opinions are also based on the following records, which the prosecution team has provided to Dr. Hoover and that also have been provided to the Defendant in this case:

- The Indictment in this case.

Dr. Hoover may review other documents produced to the Defendant and offer opinions on those documents.

#### b. *Opinions and Summary of Anticipated Testimony*

Dr. Hoover's testimony will help the jury understand the nature and appropriate uses of DME and braces, the information necessary for a doctor to determine whether DME and braces are reasonable and medically necessary, the risks attendant to the improper prescription and use of DME and braces, and the regulations governing Medicare's coverage for DME and braces. Dr. Hoover may also review orders for DME and braces and related documents from this case. If asked to do so, Dr. Hoover may provide an opinion as to whether the records demonstrate that a particular DME or brace could be determined to be medically reasonable and medically necessary based on a telephonic interaction with a patient and/or the information included in the documents provided to him.

Dr. Hoover's testimony may cover the following topics:[1]

---

[1] In addition to his potentially expert testimony, Dr. Hoover (like others whose names will appear on the Government's witness list) may also summarize voluminous documents such as claims and financial data. This portion of Dr. Hoover's testimony will be fact testimony, not expert testimony, and therefore is not summarized herein.

"Accepted" DEC 2 2 2024   *Robert Leon Smith III*

1. Opinions about DME and braces, including:

   A. Dr. Hoover's testimony will bear on whether the DME and braces ordered under the circumstances of this case (1) would be considered medically necessary under Medicare regulations and medical standards; and (2) would be considered the product of a doctor-patient relationship and examination under Medicare regulations and prevailing medical standards.

   B. Dr. Hoover's testimony may describe (1) what DME and braces are; (2) how they are used; (3) how they are properly prescribed; (4) Medicare's requirements for reimbursing claims for DME and braces; and (5) circumstances under which prescribing DME and braces would be medically unnecessary or medically inappropriate.

   C. Dr. Hoover may testify that DME is equipment that (1) can withstand repeated use (i.e., could normally be rented and used by successive patients); (2) is primarily and customarily used to serve a medical purpose; (3) generally is not useful to a person in the absence of illness or injury; and (4) is appropriate for use in a patient's home.

   D. Dr. Hoover may testify that a brace includes rigid and semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body.

   E. Dr. Hoover may testify that back, shoulder, knee, wrist braces, and other braces must all be medically necessary in order to be covered by Medicare. Local Coverage Determinations ("LCDs") further define medical necessity and provide specific requirements for different forms of braces. For example, the LCD applicable to knee braces requires a provider to physically examine a patient's knee in order for a knee brace to be considered medically necessary and covered by Medicare. Prescriptions for certain knee braces also require evaluation and documentation concerning joint stability. Although the applicable LCD does not specifically state that a physician needs to physically touch the patient's knee, the LCD implies that a physician would have to physically touch the patient in order to determine medical necessity.

   F. Dr. Hoover may testify that it would not be medically appropriate for a physician to prescribe a back brace having only had a phone conversation. For example, there are many issues that could cause lower back pain, including collapsed vertebrae and herniated disc. It would not be possible to rule out these concerns based on a phone call. Additionally, prescribing braces based exclusively on a phone conversation could lead to patient harm. For example, prescribing a back brace without determining the root cause of back pain could aggravate an underlying injury or cause serious bodily harm. Some types of back injuries require more mobility in order for a patient to heal properly and wearing a back brace could constrain mobility in such a way that recovery would be impeded. Similarly, for patients who are experiencing shoulder pain following arthroscopy, it would be appropriate to keep their shoulders immobile for the first few days, but beyond that they should begin to use their shoulders in order to avoid "frozen shoulder."

"Accepted" DEC 2 2 2024. *Robert Leon Smith III*

G. Dr. Hoover may testify that, when evaluating a patient and determining an appropriate course of treatment, a medical provider typically documents the encounter using a "SOAP" notes format, which includes the following: Subjective reasoning, Objective reasoning, Assessment, and Plan. In a telemedicine environment, the Objective part of the SOAP notes cannot be effectively employed. Additionally, without viewing imaging of a patient, a provider cannot definitively diagnose a patient with certain conditions (e.g., other intervertebral disc displacement, lumbosacral region, other intervertebral disc degeneration, lumbosacral region, among others). Certain mobility tests (Cabot maneuver, one-legged stand test, and/or a pivot shift test) also cannot effectively be conducted telephonically.

2. Opinions about medical records, including:

A. The government anticipates that Dr. Hoover will testify that, as a physician, he is familiar with the importance of thoroughly documenting patients' medical charts. Dr. Hoover may testify that the purpose of a medical chart is to document the patient encounter, record the information reviewed and document a future plan of care for the patient. Proper charting is vital to continued care of patients because health care providers see patients in episodes over a period of time. When it comes to DME and orthotic braces, patients' medical charts should reflect the provider's bases for ordering orthotic braces, which type of braces were ordered, and how the use of the braces fits into the referring physician's treatment plan for the patient.

3. Opinions about a medical professional's signature, including:

A. Dr. Hoover may testify that it is inappropriate and potentially dangerous for a person who is not a medical professional to sign orders using a medical professional's credentials.

4. Hypotheticals, including:

A. Dr. Hoover may answer hypothetical questions based on the facts of this case and opine whether the DME or braces ordered in hypotheticals constituted appropriate practice of medicine or were medically necessary. Dr. Hoover is expected to testify to the following:

- If no legitimate practitioner-patient relationship existed in connection with ordering DME or braces and the devices were not used by the ordering provider to treat the patient, the DME or braces would not be medically necessary or appropriate.

- Before ordering DME or a brace, a physician should have knowledge of the DME or brace he is ordering, know where the information used to justify the order comes from, and know whether that information is accurate.

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

- It would not be appropriate for a telemarketer or non-medical professional to collect information directly from a patient and then "diagnose" the patient or indicated the reasons for ordering DME or braces based on that information.

- Generally, without conducting, among other things, a physical examination and evaluation of range of motion, a provider cannot determine whether a particular DME or brace is medically necessary.

- Typically, the more DME and/or braces ordered, the higher the reimbursement by insurance.

- Typically, most treating physicians would consult with an orthopedist before ordering or using DME or braces in the treatment of a complex patient.

5. Records Review:

   A. Dr. Hoover may testify about doctors' orders for orthotic braces for specific Medicare beneficiaries in this case. It is expected Dr. Hoover will offer opinions on those orders and related documents and recordings. Dr. Hoover is expected to testify to whether the doctors' orders and related documents reflect:

   - A lack of a legitimate practitioner-patient relationship in connection with ordering the DME or braces and lack of evidence that these devices were used by the ordering provider to treat the patient;

   - Insufficient information for a provider to make a determination of medical necessity for the DME and braces ordered;

   - Incomplete and/or inadequate documentation to warrant the diagnoses reported and the DME and braces ordered—e.g., if the records contain no mention of differential diagnoses or sufficient medical information and patient history to properly determine the diagnosis listed;

   - Templated or fill-in-the-blank language to describe patient pain, symptoms, and previous treatments, suggesting a lack of individualized patient assessments;

   - Absence of language reflecting that a physical examination of the patient occurred, such as notes indicating examination of the patients' range of motion, strength testing, neurologic exam, or palpation for crepitus or grinding, which would be expected before ordering orthotic braces of this kind;

   - That using the braces indicated in the records without a physical examination could have aggravated the patient's pain and underlying

Page **4**

conditions, or, at a minimum, not address the patient's chief complaint;

- Inconsistencies between the braces ordered and the diagnoses reported, or combinations of braces that could not appropriately be used in conjunction with each other;

- Lack of evidence indicating that imaging studies were reviewed or ordered by the provider in conjunction with the prescription of the braces indicated in the records.

## II.    Qualifications

The following is a list of "the witness's qualifications, including a list of all publications authored in the previous 10 years." Fed. R. Crim. P. 16(a)(1)(G)(iii).

Dr. Robert Hoover is the Chief Medical Officer for CGS Administrators, which is a DME Medicare Administrative Contractor ("MAC") for CMS. Dr. Hoover has been a medical doctor for over 30 years, during which he has prescribed and ordered orthotic braces for numerous patients. He has worked for CGS Administrators since 2008, and he previously worked for them from 1998 to 2005. In his current role, he oversees compliance with Medicare rules and regulations, coverage, coding, claim review, and technology assessment for DME, orthotic braces, and prosthetics in the fee-for-service Medicare program. Dr. Hoover's CV sets out his qualifications in greater detail. A copy of Dr. Hoover's current CV is attached to this disclosure.

Dr. Hoover has not authored any publications in the previous ten years.

## III.    List of Cases

The following is "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Fed. R. Crim. P. 16(a)(1)(G)(iii).

Dr. Hoover has testified in *United States v. Freeman*, No. 4:08-cr-144 (S.D. Tex. 2010); *United States v. Bane*, No. 8:09-cr-352 (M.D. Fla. 2010); *United States ex. rel. Dr. Venus Pitts v. Jeffrey G. Hodges, et al.*, No. 5:16-cv-127-BO (E.D.N.C. 2021); *United States v. Elizabeth Hernandez*, No. 1:22-cr-20152-KMM (S.D. Fla. 2023); *United States v. Dr. Gupta*, No. 2:20-cr-773 (D.N.J. 2024); and *United States v. Young*, No. 3:19-CR-417-X (N.D. Tex. 2024).

## IV.    Approval & Signature

I, Dr. Robert Hoover, have reviewed this Disclosure and approve of its contents.

Robert D
Hoover Jr
Digitally signed by Robert D
Hoover Jr
Date: 2024.12.11 08:13:10
-06'00'
_____
Dr. Robert Hoover

12/11/2024
_____
Date

# CURRICULUM VITAE
## ROBERT D. HOOVER, JR., M.D., M.P.H., F.A.C.P

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

## PERSONAL INFORMATION

WORK ADDRESS:
    CGS Administrators, LLC
    26 Century Blvd, Ste ST610
    Nashville, TN 37214
    615.782.4476 (office)
    robert.hoover@cgsadmin.com

## EDUCATION

POST-GRADUATE TRAINING:

| | |
|---|---|
| Masters: | Medical College of Wisconsin, Master of Public Health-Health Services Administration (With Honors). Degree granted May 17, 2002 |
| Residency: | Vanderbilt University Medical Center, Nashville, Tennessee. Department of Internal Medicine July, 1991 - June, 1993 |
| Internship: | Vanderbilt University Medical Center, Nashville, Tennessee. Department of Internal Medicine July, 1990 - June, 1991 |

MEDICAL:

University of South Alabama College of Medicine, Mobile, Alabama. Medical Degree granted June 3, 1990.

UNDERGRADUATE:

University of South Alabama, Mobile, Alabama. Bachelor of Science granted June 6, 1984.
Major: Biology (emphasis Marine)   Honors: *Magna Cum Laude*

## EMPLOYMENT

| | |
|---|---|
| 8/2018 to Present: | Senior Medical Director – CGS Administrators, LLC Jurisdiction C DME MAC, Nashville, TN |
| 1/2008 to 7/2018: | Chief Medical Officer – CGS Administrators, LLC Jurisdiction C DME MAC, Nashville, TN |

| 8/2005 to 1/2008: | Sr. Vice-President, Global Clinical Service – Sunrise Medical Longmont, CO |
| 9/1998 to 8/2005: | Senior Medical Director - CIGNA Government Services Region D Durable Medical Equipment Regional Carrier, Nashville, TN |
| 11/2004 to 8/2005: | Medical Director - CIGNA Government Services TN Part B Medicare Contractor, Nashville, TN |
| 1/1996 to 8/2005: | Medical Staff - State of Tennessee, Clover Bottom Developmental Center Nashville, TN |
| 2/1996 to 9/1998: | Medical Director - Middle Tennessee Mental Health Institute Nashville, TN |
| 4/1994 to 1/1996: | Private Practice - Baptist Occupational Medicine Centers Goodlettsville, TN.  Part-time employment from 11/91-10/93 |
| 7/1993 to 3/1994: | Staff Physician - Nashville Department of Veteran's Affairs Medical Center, Division of Ambulatory Care, Nashville, TN. |

## LICENSURE

| State of Tennessee | MD022065 | Expires 10/31/2025 |
| DEA | BH3936993 | Expires 10/31/2026 |

## CERTIFICATIONS

| American Board of Internal Medicine | #147780 | 1993-2023 |
| National Board of Physicians & Surgeons | #56105 | Expires  07/31/2025 |

## PROFESSIONAL AFFILIATIONS

Fellow, American College of Physicians
Member, American Medical Association

## PUBLICATIONS

SCIENTIFIC PAPERS:

Hauptman PJ, Mikolajczak P, Mohr CJ, George A, Hoover R, Swindle J, Schnitzler M. Chronic continuous home inotropic therapy in end-stage heart failure. Am Heart J.  2006;**152**;1096.e1-1096.e9.

Hoover, R., Strickland, G., Curry, T., Carmichael, L.  Unilateral lower extremity edema secondary to infiltrative sarcoidosis.  J. American Academy of Dermatology.  1993; **30**(3):498-500.

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

ABSTRACTS:

Anil George, Olaf Hedrich, Robert Hoover, Jr., Jeffrey A. Gavard, Paul J. Hauptman.  Parenteral Home Inotropic Therapy in Heart Failure Patients:  Preliminary Analysis form a Multi-State Medicare Cohort.  2003.  American College of Cardiology Annual Scientific Session.

Hoover, Robert D. and D. O. Wood.  Analysis of the *Rickettsia prowazekii* genome by Transverse Alternating Field Electrophoresis. 1993.   Ann. Meeting Amer. Soc. Microbiol. p. 92

Hoover, R. D. and David O. Wood.  Cloning of the *recA* gene of *Rickettsia prowazekii* in *Escherichia coli*.  Alabama J. of Medical Sciences.  1987;**24**:331.

PRESENTATIONS

Available upon request

EXPERT WITNESS AT TRIAL OR BY DEPOSITION

*United States v. Maynard Freeman*, No. H-08-cr-144 (S.D. TX. May 14, 18, 2009)
*United States v. Ben Bane, et al.*, No. 8:09-cr-352-T-33MAP (M.D. FL. Nov. 8–10, 2010)
*United States ex. rel. Dr. Venus Pitts v. Jeffrey G. Hodges, et al.*, No. 5:16-CV-127-BO (E.D.N.C. Jan. 21, 2021).
*United States v. Elizabeth Hernandez*, No. 22-cr-20152-MOORE (S.D. FL. Sept. 14, 2023)
*United States v. Dr. Adarsh Gupta*, No. 2:20-cr-00773 (N.J. Apr. 11-12, 2024)
*United States of America v. David M. Young, MD*, No. 3:19-CR-00417-X (N.D. TX. May 16-17, 2024)

EXTRACURRICULAR INTERESTS

Member, Cathedral of the Incarnation, Nashville, TN
Nashville Downtown Rotary Club
Nashville Rowing Club Competition Team
Enjoy golf, kayaking, sailing and snow skiing

"Accepted"   DEC 2 2 2024   *Robert Leon Smith III*

## Disclosure as to Expert Witness Mr. Justin Cain

### I.        Statement of Opinions, Bases, and Reasons

The following is "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed under [Rule 16](b)(1)(C), and the bases and reasons for them."  Fed. R. Crim. P. 16(a)(1)(G)(iii).

### a.  Bases for Testimony

Mr. Cain's opinions are based on his experience investigating fraud, waste, and abuse as a manager in the Humana's Special Investigations Unit ("SIU"), and related training, including, among other things, internal web-based training courses and attendance at National Health Care Anti-Fraud Association conferences. Mr. Cain's testimony will aid the jury in understanding, among other things, the Medicare Advantage (or Part C) program, including the circumstances under which durable medical equipment ("DME") is covered by Medicare Advantage plans like Humana.

Mr. Cain's opinions are based on the following records, which the prosecution team has provided to him, and that have also been provided to the Defendant:

- The Indictment in this case;
- Claims data submitted to Humana by the DME companies referenced in the Indictment;
- Records that Humana provided to the Government from its files relating to the DME companies referenced in the Indictment.

In his preparation to testify, Mr. Cain may review other documents that have been produced to the Defendant in discovery and offer opinions on those documents.

### b.  Opinions and Summary of Anticipated Testimony

Mr. Cain's testimony will help the jury understand what Medicare Advantage is, what it pays for, and the mechanics of claim processing and reimbursement. Mr. Cain's testimony may cover the following topics:

1. Information about Medicare Advantage, including:

    A. Medicare Advantage, formerly known as Medicare Part C or Medicare+Choice, provides beneficiaries with the option to receive Medicare benefits through private managed care plans (known as Medicare Advantage Plans) rather than through traditional Medicare Parts A and B.

    B. Private health insurance companies offering Medicare Advantage Plans are required to provide beneficiaries with the same services and supplies offered under Medicare

"Accepted" DEC 2 2 2024 Robert Leon Smith III

Parts A and B, and to be eligible to enroll in a Medicare Advantage Plan, an individual must be entitled to receive benefits under Medicare Parts A and B.

C.  Medicare Advantage Plans are "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b), and "Federal health care program[s]," as defined by Title 42, United States Code, Section 1320a-7b(f).

D.  Private health insurance companies, along with their related subsidiaries and affiliates, contract directly with CMS to provide managed care to beneficiaries through Medicare Advantage Plans. These health insurance companies, through their Medicare Advantage Plans, adjudicate claims in locations throughout the United States, and often make payments directly to providers, rather than to beneficiaries who receive the health care benefits, items, and services. This occurs when the provider accepts an assignment of the right to payment from the beneficiary.

E.  To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers submit itemized claim forms to the beneficiaries' Medicare Advantage Plan, typically electronically via the internet. When providers submit claim forms to Medicare Advantage Plans, they certify that the contents of the forms are true, correct, complete and that the forms are prepared in compliance with laws and regulations governing Medicare. Providers also certify that the services being billed are medically necessary and were in fact provided as billed.

F.  Private health insurance companies offered Medicare Advantage Plans are paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services that the beneficiary received. These payments by Medicare to the private health insurance companies are known as "capitation payments." Every month, then, CMS pays the health insurance companies a predetermined amount for each beneficiary enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month. CMS determines the per-beneficiary capitation amount using actuarial tables, based on a variety of facts, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusts the capitation rates annually, taking into account each beneficiary's previous complains, diagnoses, and treatments. Beneficiaries with more illnesses or more serious conditions would generally rate a higher capitation payment than healthier beneficiaries.

2.  Information about Humana's claims processing and its coverage and reimbursement for durable medical equipment, prosthetics, orthotics, and supplies (hereinafter, "DME"), including:

A.  How Humana processes claims, including DME claims, for Medicare Advantage beneficiaries;

"Accepted"

DEC 2 2 2024

*Robert Leon Smith III*

B.  The applicability of the Anti-Kickback Statute to claims submitted to Humana's Medicare Advantage plans;

C.  Whether Humana and other Medicare Advantage plans cover claims, including DME claims, that were procured through kickbacks and bribes;

D.  Humana's inability to review every claim that it receives and the trust it places in providers, such as DME suppliers, to submit truthful and accurate claims; and

E.  Whether Humana covers DME for Medicare Advantage beneficiaries that is medically unnecessary or ordered without regard to medical necessity.

Mr. Cain will also authenticate, discuss, and summarize billing records, contracts, and audits performed of the claims submitted by the DME companied referenced in the Indictment.  Mr. Cain may testify regarding patterns in the billing records, including any irregularities observed in the billing data (e.g., number of braces per beneficiary, lack of variety of braces ordered, geographic dispersion of beneficiaries and referring providers).

## II.    Qualifications

The following is a list of "the witness's qualifications, including a list of all publications authored in the previous 10 years."  Fed. R. Crim. P. 16(a)(1)(G)(iii).

### a.  Qualifications

Mr. Cain is a healthcare and corporate fraud, waste, and abuse investigator with experience in Medicare fraud investigations. He graduated from Wingate University in 2004 with Bachelor of Science degree in Human Services and Sociology.  He became a Certified Fraud Examiner in 2021. Following graduation, he served in various positions with the Ohio Attorney General's Office, Ohio Peace Officer Training Commission, and as a special agent with the Ohio Attorney General's Office, Health Care Fraud Section. Since 2015, he has worked as an investigator and investigations manager for Humana, Inc., a health insurance corporation based in Louisville, Kentucky.

## III.   List of Cases During the Previous Four Years in Which Witness has Testified as an Expert at Trial or by Deposition (Fed. R. Crim. P. 16(a)(1)(G)(iii))

Within the last four years, Mr. Cain has testified as an expert in 3 trials:

- *USA v. Ashis Rakhit et al*, Case No. 1:18-CR-00033, Northern District of Ohio
- *USA v. Lawrence Alexander et al*, Case No. 21-CR-60253, Southern District of Florida
- *USA v. Leah Hagen et al*, Case No. 3:19-CR-00146, Northern District of Texas

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

Mr. Cain has been informed that if he learns of testimony that should be disclosed under this rule to notify the government.

Sincerely,

GLENN S. LEON
Chief
Fraud Section, Criminal Division
U.S. Department of Justice

By:   /s/ *Andrea Savdie*
Andrea Savdie, Trial Attorney
Michael McCarthy, Trial Attorney
Ralf Owen Dunn, Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
Savdie: (202) 262-6453
McCarthy: (202) 923-7822
Dunn: (202) 993-4824

I have reviewed and I approve this disclosure.

Date:  12/11/2024

Justin A. Cain,

Enclosures

# JUSTIN CAIN, CFE

Ohio · 502-301-2527
**Jcain2@humana.com**

Proven leader and investigator, with a demonstrated history of successful investigative resolutions, project management, and team management. Skilled in regulatory compliance, risk analysis, fraud, waste & abuse prevention, investigations, as well as creating proactive assessments to mitigate risks & loss.

## PROFESSIONAL EXPERIENCE

**JUNE 2016 – PRESENT**
**SIU INVESTIGATIVE LEAD/MANAGER,** HUMANA INSURANCE
- Manage a team of investigative staff and direct highly complex investigations covering all provider specialties and all lines of business.
- Personally conduct investigative tasks, such as interviews, medical record reviews, data analysis, and research.
- Testify in court proceedings, both criminal & civil on behalf of the company & the government.
- Proactively identify schemes and trends across the industry to mitigate fraud, waste, and abuse.
- Coordinate with local, State, and federal regulatory & law enforcement agencies.
- Ensure compliance with state, federal, and company regulations.
- Oversee processes to flag new provider claims for review, which has averted millions of payments to potentially fraudulent entities.

**JULY 2015 – JUNE 2016**
**SIU INVESTIGATOR,** HUMANA INSURANCE
- Investigated complaints of fraud, waste & abuse impacting the healthcare program across the country.
- Conducted extensive background research of subjects, witnesses, complainants, federal & state guidelines & policies.
- Created highly organized case files for documenting evidence and steps taken.
- Conducted interviews of suspects, witnesses, and insured members.
- Collaborated with internal departments as well as local, state, and federal agencies outside of the company to effectively investigate the allegation(s).
- Conducted extensive data analysis & record reviews to verify services rendered and appropriateness of the services.

**OCTOBER 2011 – JULY 2015**
**SPECIAL AGENT,** OHIO ATTORNEY GENERAL'S OFFICE
- Responsible for investigating highly sensitive allegations related to health care fraud and patient abuse/neglect.
- Maintained meticulous investigative case files, chain of custody, investigative reports, and notes pertaining to each case.
- Coordinated investigative efforts with other internal agents as well as local, state, and federal agencies. Testified in court proceedings, served subpoenas, and participated in the execution of search warrants.

"Accepted"
DEC 2 ? 2024
Robert Leon Smith III

- Conducted covert and overt investigations through means of research, claims analysis, surveillance, social media, interviews, banking records, telephone records, and immigration records.

**NOVEMBER 2005– OCTOBER 2011**
**CERTIFICATION OFFICER,** OHIO ATTORNEY GENERAL'S OFFICE
- Responsible for auditing, verifying eligibility of students, certification verification, and background research of all training program participants.
- Assisted with the development of curriculum and exams to ensure compliance with state and federal statutes.
- Conducted an average of 4,500 background investigations each year on individuals for certifications.
- Developed, coordinated, and supervised an office wide auditing and document imaging project.

**JUNE 2004 – NOVEMBER 2005**
**RESEARCHER/ASSISTANT CALEA MANAGER,** OHIO ATTORNEY GENERAL'S OFFICE
- Responsible for auditing/researching state and federal regulations, collecting and organizing data, and designing research projects for Law Enforcement training.
- Developed monthly statistical reports associated with State exams and the Commission on Accreditation of Law Enforcement Agencies (CALEA).
- Assisted with ensuring all CALEA standards were met and adhered to, which allowed for our Academy to exceed National certification standards.
- Assisted with the development of curriculum for State LE training programs.

# EDUCATION/CERTIFICATIONS

**2004**
**BS, HUMAN SERVICES,** WINGATE UNIVERSITY

**2004**
**BS, SOCIOLOGY,** WINGATE UNIVERSITY

**2013**
**CERTIFIED MASTER CRIMINAL INVESTIGATOR,** OHIO ATTORNEY GENERAL'S OFFICE

**2021**
**CERTIFIED FRAUD EXAMINER,** ASSOCIATION OF CERTIFIED FRAUD EXAMINERS

# ADDITIONAL TRAININGS

- Several Law Enforcement & Investigative Training courses – Ohio Peace Officer Training Academy
- National Healthcare Anti-Fraud Association Conference (Attendee and Presenter)

"Accepted"

DEC 2 2 2024

Robert Leon Smith III

2

Robert Leon Smith III
c/o P.O. Box 853
Archer City, Texas



REC'D BY_____D.C

JAN 15 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Angela Emilia Noble, Clerk of Court
United States District Court, Southern District of Florida
Wilkie D. Ferguson, Junior U.S. Courthouse
400 North Miami Avenue Miami, Florida 33128