Exhibit 1
Front page of the Indictment, 1 pages

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## 23-80211-CR-MARRA/MCCABE
Case No.

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)



FILED BY _____ MP _____ D.C.

**Dec 13, 2023**

ANGELA E. NOBLE
CLERK U.S. DIST. CT
S. D. OF FLA - MIAMI

UNITED STATES OF AMERICA

vs.

ROBERT LEON SMITH III,

Defendant.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

Exhibit 2
18 USC 2, 1 page

Current        ∨

<< Previous   TITLE 18 / PART I / CHAPTER 1 / § 2   Next >>

[Print]   [Print selection]

EXHIBIT 2

[OLRC Home]  Help

18 USC 2: Principals
Text contains those laws in effect on July 8, 2025

From Title 18-CRIMES AND CRIMINAL PROCEDURE
    PART I-CRIMES
    CHAPTER 1-GENERAL PROVISIONS
Jump To:
    Source Credit
    Miscellaneous
    Amendments

## §2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

(June 25, 1948, ch. 645, 62 Stat. 684 ; Oct. 31, 1951, ch. 655, §17b, 65 Stat. 717 .)

### HISTORICAL AND REVISION NOTES

Based on title 18, U.S.C., 1940 ed., §550 (Mar. 4, 1909, ch. 321, §332, 35 Stat. 1152 ).

Section 2(a) comprises section 550 of title 18, U.S.C., 1940 ed., without change except in minor matters of phraseology.

Section 2(b) is added to permit the deletion from many sections throughout the revision of such phrases as "causes or procures".

The section as revised makes clear the legislative intent to punish as a principal not only one who directly commits an offense and one who "aids, abets, counsels, commands, induces or procures" another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States.

It removes all doubt that one who puts in motion or assists in the illegal enterprise but causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense.

This accords with the following decisions: *Rothenburg v. United States*, 1918, 38 S. Ct. 18, 245 U.S. 480, 62 L. Ed. 414, and *United States v. Hodorowicz*, C. C. A. Ill. 1939, 105 F. 2d 218, certiorari denied, 60 S. Ct. 108, 308 U.S. 584, 84 L. Ed. 489. *United States v. Giles*, 1937, 57 S. Ct. 340, 300 U.S. 41, 81 L. Ed. 493,

Exhibit 3
18 U.S.C. 371, 1 page

Current
<< Previous   TITLE 18 / PART I / CHAPTER 19 / § 371   Next >>

[Print]   [Print selection]      EXHIBIT 5      [OLRC Home]  Help

**18 USC 371: Conspiracy to commit offense or to defraud United States**
Text contains those laws in effect on July 8, 2025

From Title 18-CRIMES AND CRIMINAL PROCEDURE
PART I-CRIMES
CHAPTER 19-CONSPIRACY
Jump To:
Source Credit
Miscellaneous
Amendments

### §371. Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

(June 25, 1948, ch. 645, 62 Stat. 701 ; Pub. L. 103–322, title XXXIII, §330016(1)(L), Sept. 13, 1994, 108 Stat. 2147 .)

HISTORICAL AND REVISION NOTES

Based on title 18, U.S.C., 1940 ed., §§88, 294 (Mar. 4, 1909, ch. 321, §37, 35 Stat. 1096 ; Mar. 4, 1909, ch. 321, §178a, as added Sept. 27, 1944, ch. 425, 58 Stat. 752 ).

This section consolidates said sections 88 and 294 of title 18, U.S.C., 1940 ed.

To reflect the construction placed upon said section 88 by the courts the words "or any agency thereof" were inserted. (See *Haas v. Henkel*, 1909, 30 S. Ct. 249, 216 U. S. 462, 54 L. Ed. 569, 17 Ann. Cas. 1112, where court said: "The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful functions of any department of government." Also, see *United States v. Walter*, 1923, 44 S. Ct. 10, 263 U. S. 15, 68 L. Ed. 137, and definitions of department and agency in section 6 of this title.)

The punishment provision is completely rewritten to increase the penalty from 2 years to 5 years except where the object of the conspiracy is a misdemeanor. If the object is a misdemeanor, the maximum imprisonment for a conspiracy to commit that offense, under the revised section, cannot exceed 1 year.

Exhibit 4
18 USC 982, 1 page

[Print]   [Print selection]

EXHIBIT 4

[OLRC Home]  Help

18 USC 982: Criminal forfeiture
Text contains those laws in effect on January 4, 1995

From Title 18-CRIMES AND CRIMINAL PROCEDURE
    PART I-CRIMES
    CHAPTER 46-FORFEITURE
Jump To:
    Source Credit
    Amendments
    Effective Date

## §982. Criminal forfeiture

(a)(1) The court, in imposing sentence on a person convicted of an offense in violation of section 5313(a), 5316, or 5324 of title 31, or of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property. However, no property shall be seized or forfeited in the case of a violation of section 5313(a) of title 31 by a domestic financial institution examined by a Federal bank supervisory agency or a financial institution regulated by the Securities and Exchange Commission or a partner, director, or employee thereof.

(2) The court, in imposing sentence on a person convicted of a violation of, or a conspiracy to violate-
    (A) section 215, 656, 657, 1005, 1006, 1007, 1014, 1341, 1343, or 1344 of this title, affecting a financial institution; or
    (B) section 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 842, 844, 1028, 1029, or 1030 of this title,

shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.

(3) The court, in imposing a sentence on a person convicted of an offense under-
    (A) section 666(a)(1) (relating to Federal program fraud);
    (B) section 1001 (relating to fraud and false statements);
    (C) section 1031 (relating to major fraud against the United States);
    (D) section 1032 (relating to concealment of assets from conservator, receiver, or liquidating agent of insured financial institution);
    (E) section 1341 (relating to mail fraud); or
    (F) section 1343 (relating to wire fraud),

involving the sale of assets acquired or held by the Resolution Trust Corporation, the Federal Deposit Insurance Corporation, as conservator or receiver for a financial institution or any other conservator for a financial institution appointed by the Office of the Comptroller of the Currency or the Office of Thrift

Exhibit 5
18 USC 1347, 1 page

Current

<< Previous   TITLE 18 / PART I / CHAPTER 63 / § 1347   Next >>

[Print]   [Print selection]                    EXHIBIT 5                    [OLRC Home]  Help

18 USC 1347: Health care fraud
Text contains those laws in effect on July 8, 2025

From Title 18-CRIMES AND CRIMINAL PROCEDURE
    PART I-CRIMES
      CHAPTER 63-MAIL FRAUD AND OTHER FRAUD OFFENSES
Jump To:
    Source Credit
    Miscellaneous
    Amendments

§1347. Health care fraud

  (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice-

    (1) to defraud any health care benefit program; or

    (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

  in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

  (b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

(Added Pub. L. 104–191, title II, §242(a)(1), Aug. 21, 1996, 110 Stat. 2016 ; amended Pub. L. 111–148, title X, §10606(b), Mar. 23, 2010, 124 Stat. 1008 .)

### EDITORIAL NOTES

#### AMENDMENTS

**2010**-Pub. L. 111–148 designated existing provisions as subsec. (a) and added subsec. (b).

Exhibit 6
18 USC 1349, 1 page

Current

<< Previous   TITLE 18 / PART I / CHAPTER 63 / § 1349   Next >>

[Print]   [Print selection]

EXHIBIT 0

[OLRC Home] Help

18 USC 1349: Attempt and conspiracy
Text contains those laws in effect on July 8, 2025

From Title 18-CRIMES AND CRIMINAL PROCEDURE
    PART I-CRIMES
    CHAPTER 63-MAIL FRAUD AND OTHER FRAUD OFFENSES
Jump To:
    Source Credit

## §1349. Attempt and conspiracy

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

(Added Pub. L. 107–204, title IX, §902(a), July 30, 2002, 116 Stat. 805 .)

Exhibit 7
42 USC 1320a-7b, 1 page

# EXHIBIT 7

**42 USC 1320a-7b: Criminal penalties for acts involving Federal health care programs**
Text contains those laws in effect on January 3, 2024

From Title 42-THE PUBLIC HEALTH AND WELFARE
  CHAPTER 7-SOCIAL SECURITY
  SUBCHAPTER XI-GENERAL PROVISIONS, PEER REVIEW, AND ADMINISTRATIVE
  SIMPLIFICATION
  Part A-General Provisions
Jump To:
  Source Credit
  Miscellaneous
  References in Text
  Codification
  Amendments
  Effective Date
  Regulations
  Executive Documents

## §1320a–7b. Criminal penalties for acts involving Federal health care programs

**(a) Making or causing to be made false statements or representations**

Whoever–
  (1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f)),
  (2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment,
  (3) having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment, or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized,
  (4) having made application to receive any such benefit or payment for the use and benefit of another and having received it, knowingly and willfully converts such benefit or payment or any part thereof to a use other than for the use and benefit of such other person,
  (5) presents or causes to be presented a claim for a physician's service for which payment may be made under a Federal health care program and knows that the individual who furnished the service was not licensed as a physician, or

Exhibit 8
Parallel Table of Authorities and Rules,
Excerpts, 6 pages

[CFR Index and Finding Aids, 2024]
[Parallel Table of Authorities and Rules]
[From the U.S. Government Publishing Office, www.gpo.gov]

EXHIBIT 8-1

PARALLEL TABLE OF AUTHORITIES AND RULES

--------------------------------------------------------------------

    The following table lists rulemaking authority for regulations
codified in the Code of Federal Regulations. Also included are statutory
citations which are noted as being interpreted or applied by those
regulations.

    The table is divided into four categories: United States Code
citations, United States Statutes at Large citations, public law
citations, and Presidential document citations. Within each category the
citations are arranged in numerical order:

    For the United States Code, by title and section;
    For the United States Statutes at Large, by volume and page number;
    For public laws, by number; and
    For Presidential documents (Proclamations, Executive orders, and
Reorganization plans), by document number.

    Entries in the table are taken directly from the rulemaking authority
citation provided by Federal agencies in their regulations. Federal
agencies are responsible for keeping these citations current and
accurate. Because Federal agencies sometimes present these citations in
an inconsistent manner, the table cannot be considered all-inclusive.

    The portion of the table listing the United States Code citations is
the most comprehensive, as these citations are entered into the table
whenever they are given in the authority citations provided by the
agencies. United States Statutes at Large and public law citations are
carried in the table only when there are no corresponding United States
Code citations given.

This table is revised as of January 1, 2024.

[[Page 962]]

1 U.S.C.
    112.......................................................1 Part 2
    112a....................................................22 Part 181
    112b....................................................22 Part 181
    113.......................................................1 Part 2
2 U.S.C.
    136....................................36 Parts 701, 702, 703, 705
    178......................................................36 Part 705
    179......................................................36 Part 704
    215.......................................................38 Part 49
    431...............................................11 Parts 104, 400
    432..............................................11 Part 104
    434...............................................11 Parts 104, 400

EXHIBIT 8-2

```
                                        50 Part 300
5503..................................50 Part 223
5507..................................15 Part 906
5601 et seq...........................15 Part 904
5801..................................36 Part 222
5908...................................7 Part 613
6515 note.............................36 Part 218
6571--6578............................7 Part 625
6802..................................36 Part 251
                                      43 Part 2930
6901 et seq...........................15 Part 904
                                        50 Part 300
6905..................................15 Part 906
7001 et seq...........................15 Part 904
                                      50 Parts 660, 666
7089..................................15 Part 906
7401 et seq...........................15 Part 904
7701 et seq...........................15 Part 904
7801 et seq...........................15 Part 904

17 U.S.C.
101...................................19 Part 133
112...............37 Parts 370, 380, 382, 383, 384
114...............37 Parts 370, 380, 382, 383
115...............37 Parts 210, 355, 385, 390
116...................................37 Part 387
118...................................37 Part 381
119...................................37 Part 386
408...................................37 Part 202
601--603..............................19 Part 133
702....37 Parts 201, 202, 204, 205, 210, 211, 220, 222, 223, 224, 225,
               226, 227, 228, 229, 230, 231, 232, 233, 234
801....37 Parts 301, 355, 360, 381, 382, 383, 384, 385, 386, 387, 388,
                                                             390
802...................................37 Part 354
803...................37 Parts 303, 350, 351, 352, 353, 360, 381, 387
```

[[Page 992]]

```
804...............................37 Parts 380, 385
805...................................37 Part 360
908...................................37 Part 211
1510...37 Parts 220, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231,
                                            232, 233, 234

18 U.S.C.
13..............................32 Parts 210, 263, 1290
                                      39 Part 232
42--44................................50 Part 11
42....................................19 Part 12
                           50 Parts 10, 12, 13, 14, 16
47...................................43 Part 4700
201--212..............................24 Part 8
202...................................32 Part 251
203...................................31 Part 8
205...................................31 Part 8
207...........................5 Parts 534, 1304, 2641
                                      14 Part 1207
                                      17 Part 207
                                      19 Part 200
                           22 Parts 18, 223, 525, 710, 713
                                      28 Part 45
                                      29 Part 0
                                      31 Part 15
```

EXHIBIT 8-3

|  | 36 Part 905 |
|  | 45 Parts 73b, 500 |
|  | 46 Part 502 |
|  | 49 Part 98 |
| 208.................................................. | 5 Part 2640 |
|  | 10 Part 1010 |
|  | 14 Part 1207 |
|  | 34 Part 73 |
| 212.................................................. | 5 Parts 3101, 3201 |
| 213.................................................. | 5 Parts 3101, 3201 |
| 219.................................................. | 32 Part 516 |
| 241 note............................................. | 24 Part 573 |
| 437.................................................. | 25 Part 140 |
| 474.................................................. | 31 Parts 402, 405 |
| 474A................................................. | 31 Part 601 |
| 492.................................................. | 31 Parts 101, 402, 403 |
| 499.................................................. | 32 Part 161 |
| 506.................................................. | 32 Part 161 |
|  | 36 Part 1200 |
|  | 45 Part 2540 |
| 509.................................................. | 32 Part 161 |
| 534 note............................................. | 28 Part 105 |
| 545.................................................. | 19 Part 161 |
| 546.................................................. | 19 Part 162 |
| 641.................................................. | 12 Parts 4, 1070 |
|  | 22 Part 713 |
|  | 43 Part 8200 |
|  | 49 Part 801 |
| 701.................................................. | 20 Part 369 |
|  | 32 Parts 161, 507 |
|  | 45 Part 2540 |
| 704.................................................. | 32 Part 507 |
| 707.................................................. | 7 Part 8 |
| 711.................................................. | 36 Part 271 |
| 751--752............................................. | 28 Part 511 |
| 751.................................................. | 28 Part 570 |
| 799.................................................. | 14 Parts 1203a, 1204 |
| 842.................................................. | 49 Parts 1515, 1570, 1572 |
| 843.................................................. | 27 Part 771 |
| 845.................................................. | 49 Parts 1515, 1570, 1572 |
| 847.................................................. | 27 Parts 478, 555, 771 |
| 921--931............................................. | 27 Part 478 |
| 921.................................................. | 27 Part 72 |
| 922.................................................. | 32 Part 635 |
| 951.................................................. | 28 Part 73 |
| 981 et seq........................................... | 50 Part 12 |
| 981.................................................. | 28 Parts 8, 9 |
|  | 39 Part 233 |
| 983.................................................. | 8 Part 274 |
|  | 19 Part 171 |
|  | 28 Parts 8, 9 |
|  | 32 Part 216 |
|  | 39 Part 233 |
| 1001................................................. | 25 Part 151 |
|  | 32 Parts 161, 525 |
|  | 34 Part 200 |
|  | 43 Part 3830 |
| 1017................................................. | 36 Parts 701, 1200 |
|  | 45 Part 2540 |
| 1114................................................. | 28 Part 64 |
| 1116................................................. | 22 Part 2 |
| 1159................................................. | 25 Part 309 |

EXHIBIT D-4

| | |
|---|---|
| 1162 | 28 Part 50 |
| 1261 | 27 Part 72 |
| 1301 et seq. | 37 Part 212 |
| 1350 | 17 Parts 229, 232, 240, 249, 270 |
| 1382 | 32 Part 552 |
| 1512--1514 | 32 Part 114 |
| 1512 | 28 Part 551 |
| 1514A | 29 Part 1980 |
| 1621 | 49 Part 1104 |
| 1693--1699 | 39 Parts 310, 320 |
| 1692--1737 | 39 Parts 20, 111, 113 |
| 1791--1792 | 28 Part 511 |
| 1791 | 28 Parts 6, 540 |
| 1793 | 28 Part 511 |
| 1905 | 12 Parts 4, 1070 |
| | 19 Part 103 |
| | 20 Part 402 |
| | 21 Parts 20, 26 |
| | 25 Part 516 |
| | 45 Part 5 |
| 1906 | 12 Part 4 |
| 1956 | 39 Part 233 |
| 1957 | 39 Part 233 |
| 2071 | 49 Part 801 |
| 2152 | 32 Part 761 |
| 2254 | 39 Part 233 |
| 2257 | 28 Part 75 |
| 2257A | 28 Part 75 |
| 2332d | 31 Parts 501, 535, 542, 560, 562, 596 |
| 2339B | 31 Parts 501, 560, 597 |
| 2341--2346 | 27 Parts 46, 646 |
| 2386 | 28 Part 10 |
| 3013 | 28 Part 545 |
| 3050 | 28 Part 511 |
| 3051 | 28 Parts 8, 9 |
| 3056 | 31 Parts 409, 413 |
| 3059 | 28 Part 7 |
| 3061 | 39 Parts 232, 233 |
| 3101 et seq. | 22 Part 95 |
| 3401 | 28 Part 52 |
| | 32 Parts 516, 1290 |
| 3402 | 32 Part 1290 |
| 3481 et seq. | 28 Part 550 |
| 3521--3528 | 28 Parts 524, 550 |
| 3524 | 28 Part 549 |
| 3551--3586 | 36 Part 242 |

[[Page 993]]

| | |
|---|---|
| | 50 Part 180 |
| 3559 | 10 Part 860 |
| 3565 | 28 Parts 527, 571 |
| 3568--3569 | 28 Part 571 |
| 3568 | 28 Parts 522, 523 |
| 3569 | 28 Part 527 |
| 3571 | 10 Parts 860, 1048 |
| | 28 Part 545 |
| | 43 Part 3830 |
| 3582 | 28 Part 571 |
| 3585 | 28 Part 522 |
| 3596 | 28 Part 26 |
| 3597 | 28 Part 26 |

244, 245, 246, 247, 249, 250, 251, 252, 811, 816, 817, 819, 829,
832, 836, 839, 846, 847, 852, 3001, 3002, 3003, 3004, 3005,
3006, 3007, 3009, 3011, 3012, 3015, 3016, 3017, 3018, 3019,
3022, 3023, 3024, 3025, 3027, 3028, 3030, 3031, 3032, 3033,
3034, 3035, 3036, 3037, 3042, 3046, 3047, 3052, 3053

1321--1328.............................................41 Part 201
1702....43 Parts 608, 801, 802, 803, 804, 808, 810, 811, 812, 813, 814,
815, 816, 817, 819, 822, 823, 824, 825, 826, 829, 832, 836, 835,
837, 839, 841, 842, 843, 844, 845, 846, 849, 852, 853, 870,
1201, 1202, 1203, 1204, 1205, 1206, 1207, 1209, 1211, 1212,
1213, 1215, 1216, 1217, 1219, 1222, 1223, 1224, 1227, 1228,
1231, 1232, 1233, 1235, 1236, 1237, 1239, 1242, 1246, 1247,
1252, 1253, 3001, 3002, 3003, 3004, 3005, 3006, 3007, 3009,
3011, 3012, 3015, 3016, 3017, 3018, 3019, 3022, 3023, 3024,
3025, 3027, 3028, 3030, 3031, 3032, 3033, 3034, 3035, 3036,
3037, 3042, 3046, 3047, 3052, 3053

1707....48 Parts 1001, 1002, 1016, 1019, 1028, 1032, 1034, 1042, 1052,
3001, 3002, 3003, 3004, 3005, 3006, 3007, 3009, 3011, 3012,
3015, 3016, 3017, 3018, 3019, 3022, 3023, 3024, 3025, 3027,
3028, 3030, 3031, 3032, 3033, 3034, 3035, 3036, 3037, 3042,
3046, 3047, 3052, 3053

3102...................................48 Parts 3404, 3430, 3431
4106..........................................48 Part 2022
7101--7109......................................39 Part 955
                                                48 Part 6101
7413...........................................41 Part 201
8102 et seq....................................10 Part 707
8501--8506....................................41 Part 51-6
8503...........................................41 Part 51-11

42 U.S.C.
131......................................45 Parts 63, 204
201--262...................................21 Parts 16, 17
201.............................21 Parts 10, 12, 13, 14, 15
203..........................................5 Part 6401
209.............................................40 Part 18
                                            42 Parts 21, 61
210.........................................42 Parts 22, 61
216...........................................5 Part 5501
    21 Parts 1, 3, 4, 26, 50, 56, 58, 71, 201, 210, 211, 310, 570,
      571, 600, 606, 610, 630, 640, 660, 680, 740, 812, 813, 1240,
                                                      1250, 1271
                                            32 Parts 626, 627
                                                34 Part 681
    42 Parts 3, 4, 5, 6, 7, 9, 11, 21, 31, 35, 50, 51c, 52, 52a,
      52b, 52c, 52d, 52e, 52h, 52i, 53, 56, 57, 61, 62, 63, 63a, 64,
                                    65a, 66, 68, 70, 71, 93, 121, 124
                                            45 Parts 19, 83, 94
217b.......................................45 Parts 57, 73
233.............................................28 Part 18
                                                42 Part 6
237............................................42 Part 24
238a...........................................45 Part 88
241 et seq.....................................40 Part 40
241--242.......................................21 Part 20
241............................................2 Part 1500
    21 Parts 1, 7, 26, 50, 56, 120, 123, 180, 201, 209, 310, 570,
                                                    571, 740, 812
                                            40 Parts 9, 451
                                    42 Parts 7, 11, 52c, 61, 93
242............................................21 Part 310
242a...........................................21 Part 20
                                            42 Parts 20, 64a

EXHIBT 37-b

701...........................................................45 Part 96
702...........................................................42 Part 51a
706...........................................................42 Part 51a
802 et seq....................................................31 Part 35
802...........................................................31 Part 35
803...........................................................31 Part 35
901...........................................................20 Part 423
902............................................................2 Part 2336
              20 Parts 401, 402, 403, 404, 408, 411, 416, 418, 422, 423, 429,
                                                              430, 498
                                                        22 Part 430
902 note.................................................20 Parts 404, 416
907...........................................................45 Part 204
909...........................................................20 Part 404
1001--1013...................................................20 Part 403
1006.........................................................40 Part 266
1070b........................................................34 Part 676
1007.........................................................20 Part 408
1010.........................................................20 Part 408
1102.........................................................20 Part 606
111..........................................................20 Part 619
1141 note....................................................24 Part 581
1202--1203...................................................45 Part 1393
1202.........................................................45 Part 233
1203.........................................................45 Part 201
1232c........................................................34 Part 676
1301..............................................45 Parts 201, 301, 1355
1302...............20 Parts 601, 602, 604, 619, 620, 625, 640, 650
                                                        31 Part 493
                                                     40 Parts 412, 484
        42 Parts 41, 51a, 121, 400, 401, 402, 403, 405, 406, 407, 408,
        409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421,
        422, 423, 424, 425, 430, 431, 432, 433, 434, 435, 436, 438, 440,
        441, 442, 447, 455, 456, 457, 460, 462, 466, 473, 476, 480, 482,
        483, 484, 485, 486, 488, 489, 491, 493, 494, 495, 498, 505, 510,
              512, 1000, 1001, 1002, 1003, 1004, 1005, 1006, 1007
        45 Parts 1, 88, 95, 160, 180, 184, 201, 204, 205, 206, 212, 225,
        233, 234, 235, 237, 264, 301, 302, 303, 304, 305, 307, 308, 309,
                                                   310, 512, 1355, 1356, 1357
1302c-3...................................................42 Part 466
1306................................................20 Parts 401, 402
                                                  42 Parts 121, 422, 423, 425
                                                  45 Parts 5, 205, 206
1307b-7..................................................45 Part 205
1308.................................................45 Parts 260, 264
1310.........................................................20 Part 416
1313.........................................................45 Part 212
1315............................................45 Parts 88, 204, 510, 513
1315a................................................42 Parts 510, 512
                                                        45 Part 88
1316.........................................................45 Part 201
1320.........................................................42 Part 1000
1320a-1......................................................45 Part 88
1320a-3..............................................42 Parts 1002, 1006
1320a-5..............................................42 Parts 1002, 1006
1320a-6..............................................20 Parts 404, 406
1320a-7.......................................42 Parts 1001, 1002, 1005, 1006
1320a-7a.....................................................32 Part 200
                                                        42 Part 1003
1320a-7b.....................................................42 Part 1001
1320a-7d.............................................42 Parts 1000, 1008
1320a-7e.....................................................45 Part 61

Exhibit 9
44 USC 1507, 1 page

EXHIBIT - q

[Print]   [Print selection]                                                   [OLRC Home]   Help

44 USC 1507: Filing document as constructive notice; publication in Federal Register as presumption of validity; judicial notice; citation
Text contains those laws in effect on July 8, 2025

From Title 44-PUBLIC PRINTING AND DOCUMENTS
    CHAPTER 15-FEDERAL REGISTER AND CODE OF FEDERAL REGULATIONS
Jump To:
    Source Credit
    Miscellaneous
    Amendments

## §1507. Filing document as constructive notice; publication in Federal Register as presumption of validity; judicial notice; citation

A document required by section 1505(a) of this title to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until the document has been filed with the Office of the Federal Register and a copy made available for public inspection as provided by section 1503 of this title. Unless otherwise specifically provided by statute, filing of a document, required or authorized to be published by section 1505 of this title, except in cases where notice by publication is insufficient in law, is sufficient to give notice of the contents of the document to a person subject to or affected by it. The publication in the Federal Register of a document creates a rebuttable presumption-

    (1) that it was duly issued, prescribed, or promulgated;
    (2) that it was filed with the Office of the Federal Register and made available for public inspection at the day and hour stated in the published notation;
    (3) that the copy contained in the Federal Register is a true copy of the original; and
    (4) that all requirements of this chapter and the regulations prescribed under it relative to the document have been complied with.

The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number.

( Pub. L. 90–620, Oct. 22, 1968, 82 Stat. 1276 ; Pub. L. 118–267, §2(a)(2), Jan. 4, 2025, 138 Stat. 2983 .)

HISTORICAL AND REVISION NOTES

Based on 44 U.S. Code, 1964 ed., §307 (July 26, 1935, ch. 417, §7, 49 Stat. 502 ).

EDITORIAL NOTES
-

Exhibit 10
42 Part 1001 Subchapter B – OIG Authorities, 65 page

where applicable, in imposing exclusions proposed by the OIG).

[57 FR 3330, Jan. 29, 1992, as amended at 59 FR 5512, Jan. 22, 1993; 64 FR 39428, July 22, 1999]

**§ 1001.2 Definitions.**

For purposes of this part:

*Agent* means any person who has express or implied authority to obligate or act on behalf of an entity.

*Controlled substance* means a drug or other substance, or immediate precursor:

(a) Included in schedules I, II, III, IV or V of part B of subchapter I of 21 U.S.C. chapter 13, or

(b) That is deemed a controlled substance by the law of any State.

*Convicted* means that—

(a) A judgment of conviction has been entered against an individual or entity by a Federal, State or local court, regardless of whether:

(1) There is a post-trial motion or an appeal pending, or

(2) The judgment of conviction or other record relating to the criminal conduct has been expunged or otherwise removed;

(b) A Federal, State or local court has made a finding of guilt against an individual or entity;

(c) A Federal, State or local court has accepted a plea of guilty or nolo contendere by an individual or entity; or

(d) An individual or entity has entered into participation in a first offender, deferred adjudication or other program or arrangement where judgment of conviction has been withheld.

*HHS* means Department of Health and Human Services.

*Immediate family member* means a person's husband or wife; natural or adoptive parent; child or sibling; stepparent, stepchild, stepbrother, or stepsister; father-, mother-, daughter-, son-, brother- or sister-in-law; grandparent or grandchild; or spouse of a grandparent or grandchild.

*Incarceration* means imprisonment or any type of confinement with or without supervised release, including, but not limited to, community confinement, house arrest and home detention.

*Indirect ownership interest* includes an ownership interest through any other entities that ultimately have an ownership interest in the entity in issue. (For example, an individual has a 10-percent ownership interest in the entity at issue if he or she has a 20-percent ownership interest in a corporation that wholly owns a subsidiary that is a 50-percent owner of the entity in issue.)

*Managing employee* means an individual (including a general manager, business manager, administrator, or director) who exercises operational or managerial control over the entity or part thereof, or directly or indirectly conducts the day-to-day operations of the entity or part thereof.

*Member of household* means, with respect to a person, any individual with whom the person is sharing a common abode as part of a single-family unit, including domestic employees and others who live together as a family unit. A roomer or boarder is not considered a member of household.

*Ownership interest* means an interest in:

(1) The capital, the stock, or the profits of the entity, or

(2) Any mortgage, deed, trust or note, or other obligation secured in whole or in part by the property or assets of the entity.

*Ownership or control interest* means, with respect to an entity, a person who

(1) Has a direct or an indirect ownership interest (or any combination thereof) of 5 percent or more in the entity;

(2) Is the owner of a whole or part interest in any mortgage, deed of trust, note, or other obligation secured (in whole or in part) by the entity or any of the property assets thereof, if such interest is equal to or exceeds 5 percent of the total property and assets of the entity;

(3) Is an officer or a director of the entity;

(4) Is a partner in the entity if the entity is organized as a partnership;

(5) Is an agent of the entity; or

(6) Is a managing employee of the entity.

*Patient* means any individual who is receiving health care items or services, including any item or service provided to meet his or her physical, mental or

EXHIBIT 10

# SUBCHAPTER B—OIG AUTHORITIES

## PART 1001—PROGRAM INTEGRITY—MEDICARE AND STATE HEALTH CARE PROGRAMS

### Subpart A—General Provisions

Sec.
1001.1   Scope and purpose.
1001.2   Definitions.

### Subpart B—Mandatory Exclusions

1001.101   Basis for liability.
1001.102   Length of exclusion.

### Subpart C—Permissive Exclusions

1001.201   Conviction relating to program or health care fraud.
1001.301   Conviction relating to obstruction of an investigation or audit.
1001.401   Conviction relating to controlled substances.
1001.501   License revocation or suspension.
1001.601   Exclusion or suspension under a Federal or State health care program.
1001.701   Excessive claims or furnishing of unnecessary or substandard items and services.
1001.801   Failure of HMOs and CMPs to furnish medically necessary items and services.
1001.901   False or improper claims.
1001.951   Fraud and kickbacks and other prohibited activities.
1001.952   Exceptions.
1001.1001   Exclusion of entities owned or controlled by a sanctioned person.
1001.1101   Failure to disclose certain information.
1001.1201   Failure to provide payment information.
1001.1301   Failure to grant immediate access.
1001.1401   Violations of PPS corrective action.
1001.1501   Default of health education loan or scholarship obligations.
1001.1551   Exclusion of individuals with ownership or control interest in sanctioned entities.
1001.1601   Making false statements or misrepresentation of material facts.
1001.1701   Violations of the limitations on physician charges.
1001.1751   Billing for services of assistant at surgery during cataract operations.
APPENDIX A TO SUBPART C OF PART 1001

### Subpart D—Waivers and Effect of Exclusion

1001.1801   Waivers of exclusions.
1001.1901   Scope and effect of exclusion.

### Subpart E—Notice and Appeals

1001.2001   Notice of intent to exclude.
1001.2002   Notice of exclusion.
1001.2003   Notice of proposal to exclude.
1001.2004   Notice to State agencies.
1001.2005   Notice to State licensing agencies.
1001.2006   Notice to others regarding exclusion.
1001.2007   Appeal of exclusions.

### Subpart F—Reinstatement into the Programs

1001.3001   Timing and method of request for reinstatement.
1001.3002   Basis for reinstatement.
1001.3003   Approval of request for reinstatement.
1001.3004   Denial of request for reinstatement.
1001.3005   Withdrawal of exclusion for reversed or vacated decisions.

AUTHORITY: 42 U.S.C. 1302; 1320a-7; 1320a-7b; 1395u(j); 1395u(k); 1395w-104(e)(6), 1395y(d); 1395y(e); 1395cc(b)(2)(D), (E), and (F); 1395hh; 1842(j)(1)(D)(iv), 1842(k)(1); and sec. 2455, Pub. L. 103-355, 108 Stat. 3327 (31 U.S.C. 6101 note).

SOURCE: 57 FR 3330, Jan. 29, 1992, unless otherwise noted.

## Subpart A—General Provisions

### § 1001.1  Scope and purpose.

(a) The regulations in this part specify certain bases upon which individuals and entities may, or in some cases must, be excluded from participation in Medicare, Medicaid and all other Federal health care programs. They also state the effect of exclusion, the factors that will be considered in determining the length of any exclusion, the provisions governing notices of exclusions, and the process by which an excluded individual or entity may seek reinstatement into the programs.

(b) The regulations in this part are applicable to and binding on the Office of Inspector General (OIG) in imposing and proposing exclusions, as well as to Administrative Law Judges (ALJs), the Departmental Appeals Board (DAB), and federal courts in reviewing the imposition of exclusions by the OIG (and,

emotional needs or well-being (including a resident receiving care in a facility as described in part 483 of this chapter), whether or not reimbursed under Medicare, Medicaid and any other Federal health care program and regardless of the location in which such item or service is provided.

*Professionally recognized standards of health care* are Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practicing or providing care within a State. When the Department has declared a treatment modality not to be safe and effective, practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care. This definition will not be construed to mean that all other treatments meet professionally recognized standards.

*Sole community physician* means a physician who is the only physician who provides primary care services to Federal or State health care program beneficiaries within a defined service area.

*Sole source of essential specialized services in the community* means that an individual or entity—

(1) Is the only practitioner, supplier or provider furnishing specialized services in an area designated by the Health Resources Services Administration as a health professional shortage area for that medical specialty, as listed in 42 part 5, appendices B–F;

(2) Is a sole community hospital, as defined in §412.92 of this title; or

(3) Is the only source of specialized services in a reasonably defined service area where services by a non-specialist could not be substituted for the source without jeopardizing the health or safety of beneficiaries.

*State Medicaid Fraud Control Unit* means a unit certified by the Secretary as meeting the criteria of 49 U.S.C. 1396b(q) and §1002.305 of this chapter.

[57 FR 3330, Jan. 28, 1992, as amended at 63 FR 46686, Sept. 2, 1998; 64 FR 39426, July 22, 1999; 82 FR 4111, Jan. 12, 2017]

## Subpart B—Mandatory Exclusions

**§1001.101  Basis for liability.**

The OIG will exclude any individual or entity that—

(a) Has been convicted of a criminal offense related to the delivery of an item or service under Medicare or a State health care program, including the performance of management or administrative services relating to the delivery of items or services under any such program;

(b) Has been convicted, under Federal or State law, of a criminal offense related to the neglect or abuse of a patient, in connection with the delivery of a health care item or service, including any offense that the OIG concludes entailed, or resulted in, neglect or abuse of patients (the delivery of a health care item or service includes the provision of any item or service to an individual to meet his or her physical, mental or emotional needs or well-being, whether or not reimbursed under Medicare, Medicaid or any Federal health care program);

(c) Has been convicted, under Federal or State law, of a felony that occurred after August 21, 1996, relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct—

(1) In connection with the delivery of a health care item or service, including the performance of management or administrative services relating to the delivery of such items or services, or

(2) With respect to any act or omission in a health care program (other than Medicare and a State health care program) operated by, or financed in whole or in part, by any Federal, State or local government agency; or

(d) Has been convicted, under Federal or State law, of a felony that occurred after August 21, 1996 relating to the unlawful manufacture, distribution, prescription or dispensing of a controlled substance, as defined under Federal or State law. This applies to any individual or entity that—

(1) Is, or has ever been, a health care practitioner, provider, or supplier or furnished or furnishes items or services;

(2) Holds, or has held, a direct or an indirect ownership or control interest

in an entity that furnishes or furnishes items or services or is, or has ever been, an officer, director, agent, or managing employee of such an entity; or

(3) Is, or has ever been, employed in any capacity in the health care industry.

[63 FR 46690, Sept. 2, 1994, as amended at 67 FR 11932, Mar. 18, 2002; 82 FR 4112, Jan. 12, 2017]

§ 1001.102   Length of exclusion.

(a) No exclusion imposed in accordance with § 1001.101 will be for less than 5 years.

(b) Any of the following factors may be considered to be aggravating and a basis for lengthening the period of exclusion—

(1) The acts resulting in the conviction, or similar acts, caused, or were intended to cause, a financial loss to a government agency or program or to one or more other entities of $50,000 or more. (The entire amount of financial loss to such government agencies or programs or to other entities, including any amounts resulting from similar acts not adjudicated, will be considered regardless of whether full or partial restitution has been made);

(2) The acts that resulted in the conviction, or similar acts, were committed over a period of one year or more;

(3) The acts that resulted in the conviction, or similar acts, had a significant adverse physical, mental or financial impact on one or more program beneficiaries or other individuals;

(4) In convictions involving patient abuse or neglect, the action that resulted in the conviction was premeditated, was part of a continuing pattern of behavior, or consisted of non-consensual sexual acts;

(5) The sentence imposed by the court included incarceration;

(6) The convicted individual or entity has a prior criminal, civil or administrative sanction record;

(7) The individual or entity has previously been convicted of a criminal offense involving the same or similar circumstances;

(8) The individual or entity has been convicted of other offenses besides

those that formed the basis for the exclusion; or

(9) The individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

(c) Only if any of the aggravating factors set forth in paragraph (b) of this section justifies an exclusion longer than 5 years, may mitigating factors be considered as a basis for reducing the period of exclusion to no less than 5 years. Only the following factors may be considered mitigating—

(1) In the case of an exclusion under § 1001.101(a), whether the individual or entity was convicted of three or fewer misdemeanor offenses and the entire amount of financial loss (both actual loss and intended loss) to Medicare or any other Federal, State, or local governmental health care program due to the acts that resulted in the conviction, and similar acts, is less than $5,000;

(2) The record in the criminal proceedings, including sentencing documents, demonstrates that the court determined that the individual had a mental, emotional or physical condition before or during the commission of the offense that reduced the individual's culpability; or

(3) The individual's or entity's cooperation with Federal or State officials resulted in—

(i) Others being convicted or excluded from Medicare, Medicaid and all other Federal health care programs,

(ii) Additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses, or

(iii) The imposition against anyone of a civil money penalty or assessment under part 1003 of this chapter.

(d) In the case of an exclusion under this subpart, based on a conviction occurring on or after August 5, 1997, an exclusion will be—

(1) For not less than 10 years if the individual has been convicted on one previous occasion of one or more offenses for which an exclusion may be effected under section 1128(a) of the

**Office of Inspector General—Health Care, HHS**      **§ 1001.201**

Act. (The aggravating and mitigating factors in paragraphs (b) and (c) of this section can be used to impose a period of time in excess of the 10-year mandatory exclusion; or

(2) Permanent if the individual has been convicted on two or more previous occasions of one or more offenses for which an exclusion may be effected under section 1128(a) of the Act.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46688, Sept. 2, 1998; 63 FR 57918, Oct. 29, 1998; 64 FR 39425, July 22, 1999; 67 FR 11933, Mar. 16, 2002; 82 FR 4113, Jan. 12, 2017]

## Subpart C—Permissive Exclusions

**§ 1001.201  Conviction relating to program or health care fraud.**

(a) *Circumstance for exclusion.* The OIG may exclude an individual or entity convicted under Federal or State law of—

(1) A misdemeanor relating to fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct—

(i) In connection with the delivery of any health care item or service, including the performance of management or administrative services relating to the delivery of such items or services, or

(ii) With respect to any act or omission in a health care program, other than Medicare and a State health care program, operated by, or financed in whole or in part by, any Federal, State or local government agency; or

(2) Fraud, theft, embezzlement, breach of fiduciary responsibility, or other financial misconduct with respect to any act or omission in a program, other than a health care program, operated by or financed in whole or in part by any Federal, State or local government agency.

(b) *Length of exclusion.* (1) An exclusion imposed in accordance with this section will be for a period of 3 years, unless aggravating or mitigating factors listed in paragraphs (b)(2) and (b)(3) of this section form a basis for lengthening or shortening that period.

(2) Any of the following factors may be considered to be aggravating and a basis for lengthening the period of exclusion—

(i) The acts resulting in the conviction, or similar acts, caused or reason-

ably could have been expected to cause, a financial loss of $50,000 or more to a government agency or program or to one or more other entities or had a significant financial impact on program beneficiaries or other individuals. (The entire amount of financial loss will be considered, including any amounts resulting from similar acts not adjudicated, regardless of whether full or partial restitution has been made);

(ii) The acts that resulted in the conviction, or similar acts, were committed over a period of one year or more;

(iii) The acts that resulted in the conviction, or similar acts, had a significant adverse physical or mental impact on one or more program beneficiaries or other individuals;

(iv) The sentence imposed by the court included incarceration;

(v) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing; or

(vi) Whether the individual or entity has been convicted of other offenses besides those that formed the basis for the exclusion; or

(vii) Whether the individual or entity has been the subject of any other adverse action by any Federal, State, or local government agency or board if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

(3) Only the following factors may be considered as mitigating and a basis for reducing the period of exclusion—

(i) The individual or entity was convicted of three or fewer offenses, and the entire amount of financial loss (both actual loss and reasonably expected loss) to a government agency or program or to other individuals or entities due to the acts that resulted in the conviction and similar acts is less than $5,000;

(ii) The record in the criminal proceedings, including sentencing documents, demonstrates that the court determined that the individual had a mental, emotional, or physical condition, before or during the commission of the offense, that reduced the individual's culpability; or

(iii) The individual's or entity's cooperation with Federal or State officials resulted in—

(A) Others being convicted or excluded from Medicare, Medicaid or any of the other Federal health care programs, or

(B) Additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses, or

(C) The imposition of a civil money penalty against others; or

(iv) Alternative sources of the type of health care items or services furnished by the individual or entity are not available.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46687, Sept. 2, 1998; 64 FR 39426, July 22, 1999; 67 FR 11932, Mar. 18, 2002; 67 FR 21579, May 1, 2002; 82 FR 4112, Jan. 12, 2017]

§ 1001.301   Conviction relating to obstruction of an investigation or audit.

(a) Circumstance for exclusion. The OIG may exclude an individual or entity that has been convicted, under Federal or State law, in connection with the interference with or obstruction of any investigation or audit related to—

(1) Any offense described in § 1001.101 or § 1001.201; or

(2) The use of funds received, directly or indirectly, from any Federal health care program.

(b) Length of exclusion. (1) An exclusion imposed in accordance with this section will be for a period of three years, unless aggravating or mitigating factors listed in paragraphs (b)(2) and (3) of this section form the basis for lengthening or shortening that period.

(2) Any of the following factors may be considered to be aggravating and a basis for lengthening the period of exclusion—

(i) The interference or obstruction caused the expenditure of significant additional time or resources;

(ii) The interference or obstruction had a significant adverse physical or mental impact on one or more program beneficiaries or other individuals;

(iii) The interference or obstruction also affected a civil or administrative investigation;

(iv) The sentence imposed by the court included incarceration;

(v) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing; or

(vi) Whether the individual or entity has been convicted of other offenses besides those that formed the basis for the exclusion;

(vii) Whether the individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion; or

(viii) The acts resulting in the conviction, or similar acts, caused, or reasonably could have been expected to cause, a financial loss of $50,000 or more to a government agency or program or to one or more other entities or had a significant financial impact on program beneficiaries or other individuals. (The entire amount of financial loss or intended loss identified in the investigation or audit will be considered, including any amounts resulting from similar acts not adjudicated, regardless of whether full or partial restitution has been made).

(3) Only the following factors may be considered as mitigating and a basis for reducing the period of exclusion—

(i) The record of the criminal proceedings, including sentencing documents, demonstrates that the court determined that the individual had a mental, emotional, or physical condition, before or during the commission of the offense, that reduced the individual's culpability; or

(ii) The individual's or entity's cooperation with Federal or State officials resulted in—

(A) Others being convicted or excluded from Medicare, Medicaid and all other Federal health care programs,

(B) Additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses, or

(C) The imposition of a civil money penalty against others; or

(iii) Alternative sources of the type of health care items or services furnished by the individual or entity are not available.

[57 FR 3325, Jan. 29, 1992; 57 FR 5669, Mar. 20, 1992; 63 FR 46687, Sept. 2, 1998; 61 FR 39425, July 22, 1999; 82 FR 4113, Jan. 12, 2017]

§ 1001.401 Conviction relating to controlled substances.

(a) *Circumstance for exclusion.* The OIG may exclude an individual or entity convicted under Federal or State law of a misdemeanor relating to the unlawful manufacture, distribution, prescription, or dispensing of a controlled substance, as defined under Federal or State law. This section applies to any individual or entity that—

(1) Is, or has ever been, a health care practitioner, provider, or supplier or furnished or furnishes items or services;

(2) Holds, or held, a direct or indirect ownership or control interest in an entity that furnished or furnishes items or services or is or has ever been an officer, director, agent, or managing employee of such an entity; or

(3) Is, or has ever been, employed in any capacity in the health care industry.

(b) *For purposes of this section,* the definition of *controlled substance* will be the definition that applies to the law forming the basis for the conviction.

(c) *Length of exclusion.* (1) An exclusion imposed in accordance with this section will be for a period of 3 years, unless aggravating or mitigating factors listed in paragraphs (c)(2) and (3) of this section form a basis for lengthening or shortening that period.

(2) Any of the following factors may be considered to be aggravating and to be a basis for lengthening the period of exclusion—

(i) The acts that resulted in the conviction or similar acts were committed over a period of one year or more;

(ii) The acts that resulted in the conviction or similar acts had a significant adverse mental, physical or financial impact on program beneficiaries or other individuals or the Medicare, Medicaid or other Federal health care programs;

(iii) The sentence imposed by the court included incarceration;

(iv) Whether the individual or entity has a documented history of criminal, civil, or administrative wrongdoing;

(v) Whether the individual or entity has been convicted of other offenses besides those that formed the basis for the exclusion; or

(vi) Whether the individual or entity has been the subject of any other adverse action by any Federal, State, or local government agency or board if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

(3) Only the following factor may be considered to be mitigating and to be a basis for shortening the period of exclusion: The individual's or entity's cooperation with Federal or State officials resulted in—

(i) Others being convicted or excluded from Medicare, Medicaid, and any other Federal health care program;

(ii) Additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses; or

(iii) The imposition of a civil money penalty against others.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46687, Sept. 2, 1998; 64 FR 39425, July 22, 1999; 82 FR 4113, Jan. 13, 2017]

§ 1001.501 License revocation or suspension.

(a) *Circumstance for exclusion.* The OIG may exclude an individual or entity that has—

(1) Had a license to provide health care revoked or suspended by any State licensing authority, or has otherwise lost such a license (including the right to apply for or renew such a license), for reasons bearing on the individual's or entity's professional competence, professional performance or financial integrity; or

(2) Has surrendered such a license while a formal disciplinary proceeding concerning the individual's or entity's professional competence, professional performance or financial integrity was pending before a State licensing authority.

(b) *Length of exclusion.* (1) Except as provided in paragraph (b)(2) of this section, an exclusion imposed in accordance with this section will not be for a period of time less than the period during which an individual's or entity's license is revoked, suspended, or otherwise not in effect as a result of, or in connection with, a State licensing agency action.

(2) Any of the following factors may be considered aggravating and a basis for lengthening the period of exclusion—

(i) The acts that resulted in the revocation, suspension or loss of the individual's or entity's license to provide health care had or could have had a significant adverse physical, emotional or financial impact on one or more program beneficiaries or other individuals;

(ii) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing;

(iii) The acts, or similar acts, had or could have had a significant adverse impact on the financial integrity of the programs; or

(iv) The individual or entity has been the subject of any other adverse action by any other Federal, State or local government agency or board, if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

(3) Only if any of the aggravating factors listed in paragraph (b)(2) of this section justifies a longer exclusion may a mitigating factor be considered as a basis for reducing the period of exclusion to a period not less than that set forth in paragraph (b)(1) of this section. Only the following factor may be considered mitigating: The individual's or entity's cooperation with a State licensing authority resulted in—

(i) The sanctioning of other individuals or entities; or

(ii) Additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses.

(4) When an individual or entity has been excluded under this section, the OIG will consider a request for reinstatement in accordance with §1001.3001 if:

(i) The individual or entity obtains the license in the State where the license was originally revoked, suspended, surrendered, or otherwise lost or

(ii) The individual meets the conditions for early reinstatement set forth in paragraph (c) of this section.

(c) *Consideration of early reinstatement.* (1) If an individual or entity that is excluded in accordance with this section fully and accurately discloses the circumstances surrounding the action that formed the basis for the exclusion to a licensing authority of a different State or to a different licensing authority in the same State and that licensing authority grants the individual or entity a new health care license or has decided to take no adverse action as to a currently held health care license, the OIG will consider a request for early reinstatement. The OIG will consider the following factors in determining whether a request for early reinstatement under this paragraph (c)(1) will be granted:

(i) The circumstances that formed the basis for the exclusion;

(ii) Whether the second licensing authority is in a state that is not the individual's primary place of practice;

(iii) Evidence that the second licensing authority was aware of the circumstances surrounding the action that formed the basis for the exclusion;

(iv) Whether the individual has demonstrated that he or she has satisfactorily resolved any underlying problem that caused or contributed to the basis for the initial licensing action;

(v) The benefits to the Federal health care programs and program beneficiaries of early reinstatement;

(vi) The risks to the Federal health care programs and program beneficiaries of early reinstatement;

(vii) Any additional or pending license actions in any State;

(viii) Any ongoing investigations involving the individual; and

(ix) All the factors set forth in §1001.3002(b).

(2) If an exclusion has been imposed under this section and the individual does not have a valid health care license of any kind in any State, that individual may request the OIG to consider whether he or she may be eligible

for early reinstatement. The OIG will consider the following factors in determining whether a request for early reinstatement under this paragraph (c)(2) will be granted:

(i) The length of time the individual has been excluded. The OIG will apply a presumption against early reinstatement under paragraph (c)(2) of this section if the person has been excluded for less than 3 years; however, if the revocation or suspension on which the exclusion is based was for a set period longer than 3 years, the presumption against early reinstatement will be coterminous with the period set by the licensing board;

(ii) The circumstances that formed the basis for the exclusion;

(iii) Whether the individual has demonstrated that he or she has satisfactorily resolved any underlying problem that caused or contributed to the basis for the initial licensing action;

(iv) The benefits to the Federal health care programs and program beneficiaries of early reinstatement;

(v) The risks to the Federal health care programs and program beneficiaries of early reinstatement;

(vi) Any additional or pending license actions in any State;

(vii) Any ongoing investigations involving the individual; and

(viii) All the factors set forth in §1001.3002(b).

(3) Notwithstanding paragraphs (c)(1) and (2) of this section, if an individual's license revocation or suspension was for reasons related to patient abuse or neglect, the OIG will not consider an application for early reinstatement.

(4) Except for §1001.3002(a)(1)(i), all the provisions of subpart F (§§1001.3001 through 1001.3005) apply to early reinstatements under this section.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46683, Sept. 2, 1998; 82 FR 4113, Jan. 12, 2017]

§1001.601 Exclusion or suspension under a Federal or State health care program.

(a) *Circumstance for exclusion.* (1) The OIG may exclude an individual or entity suspended or excluded from participation, or otherwise sanctioned, under—

(i) Any Federal program involving the provision of health care, or

(ii) A State health care program, for reasons bearing on the individual's or entity's professional competence, professional performance or financial integrity.

(2) The term "or otherwise sanctioned" in paragraph (a)(1) of this section is intended to cover all actions that limit the ability of a person to participate in the program at issue regardless of what such an action is called, and includes situations where an individual or entity voluntarily withdraws from a program to avoid a formal sanction.

(b) *Length of exclusion.* (1) An exclusion imposed in accordance with this section will not be for a period of time less than the period during which the individual or entity is excluded or suspended from a Federal or State health care program.

(2) Any of the following factors may be considered aggravating and a basis for lengthening the period of exclusion—

(i) The acts that resulted in the exclusion, suspension or other sanction under Medicare, Medicaid and all other Federal health care programs had, or could have had, a significant adverse impact on Federal or State health care programs or the beneficiaries of those programs or other individuals;

(ii) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing; or

(iii) The individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board, if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

(3) Only if any of the aggravating factors listed in paragraph (b)(2) of this section justifies a longer exclusion may a mitigating factor be considered as a basis for reducing the period of exclusion to a period not less than that set forth in paragraph (b)(1) of this section. Only the following factor may be considered mitigating: The individual's or entity's cooperation with Federal or State officials resulted in—

(i) The sanctioning of other individuals or entities, or

1127

(ii) Additional cases being investigated or reports being issued by the appropriate law enforcement agency identifying program vulnerabilities or weaknesses.

(4) If the individual or entity is eligible to apply for reinstatement in accordance with §1001.3001 and the sole reason why the State or Federal health care program denied reinstatement to that program is the existing exclusion imposed by the OIG as a result of the original State or Federal health care program action, the OIG will consider a request for reinstatement.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46686, Sept. 2, 1998; 82 FR 4114, Jan. 12, 2017]

§ 1001.701 Excessive claims or furnishing of unnecessary or substandard items and services.

(a) Circumstance for exclusion. The OIG may exclude an individual or entity that has—

(1) Submitted, or caused to be submitted, bills or requests for payments under Medicare or any of the State health care programs containing charges or costs for items or services furnished that are substantially in excess of such individual's or entity's usual charges or costs for such items or services; or

(2) Furnished, or caused to be furnished, to patients (whether or not covered by Medicare or any of the State health care programs) any items or services substantially in excess of the patient's needs, or of a quality that fails to meet professionally recognized standards of health care.

(b) The OIG's determination under paragraph (a)(2) of this section—that the items or services furnished were excessive or of unacceptable quality—will be made on the basis of information, including sanction reports, from the following sources:

(1) The QIO for the area served by the individual or entity;

(2) State or local licensing or certification authorities;

(3) Fiscal agents or contractors, or private insurance companies;

(4) State or local professional societies; or

(5) Any other sources deemed appropriate by the OIG;

(c) Exceptions. An individual or entity will not be excluded for—

(1) Submitting, or causing to be submitted, bills or requests for payment that contain charges or costs substantially in excess of usual charges or costs when such charges or costs are due to unusual circumstances or medical complications requiring additional time, effort, expense or other good cause; or

(2) Furnishing, or causing to be furnished, items or services in excess of the needs of patients, when the items or services were ordered by a physician or other authorized individual, and the individual or entity furnishing the items or services was not in a position to determine medical necessity or to refuse to comply with the order of the physician or other authorized individual.

(d) Length of exclusion. (1) An exclusion imposed in accordance with this section will be for a period of 3 years, unless aggravating or mitigating factors set forth in paragraphs (d)(2) and (d)(3) of this section form a basis for lengthening or shortening the period. In no case may the period be shorter than 1 year for any exclusion taken in accordance with paragraph (a)(2) of this section.

(2) Any of the following factors may be considered aggravating and a basis for lengthening the period of exclusion—

(i) The violations were serious in nature, and occurred over a period of one year or more;

(ii) The violations had a significant adverse physical, mental or financial impact on program beneficiaries or other individuals;

(iii) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing;

(iv) The violation resulted in financial loss to Medicare, Medicaid, or any other Federal health care program of $15,000 or more; or

(v) The individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board, if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

**Office of Inspector General—Health Care, HHS**  §1001.901

(3) Only the following factor may be considered mitigating and a basis for reducing the period of exclusion: Whether there were few violations and they occurred over a short period of time.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46683, Sept. 2, 1998; 82 FR 4114, Jan. 12, 2017]

§1001.901   Failure of HMOs and CMPs to furnish medically necessary items and services.

(a) *Circumstances for exclusion.* The OIG may exclude an entity—

(1) That is a—

(i) Health maintenance organization (HMO), as defined in section 1903(m) of the Act, providing items or services under a State Medicaid Plan;

(ii) Primary care case management system providing services, in accordance with a waiver approved under section 1915(b)(1) of the Act; or

(iii) HMO or competitive medical plan providing items or services in accordance with a risk-sharing contract under section 1876 of the Act;

(2) That has failed substantially to provide medically necessary items and services that are required under a plan, waiver or contract described in paragraph (a)(1) of this section to be provided to individuals covered by such plan, waiver or contract; and

(3) Where such failure has adversely affected or has a substantial likelihood of adversely affecting covered individuals.

(b) The OIG's determination under paragraph (a)(2) of this section—that the medically necessary items and services required under law or contract were not provided—will be made on the basis of information, including sanction reports, from the following sources:

(1) The QIO or other quality assurance organization under contract with a State Medicaid plan for the area served by the HMO or competitive medical plan;

(2) State or local licensing or certification authorities;

(3) Fiscal agents or contractors, or private insurance companies;

(4) State or local professional societies;

(5) CMS's HMO compliance office; or

(6) Any other sources deemed appropriate by the OIG.

(c) *Length of exclusion.* (1) An exclusion imposed in accordance with this section will be for a period of 3 years, unless aggravating or mitigating factors set forth in paragraphs (c)(2) and (c)(3) of this section form a basis for lengthening or shortening the period.

(2) Any of the following factors may be considered aggravating and a basis for lengthening the period of exclusion—

(i) The entity failed to provide a large number or a variety of items or services;

(ii) The failures occurred over a lengthy period of time;

(iii) The entity's failure to provide a necessary item or service that had or could have had a serious adverse effect;

(iv) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing; or

(v) The individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board, if the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion.

(3) Only the following factors may be considered as mitigating and a basis for reducing the period of exclusion—

(i) There were few violations and they occurred over a short period of time; or

(ii) The entity took corrective action upon learning of impermissible activities by an employee or contractor.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46688, Sept. 2, 1998; 82 FR 4114, Jan. 12, 2017]

§1001.901   False or improper claims.

(a) *Circumstance for exclusion.* The OIG may exclude any individual or entity that it determines has committed an act described in section 1128A of the Act. The imposition of a civil money penalty or assessment is not a prerequisite for an exclusion under this section.

(b) *Length of exclusion.* In determining the length of an exclusion imposed in accordance with this section, the OIG will consider the following factors—

(1) The nature and circumstances surrounding the actions that are the basis for liability, including the period of time over which the acts occurred, the number of acts, whether there is evidence of a pattern and the amount claimed;

(2) The degree of culpability;

(3) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing (The lack of any prior record is to be considered neutral);

(4) The individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board. If the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion; or

(5) Other matters as justice may require.

(c) *Limitations.* The OIG may not impose an exclusion under this section more than 10 years after the date when an act which is described in section 1128A of the Act occurred;

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46688, Sept. 2, 1998; 82 FR 4111, Jan. 12, 2017]

**§ 1001.951 Fraud and kickbacks and other prohibited activities.**

(a) *Circumstance for exclusion.* (1) Except as provided for in paragraph (a)(2)(ii) of this section, the OIG may exclude any individual or entity that it determines has committed an act described in section 1128B(b) of the Act.

(2) With respect to acts described in section 1128B of the Act, the OIG—

(i) May exclude any individual or entity that it determines has knowingly and willfully solicited, received, offered or paid any remuneration in the manner and for the purposes described therein, irrespective of whether the individual or entity may be able to prove that the remuneration was also intended for some other purpose; and

(ii) Will not exclude any individual or entity if that individual or entity can prove that the remuneration that is the subject of the exclusion is exempted from serving as the basis for an exclusion.

(b) *Length of exclusion.* (1) The following factors will be considered in determining the length of exclusion in accordance with this section—

(1) The nature and circumstances of the acts and other similar acts;

(ii) The nature and extent of any adverse physical, mental, financial or other impact the conduct had on program beneficiaries or other individuals or the Medicare, Medicaid and all other Federal health care programs;

(iii) Whether the individual or entity has a documented history of criminal, civil or administrative wrongdoing (The lack of any prior record is to be considered neutral);

(iv) The individual or entity has been the subject of any other adverse action by any Federal, State or local government agency or board. If the adverse action is based on the same set of circumstances that serves as the basis for the imposition of the exclusion; or

(v) Any other facts bearing on the nature and seriousness of the individual's or entity's misconduct.

(2) It will be considered a mitigating factor if—

(i) The individual had a documented mental, emotional, or physical condition before or during the commission of the prohibited act(s) that reduced the individual's culpability for the acts in question; or

(ii) The individual's or entity's cooperation with Federal or State officials resulted in the—

(A) Sanctioning of other individuals or entities, or

(B) Imposition of a civil money penalty against others.

(c) *Limitations.* The OIG may not impose an exclusion under this section more than 10 years after the date when an act which is described in section 1128B(b) of the Act occurred.

[57 FR 3330, Jan. 29, 1992, as amended at 63 FR 46689, Sept. 2, 1998; 67 FR 11933, Mar. 18, 2002; 82 FR 4111, Jan. 12, 2017]

**§ 1001.952 Exceptions.**

The following payment practices shall not be treated as a criminal offense under section 1128B of the Act and shall not serve as the basis for an exclusion:

(a) *Investment interests.* As used in section 1128B of the Act, "remuneration" does not include any payment

that is a return on an investment interest, such as a dividend or interest income, made to an investor as long as all of the applicable standards are met within one of the following three categories of entities:

(1) If, within the previous fiscal year or previous 12 month period, the entity possesses more than $50,000,000 in undepreciated net tangible assets (based on the net acquisition cost of purchasing such assets from an unrelated entity) related to the furnishing of health care items and services, all of the following five standards must be met—

(i) With respect to an investment interest that is an equity security, the equity security must be registered with the Securities and Exchange Commission under 15 U.S.C. 781 (b) or (g).

(ii) The investment interest of an investor in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must be obtained on terms (including any direct or indirect transferability restrictions) and at a price equally available to the public when trading on a registered securities exchange, such as the New York Stock Exchange or the American Stock Exchange, or in accordance with the National Association of Securities Dealers Automated Quotation System.

(iii) The entity or any investor must not market or furnish the entity's items or services (or those of another entity as part of a cross referral agreement) to passive investors differently than to non-investors.

(iv) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor in the entity) must not loan funds to or guarantee a loan for an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity if the investor uses any part of such loan to obtain the investment interest.

(v) The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment of that investor.

(2) If the entity possesses investment interests that are held by either active or passive investors, all of the following eight applicable standards must be met—

(i) No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity. (For purposes of paragraph (a)(2)(i) of this section, equivalent classes of equity investments may be combined, and equivalent classes of debt instruments may be combined.)

(ii) The terms on which an investment interest is offered to a passive investor, if any, who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must be no different from the terms offered to other passive investors.

(iii) The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity.

(iv) There is no requirement that a passive investor, if any, make referrals to, be in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity as a condition for remaining as an investor.

(v) The entity or any investor must not market or furnish the entity's items or services (or those of another entity as part of a cross referral agreement) to passive investors differently than to non-investors.

(vi) No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12-month period may come from referrals or business otherwise generated from investors.

(vii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor in the entity) must not loan funds to or guarantee a loan for an investor who is in a position to make or influence referrals

to, furnish items or services to, or otherwise generate business for the entity if the investor uses any part of such loan to obtain the investment interest.

(viii) The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(3)(i) If the entity possesses investment interests that are held by either active or passive investors and is located in an underserved area, all of the following eight standards must be met—

(A) No more than 50 percent of the value of the investment interests of each class of investments may be held in the previous fiscal year or previous 12-month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity. (For purposes of paragraph (a)(3)(i)(A) of this section, equivalent classes of equity investments may be combined, and equivalent classes of debt instruments may be combined.)

(B) The terms on which an investment interest is offered to a passive investor, if any, who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must be no different from the terms offered to other passive investors.

(C) The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity.

(D) There is no requirement that a passive investor, if any, make referrals to, be in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity as a condition for remaining as an investor.

(E) The entity or any investor must not market or furnish the entity's items or services (or those of another entity as part of a cross-referral agreement) to passive investors differently than to non-investors.

(F) At least 75 percent of the dollar volume of the entity's business in the previous fiscal year or previous 12-month period must be derived from the service of persons who reside in an underserved area or are members of medically underserved populations.

(G) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor in the entity) must not loan funds to or guarantee a loan for an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity if the investor uses any part of such loan to obtain the investment interest.

(H) The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(ii) If an entity that otherwise meets all of the above standards is located in an area that was an underserved area at the time of the initial investment, but subsequently ceases to be an underserved area, the entity will be deemed to comply with paragraph (a)(3)(i) of this section for a period equal to the lesser of:

(A) The current term of the investment remaining after the date upon which the area ceased to be an underserved area; or

(B) Three years from the date the area ceased to be an underserved area.

(4) For purposes of paragraph (a) of this section, the following terms apply. *Active investor* means an investor either who is responsible for the day-to-day management of the entity and is a bona fide general partner in a partnership under the Uniform Partnership Act, or who agrees in writing to undertake liability for the actions of the entity's agents acting within the scope of their agency. *Investment interest* means a security issued by an entity, and may include the following classes of investments: shares in a corporation, interests or units in a partnership or limited liability company, bonds, debentures, notes, or other debt instruments. *Investor* means an individual or entity

either who directly holds an investment interest in an entity, or who holds such investment interest indirectly by, including but not limited to, such means as having a family member hold such investment interest or holding a legal or beneficial interest in another entity (such as a trust or holding company) that holds such investment interest. *Passive investor* means an investor who is not an active investor, such as a limited partner in a partnership under the Uniform Partnership Act, a shareholder in a corporation, or a holder of a debt security. *Underserved area* means any defined geographic area that is designated as a Medically Underserved Area (MUA) in accordance with regulations issued by the Department. *Medically underserved population* means a Medically Underserved Population (MUP) in accordance with regulations issued by the Department.

(b) *Space rental.* As used in section 1128B of the Act, "remuneration" does not include any payment made by a lessee to a lessor for the use of premises, as long as all of the following six standards are met—

(1) The lease agreement is set out in writing and signed by the parties.

(2) The lease covers all of the premises leased between the parties for the term of the lease and specifies the premises covered by the lease.

(3) If the lease is intended to provide the lessee with access to the premises for periodic intervals of time, rather than on a full-time basis for the term of the lease, the lease specifies exactly the schedule of such intervals, their precise length, and the exact rent for such intervals.

(4) The term of the lease is for not less than one year.

(5) The aggregate rental charge is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The aggregate space rented does not exceed that which is reasonably necessary to accomplish the commercially reasonable business purpose of

the rental. Note that for purposes of paragraph (b) of this section, the term *fair market value* means the value of the rental property for general commercial purposes, but shall not be adjusted to reflect the additional value that one party (either the prospective lessee or lessor) would attribute to the property as a result of its proximity or convenience to sources of referrals or business otherwise generated for which payment may be made in whole or in part under Medicare, Medicaid and all other Federal health care programs.

(c) *Equipment rental.* As used in section 1128B of the Act, "remuneration" does not include any payment made by a lessee of equipment to the lessor of the equipment for the use of the equipment, as long as all of the following six standards are met—

(1) The lease agreement is set out in writing and signed by the parties.

(2) The lease covers all of the equipment leased between the parties for the term of the lease and specifies the equipment covered by the lease.

(3) If the lease is intended to provide the lessee with use of the equipment for periodic intervals of time, rather than on a full-time basis for the term of the lease, the lease specifies exactly the schedule of such intervals, their precise length, and the exact rent for such interval.

(4) The term of the lease is for not less than one year.

(5) The aggregate rental charge is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or all other Federal health care programs.

(6) The aggregate equipment rental does not exceed that which is reasonably necessary to accomplish the commercially reasonable business purpose of the rental. Note that for purposes of paragraph (c) of this section, the term *fair market value* means that the value of the equipment when obtained from a manufacturer or professional distributor, but shall not be adjusted to reflect the additional value one party (either the prospective lessee or lessor)

would attribute to the equipment as a result of its proximity or convenience to sources of referrals or business otherwise generated for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(ii) *Personal services and management contracts and outcomes-based payment arrangements.* (1) As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following standards are met:

(i) The agency agreement is set out in writing and signed by the parties;

(ii) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(iii) The term of the agreement is not less than 1 year.

(iv) The methodology for determining the compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arm's-length transactions, and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.

(v) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(vi) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

(2) As used in section 1128B of the Act, "remuneration" does not include any outcomes-based payment as long as all of the standards in paragraphs (d)(2)(i) through (viii) of this section are met:

(i) To receive an outcomes-based payment, the agent achieves one or more legitimate outcome measures that:

(A) Are selected based on clinical evidence or credible medical support; and

(B) Have benchmarks that are used to quantify:

(1) Improvements in, or the maintenance of improvements in, the quality of patient care;

(2) A material reduction in costs to or growth in expenditures of payors while maintaining or improving quality of care for patients; or

(3) Both.

(ii) The methodology for determining the aggregate compensation (including any outcomes-based payments) paid between or among the parties over the term of the agreement is: Set in advance; commercially reasonable; consistent with fair market value; and not determined in a manner that directly takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part by a Federal health care program.

(iii) The agreement between the parties is set out in writing and signed by the parties in advance of, or contemporaneous with, the commencement of the terms of the outcomes-based payment arrangement. The writing states at a minimum: A general description of the services to be performed by the parties for the term of the agreement; the outcome measure(s) the agent must achieve to receive an outcomes-based payment; the clinical evidence or credible medical support relied upon by the parties to select the outcome measure(s); and the schedule for the parties to regularly monitor and assess the outcome measure(s).

(iv) The agreement neither limits any party's ability to make decisions in their patients' best interest nor induces any party to reduce or limit medically necessary items or services.

(v) The term of the agreement is not less than 1 year.

(vi) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(vii) For each outcome measure under the agreement, the parties:

(A) Regularly monitor and assess the agent's performance, including the impact of the outcomes-based payment

**Office of Inspector General—Health Care, HHS** § 1001.952

arrangement on patient quality of care; and

(B) Periodically assess, and as necessary revise, benchmarks and remuneration under the arrangement to ensure that the remuneration is consistent with fair market value in an arm's length transaction as required by paragraph (d)(2)(ii) of this section during the term of the agreement.

(viii) The principal has policies and procedures to promptly address and correct identified material performance failures or material deficiencies in quality of care resulting from the outcomes-based payment arrangement.

(3) For purposes of this paragraph (d):

(i) An agent of a principal is any person other than a bona fide employee of the principal who has an agreement to perform services for or on behalf of the principal.

(ii) Outcomes-based payments are limited to payments between or among a principal and an agent that:

(A) Reward the agent for successfully achieving an outcome measure described in paragraph (d)(2)(i) of this section; or

(B) Recoup from or reduce payment to an agent for failure to achieve an outcome measure described in paragraph (d)(2)(i) of this section.

(iii) Outcomes-based payments exclude any payments:

(A) Made directly or indirectly by the following entities:

(1) A pharmaceutical manufacturer, distributor, or wholesaler;

(2) A pharmacy benefit manager;

(3) A laboratory company;

(4) A pharmacy that primarily compounds drugs or primarily dispenses compounded drugs;

(5) A manufacturer of a device or medical supply as defined in paragraph (ee)(14)(iv) of this section;

(6) A medical device distributor or wholesaler that is not otherwise a manufacturer of a device or medical supply, as defined in paragraph (ee)(14)(iv) of this section; or

(7) An entity or individual that sells or rents durable medical equipment, prosthetics, orthotics, or supplies covered by a Federal health care program (other than a pharmacy or a physician, provider, or other entity that primarily furnishes services); or

(B) Related solely to the achievement of internal cost savings for the principal; or

(C) Based solely on patient satisfaction or patient convenience measures.

(e) Sale of practice. (1) As used in section 1128B of the Act, "remuneration" does not include any payment made to a practitioner by another practitioner where the former practitioner is selling his or her practice to the latter practitioner, as long as both of the following two standards are met—

(i) The period from the date of the first agreement pertaining to the sale to the completion of the sale is not more than one year.

(ii) The practitioner who is selling his or her practice will not be in a professional position to make referrals to, or otherwise generate business for, the purchasing practitioner for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs after 1 year from the date of the first agreement pertaining to the sale.

(2) As used in section 1128B of the Act, "remuneration" does not include any payment made to a practitioner by a hospital or other entity where the practitioner is selling his or her practice to the hospital or other entity, so long as the following four standards are met:

(i) The period from the date of the first agreement pertaining to the sale to the completion date of the sale is not more than three years.

(ii) The practitioner who is selling his or her practice will not be in a professional position after completion of the sale to make or influence referrals to, or otherwise generate business for, the purchasing hospital or entity for which payment may be made under Medicare, Medicaid or other Federal health care programs.

(iii) The practice being acquired must be located in a Health Professional Shortage Area (HPSA), as defined in Departmental regulations, for the practitioner's specialty area.

(iv) Commencing at the time of the first agreement pertaining to the sale, the purchasing hospital or entity must diligently and in good faith engage in commercially reasonable recruitment activities that:

(A) May reasonably be expected to result in the recruitment of a new practitioner to take over the acquired practice within a one year period; and

(B) Will satisfy the conditions of the practitioner recruitment safe harbor in accordance with paragraph (n) of this section.

(f) *Referral services.* As used in section 1128B of the Act, "remuneration" does not include any payment or exchange of anything of value between an individual or entity ("participant") and another entity serving as a referral service ("referral service"), as long as all of the following four standards are met—

(1) The referral service does not exclude as a participant in the referral service any individual or entity who meets the qualifications for participation.

(2) Any payment the participant makes to the referral service is assessed equally against and collected equally from all participants and is based only on the cost of operating the referral service, and not on the volume or value of any referrals to or business otherwise generated by either party for the other party for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.

(3) The referral service imposes no requirements on the manner in which the participant provides services to a referred person, except that the referral service may require that the participant charge the person referred at the same rate as it charges other persons not referred by the referral service, or that these services be furnished free of charge or at reduced charge.

(4) The referral service makes the following five disclosures to each person seeking a referral, with each such disclosure maintained by the referral service in a written record certifying such disclosure and signed by either each person seeking a referral or by the individual making the disclosure on behalf of the referral service—

(i) The manner in which it selects the group of participants in the referral service to which it could make a referral;

(ii) Whether the participant has paid a fee to the referral service;

(iii) The manner in which it selects a particular participant from this group for that person;

(iv) The nature of the relationship between the referral service and the group of participants to whom it could make the referral; and

(v) The nature of any restrictions that would exclude such an individual or entity from continuing as a participant.

(g) *Warranties.* As used in section 1128B of the Act, "remuneration" does not include any payment or exchange of anything of value under a warranty provided by a manufacturer or supplier of one or more items and services (provided the warranty covers at least one item) to the buyer (such as a health care provider or beneficiary) of the items and services, as long as the buyer complies with all of the following standards in paragraphs (g)(1) and (2) of this section and the manufacturer or supplier complies with all of the following standards in paragraphs (g)(3) through (6) of this section.

(1) The buyer (unless the buyer is a Federal health care program beneficiary) must fully and accurately report any price reduction of an item or service (including a free item or service) that was obtained as part of the warranty in the applicable cost reporting mechanism or claim for payment filed with the Department or a State agency.

(2) The buyer must provide, upon request by the Secretary or a State agency, information provided by the manufacturer or supplier as specified in paragraph (g)(3) of this section.

(3) The manufacturer or supplier must comply with either of the following standards:

(i) The manufacturer or supplier must fully and accurately report any price reduction of an item or service (including free items and services) that the buyer obtained as part of the warranty on the invoice or statement submitted to the buyer and inform the buyer of its obligations under paragraphs (g)(1) and (2) of this section.

(ii) When the amount of any price reduction is not known at the time of sale, the manufacturer or supplier must fully and accurately report the existence of a warranty on the invoice

or statement, inform the buyer of its obligations under paragraphs (g)(1) and (g)(2) of this section, and when any price reduction becomes known, provide the buyer with documentation of the calculation of the price reduction resulting from the warranty.

(4) The manufacturer or supplier must not pay any remuneration to any individual (other than a beneficiary) or entity for any medical, surgical, or hospital expense incurred by a beneficiary other than for the cost of the items and services subject to the warranty.

(5) If a manufacturer or supplier offers a warranty for more than one item or one or more items and related services, the federally reimbursable items and services subject to the warranty must be reimbursed by the same Federal health care program and in the same Federal health care program payment.

(6) The manufacturer or supplier must not condition a warranty on a buyer's exclusive use of, or a minimum purchase of, any of the manufacturer's or supplier's items or services.

(7) For purposes of this paragraph (g), the term warranty means:

(i) Any written affirmation of fact or written promise made in connection with the sale of an item or bundle of items, or services in combination with one or more related items, by a manufacturer or supplier to a buyer, which affirmation of fact or written promise relates to the nature of the quality or workmanship and affirms or promises that such quality or workmanship is defect free or will meet a specified level of performance over a specified period of time;

(ii) Any undertaking in writing in connection with the sale by a manufacturer or supplier of an item or bundle of items, or services in combination with one or more related items, to refund, repair, replace, or take other remedial action with respect to such item or bundle of items, or services in combination with one or more related items, fails to meet the specifications set forth in the undertaking which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a

seller and a buyer for purposes other than resell of such item or bundle of items; or

(iii) A manufacturer's or supplier's agreement to replace another manufacturer's or supplier's defective item or bundle of items (which is covered by an agreement made in accordance with this paragraph (g)), on terms equal to the agreement that it replaces.

(h) Discounts. As used in section 1128B of the Act, "remuneration" does not include a discount, as defined in paragraph (h)(5) of this section, on an item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs for a buyer as long as the buyer complies with the applicable standards of paragraph (h)(1) of this section, a seller as long as the seller complies with the applicable standards of paragraph (h)(2) of this section; and an offeror of a discount who is not a seller under paragraph (h)(2) of this section so long as such offeror complies with the applicable standards of paragraph (h)(3) of this section.

(1) With respect to the following three categories of buyers, the buyer must comply with all of the applicable standards within one of the three following categories:

(i) If the buyer is an entity which is a health maintenance organization (HMO) or a competitive medical plan (CMP) acting in accordance with a risk contract under section 1876(g) or 1903(m) of the Act, or under another State health care program, it need not report the discount except as otherwise may be required under the risk contract.

(ii) If the buyer is an entity which reports its costs on a cost report required by the Department or a State health care program, it must comply with all of the following four standards—

(A) The discount must be earned based on purchases of that same good or service bought within a single fiscal year of the buyer;

(B) The buyer must claim the benefit of the discount in the fiscal year in which the discount is earned or the following year;

(C) The buyer must fully and accurately report the discount in the applicable cost report; and

(D) the buyer must provide, upon request by the Secretary or a State agency, information provided by the seller as specified in paragraph (h)(2)(ii) of this section, or information provided by the offeror as specified in paragraph (h)(3)(i) of this section.

(iii) If the buyer is an individual or entity in whose name a claim or request for payment is submitted for the discounted item or service and payment may be made, in whole or in part, under Medicare, Medicaid or other Federal health care programs (not including individuals or entities defined as buyers in paragraph (h)(1)(ii) or (h)(1)(iii) of this section), the buyer must comply with both of the following standards—

(A) The discount must be made at the time of the sale of the good or service or the terms of the rebate must be fixed and disclosed in writing to the buyer at the time of the initial sale of the good or service; and

(B) the buyer (if submitting the claim) must provide, upon request by the Secretary or a State agency, information provided by the seller as specified in paragraph (h)(2)(iii)(B) of this section, or information provided by the offeror as specified in paragraph (h)(3)(iii)(A) of this section.

(2) The seller is an individual or entity that supplies an item or service for which payment may be made, in whole or in part, under Medicare, Medicaid or other Federal health care programs to the buyer and who permits a discount to be taken off the buyer's purchase price. The seller must comply with all of the applicable standards within one of the following three categories—

(i) If the buyer is an entity which is an HMO a CMP acting in accordance with a risk contract under section 1876(g) or 1903(m) of the Act, or under another State health care program, the seller need not report the discount to the buyer for purposes of this provision.

(ii) If the buyer is an entity that reports its costs on a cost report required by the Department or a State agency, the seller must comply with either of the following two standards—

(A) Where a discount is required to be reported to Medicare or a State health care program under paragraph (h)(1) of this section, the seller must fully and

accurately report such discount on the invoice, coupon or statement submitted to the buyer; inform the buyer in a manner that is reasonably calculated to give notice to the buyer of its obligations to report such discount and to provide information upon request under paragraph (h)(1) of this section; and refrain from doing anything that would impede the buyer from meeting its obligations under this paragraph; or

(B) Where the value of the discount is not known at the time of sale, the seller must fully and accurately report the existence of a discount program on the invoice, coupon or statement submitted to the buyer; inform the buyer in a manner reasonably calculated to give notice to the buyer of its obligations to report such discount and to provide information upon request under paragraph (h)(1) of this section; when the value of the discount becomes known, provide the buyer with documentation of the calculation of the discount identifying the specific goods or services purchased to which the discount will be applied; and refrain from doing anything which would impede the buyer from meeting its obligations under this paragraph.

(iii) If the buyer is an individual or entity not included in paragraph (h)(2)(i) or (h)(2)(ii) of this section, the seller must comply with either of the following two standards—

(A) Where the seller submits a claim or request for payment on behalf of the buyer and the item or service is separately claimed, the seller must provide, upon request by the Secretary or a State agency, information provided by the offeror as specified in paragraph (h)(3)(iii)(A) of this section; or

(B) Where the buyer submits a claim, the seller must fully and accurately report such discount on the invoice, coupon or statement submitted to the buyer; inform the buyer in a manner reasonably calculated to give notice to the buyer of its obligations to report such discount and to provide information upon request under paragraph (h)(1) of this section; and refrain from doing anything that would impede the buyer from meeting its obligations under this paragraph.

(3) The offeror of a discount is an individual or entity who is not a seller under paragraph (h)(2) of this section, but promotes the purchase of an item or service by a buyer under paragraph (h)(1) of this section at a reduced price for which payment may be made, in whole or in part, under Medicare, Medicaid or other Federal health care programs. The offeror must comply with all of the applicable standards within the following three categories—

(i) If the buyer is an entity which is an HMO or a CMP acting in accordance with a risk contract under section 1876(g) or 1903(m) of the Act, or under another State health care program, the offeror need not report the discount to the buyer for purposes of this provision.

(ii) If the buyer is an entity that reports its costs on a cost report required by the Department or a State agency, the offeror must comply with the following two standards—

(A) The offeror must inform the buyer in a manner reasonably calculated to give notice to the buyer of its obligations to report such a discount and to provide information upon request under paragraph (h)(1) of this section; and

(B) The offeror of the discount must refrain from doing anything that would impede the buyer's ability to meet its obligations under this paragraph.

(iii) If the buyer is an individual or entity in whose name a request for payment is submitted for the discounted item or service and payment may be made, in whole or in part, under Medicare, Medicaid or other Federal health care programs (not including individuals or entities defined as buyers in paragraph (h)(1)(i) or (h)(1)(ii) of this section), the offeror must comply with the following two standards—

(A) The offeror must inform the individual or entity submitting the claim or request for payment in a manner reasonably calculated to give notice to the individual or entity of its obligations to report such a discount and to provide information upon request under paragraphs (h)(1) and (h)(2) of this section; and

(B) The offeror of the discount must refrain from doing anything that would impede the buyer's or seller's ability to

meet its obligations under this paragraph.

(4) For purposes of this paragraph, a rebate is any discount the terms of which are fixed and disclosed in writing to the buyer at the time of the initial purchase to which the discount applies, but which is not given at the time of sale.

(5) For purposes of this paragraph, the term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction. The term discount does not include—

(i) Cash payment or cash equivalents (except that rebates as defined in paragraph (h)(4) of this section may be in the form of a check);

(ii) Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology;

(iii) A reduction in price applicable to one payer but not to Medicare, Medicaid or other Federal health care programs;

(iv) A routine reduction or waiver of any coinsurance or deductible amount owed by a program beneficiary;

(v) Warranties;

(vi) Services provided in accordance with a personal or management services contract;

(vii) Other remuneration, in cash or in kind, not explicitly described in this paragraph (h)(5); or

(viii) A reduction in price or other remuneration in connection with the sale or purchase of a prescription pharmaceutical product from a manufacturer to a plan sponsor under Medicare Part D either directly to the plan sponsor under Medicare Part D, or indirectly through a pharmacy benefit manager acting under contract with a plan sponsor under Medicare Part D, unless it is a price reduction or rebate that is required by law.

(6) For purposes of this paragraph (h), the term manufacturer carries the meaning ascribed to it in Social Security Act section 1927(k)(5).

(7) For purposes of this paragraph (h), the terms wholesaler and distributor are used interchangeably and carry the same meaning as the term "wholesaler" defined in Social Security Act section 1927(k)(11).

(8) For purposes of this paragraph (h), the term pharmacy benefit manager or PBM means any entity that provides pharmacy benefit management on behalf of a health plan that manages prescription drug coverage.

(9) For purposes of this paragraph (h), a prescription pharmaceutical product means either a drug or biological product as those terms are described in Social Security Act section 1927(k)(2)(A), (B), and (C).

(i) *Employees.* As used in section 1128B of the Act, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term *employee* has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2).

(j) *Group purchasing organizations.* As used in section 1128B of the Act, "remuneration" does not include any payment by a vendor of goods or services to a group purchasing organization (GPO), as part of an agreement to furnish such goods or services to an individual or entity as long as both of the following two standards are met—

(1) The GPO must have a written agreement with each individual or entity, for which items or services are furnished, that provides for either of the following—

(i) The agreement states that participating vendors from which the individual or entity will purchase goods or services will pay a fee to the GPO of 3 percent or less of the purchase price of the goods or services provided by that vendor.

(ii) In the event the fee paid to the GPO is not fixed at 3 percent or less of

the purchase price of the goods or services, the agreement specifies the amount (or if not known, the maximum amount) the GPO will be paid by each vendor (where such amount may be a fixed sum or a fixed percentage of the value of purchases made from the vendor by the members of the group under the contract between the vendor and the GPO).

(2) Where the entity which receives the goods or service from the vendor is a health care provider of services, the GPO must disclose in writing to the entity at least annually, and to the Secretary upon request, the amount received from each vendor with respect to purchases made by or on behalf of the entity. Note that for purposes of paragraph (j) of this section, the term *group purchasing organization* (GPO) means an entity authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs, and who are neither wholly-owned by the GPO nor subsidiaries of a parent corporation that wholly owns the GPO (either directly or through another wholly-owned entity).

(k) *Waiver of beneficiary copayment, coinsurance and deductible amounts.* As used in section 1128B of the Act, "remuneration" does not include any reduction or waiver of a Federal health care program beneficiary's obligation to pay copayment, coinsurance or deductible (for purposes of this subparagraph (k) "cost-sharing") amounts as long as all the standards are met with-in one of the following categories of health care providers or suppliers:

(1) If the cost-sharing amounts are owed to a hospital for inpatient hospital services for which a Federal health care program pays under the prospective payment system, the hospital must comply with all of the following three standards:

(i) The hospital must not later claim the amount reduced or waived as a bad debt for payment purposes under a Federal health care program or otherwise shift the burden of the reduction or waiver onto a Federal health care program, other payers, or individuals.

(ii) The hospital must offer to reduce or waive the cost-sharing amounts without regard to the reason for admission, the length of stay of the beneficiary, or the diagnostic related group for which the claim for reimbursement is filed.

(iii) The hospital's offer to reduce or waive the cost-sharing amounts must not be made as part of a price reduction agreement between a hospital and a third-party payer (including a health plan as defined in paragraph (l)(2) of this section), unless the agreement is part of a contract for the furnishing of items or services to a beneficiary of a Medicare supplemental policy issued under the terms of section 1882(t)(1) of the Act.

(2) If the cost-sharing amounts are owed by an individual who qualifies for subsidized services under a provision of the Public Health Services Act or under Titles V or XIX of the Act to a federally qualified health care center or other health care facility under any Public Health Services Act grant program or under Title V of the Act, the health care center or facility may reduce or waive the cost-sharing amounts for items or services for which payment may be made in whole or in part by a Federal health care program.

(3) If the cost-sharing amounts are owed to a pharmacy (including, but not limited to, pharmacies of the Indian Health Service, Indian tribes, tribal organizations, and urban Indian organizations) for cost-sharing imposed under a Federal health care program, the pharmacy may reduce or waive the cost-sharing amounts if:

(i) The waiver or reduction is not offered as part of an advertisement or solicitation; and

(ii) Except for waivers or reductions offered to subsidy-eligible individuals (as defined in section 1860D-14(a)(3)) to which only requirement in paragraph (k)(3)(i) of this section applies:

(A) The pharmacy does not routinely waive or reduce cost-sharing amounts; and

(B) The pharmacy waives the cost-sharing amounts only after determining in good faith that the individual is in financial need or after failing to collect the cost-sharing amounts

after making reasonable collection efforts;

(4) If the cost-sharing amounts are owed to an ambulance provider or supplier for emergency ambulance services for which a Federal health care program pays under a fee-for-service payment system and all the following conditions are met:

(i) The ambulance provider or supplier is owned and operated by a State, a political subdivision of a State, or a tribal health care program, as that term is defined in section 4 of the Indian Health Care Improvement Act;

(ii) The ambulance provider or supplier engaged in an emergency response, as defined in 42 CFR 414.605;

(iii) The ambulance provider or supplier offers the reduction or waiver on a uniform basis to all of its residents or (if applicable) tribal members, or to all individuals transported; and

(iv) The ambulance provider or supplier must not later claim the amount reduced or waived as a bad debt for payment purposes under a Federal health care program or otherwise shift the burden of the reduction or waiver onto a Federal health care program, other payers, or individuals.

(l) *Increased coverage, reduced cost-sharing amounts, or reduced premium amounts offered by health plans.* (1) As used in section 1128B of the Act, "remuneration" does not include the additional coverage of any item or service offered by a health plan to an enrollee or the reduction of some or all of the enrollee's obligation to pay the health plan or a contract health care provider for cost-sharing amounts (such as coinsurance, deductible, or copayment amounts) or for premium amounts attributable to items or services covered by the health plan, the Medicare program, or a State health care program, as long as the health plan complies with all of the standards within one of the following two categories of health plans:

(i) If the health plan is a risk-based health maintenance organization, competitive medical plan, prepaid health plan, or other health plan under contract with CMS or a State health care program and operating in accordance with section 1876(g) or 1903(m) of the

Act, under a Federal statutory demonstration authority, or under other Federal statutory or regulatory authority, it must offer the same increased coverage or reduced cost-sharing or premium amounts to all Medicare or State health care program enrollees covered by the contract unless otherwise approved by CMS or by a State health care program.

(ii) If the health plan is a health maintenance organization, competitive medical plan, health care prepayment plan, prepaid health plan or other health plan that has executed a contract or agreement with CMS or with a State health care program to receive payment for enrollees on a reasonable cost or similar basis, it must comply with both of the following two standards—

(A) The health plan must offer the same increased coverage or reduced cost-sharing or premium amounts to all Medicare or State health care program enrollees covered by the contract or agreement unless otherwise approved by CMS or by a State health care program; and

(B) The health plan must not claim the costs of the increased coverage or the reduced cost-sharing or premium amounts as a bad debt for payment purposes under Medicare or a State health care program or otherwise shift the burden of the increased coverage or reduced cost-sharing or premium amounts to the extent that increased payments are claimed from Medicare or a State health care program.

(2) For purposes of paragraph (l) of this section, the terms—

Contract health care provider means an individual or entity under contract with a health plan to furnish items or services to enrollees who are covered by the health plan, Medicare, or a State health care program.

Enrollee means an individual who has entered into a contractual relationship with a health plan (or on whose behalf an employer, or other private or governmental entity has entered into such a relationship) under which the individual is entitled to receive specified health care items and services, or insurance coverage for such items and services, in return for payment of a premium or a fee.

Health plan means an entity that furnishes or arranges, under agreement with contract health care providers for the furnishing of items or services to enrollees, or furnishes insurance coverage for the provision of such items and services, in exchange for a premium or a fee, where such entity:

(i) Operates in accordance with a contract, agreement or statutory demonstration authority approved by CMS or a State health care program;

(ii) Charges a premium and its premium structure is regulated under a State insurance statute or a State enabling statute governing health maintenance organizations or preferred provider organizations;

(iii) Is an employer, if the enrollees of the plan are current or retired employees, or is a union welfare fund, if the enrollees of the plan are union members; or

(iv) Is licensed in the State, is under contract with an employer, union welfare fund, or a company furnishing health insurance coverage as described in conditions (ii) and (iii) of this definition, and is paid a fee for the administration of the plan which reflects the fair market value of those services.

(m) Price reductions offered to health plans. (1) As used in section 1128B of the Act, "remuneration" does not include a reduction in price a contract health care provider offers to a health plan in accordance with the terms of a written agreement between the contract health care provider and the health plan for the sole purpose of furnishing to enrollees items or services that are covered by the health plan, Medicare, or a State health care program, as long as both the health plan and contract health care provider comply with all of the applicable standards within one of the following four categories of health plans:

(i) If the health plan is a risk-based health maintenance organization, competitive medical plan, or prepaid health plan under contract with CMS or a State agency and operating in accordance with section 1876(g) or 1903(m) of the Act, under a Federal statutory demonstration authority, or under other Federal statutory or regulatory authority, the contract health care provider must not claim payment in

1142

**Office of Inspector General—Health Care, HHS** §1001.952

any form from the Department or the State agency for items or services furnished in accordance with the agreement except as approved by CMS or the State health care program, or otherwise shift the burden of such an agreement to the extent that increased payments are claimed from Medicare or a State health care program.

(ii) If the health plan is a health maintenance organization, competitive medical plan, health care prepayment plan, prepaid health plan, or other health plan that has executed a contract or agreement with CMS or a State health care program to receive payment for enrollees on a reasonable cost or similar basis, the health plan and contract health care provider must comply with all of the following four standards—

(A) The term of the agreement between the health plan and the contract health care provider must be for not less than one year;

(B) The agreement between the health plan and the contract health care provider must specify in advance the covered items and services to be furnished to enrollees, and the methodology for computing the payment to the contract health care provider;

(C) The health plan must fully and accurately report, on the applicable cost report or other claim form filed with the Department or the State health care program, the amount it has paid the contract health care provider under the agreement for the covered items and services furnished to enrollees; and

(D) The contract health care provider must not claim payment in any form from the Department or the State health care program for items or services furnished in accordance with the agreement except as approved by CMS or the State health care program, or otherwise shift the burden of such an agreement to the extent that increased payments are claimed from Medicare or a State health care program.

(iii) If the health plan is not described in paragraphs (m)(1)(i) or (m)(1)(ii) of this section and the contract health care provider is not paid on an at-risk, capitated basis, both the health plan and contract health care

provider must comply with all of the following six standards—

(A) The term of the agreement between the health plan and the contract health care provider must be for not less than one year;

(B) The agreement between the health plan and the contract health care provider must specify in advance the covered items and services to be furnished to enrollees, which party is to file claims or requests for payment with Medicare or the State health care program for such items and services, and the schedule of fees the contract health care provider will charge for furnishing such items and services to enrollees;

(C) The fee schedule contained in the agreement between the health plan and the contract health care provider must remain in effect throughout the term of the agreement, unless a fee increase results directly from a payment update authorized by Medicare or the State health care program;

(D) The party submitting claims or requests for payment from Medicare or the State health care program for items and services furnished in accordance with the agreement must not claim or request payment for amounts in excess of the fee schedule;

(E) The contract health care provider and the health plan must fully and accurately report on any cost report filed with Medicare or a State health care program the fee schedule amounts charged in accordance with the agreement and, upon request, will report to the Medicare or a State health care program the terms of the agreement and the amounts paid in accordance with the agreement; and

(F) The party to the agreement, which does not have the responsibility under the agreement for filing claims or requests for payment, must not claim or request payment in any form from the Department or the State health care program for items or services furnished in accordance with the agreement, or otherwise shift the burden of such an agreement to the extent that increased payments are claimed from Medicare or a State health care program.

(iv) If the health plan is not described in paragraphs (m)(1)(i) or (m)(1)(ii) of

this section, and the contract health care provider is paid on an at-risk, capitated basis, both the health plan and contract health care provider must comply with all of the following five standards—

(A) The term of the agreement between the health plan and the contract health provider must be for not less than one year;

(B) The agreement between the health plan and the contract health provider must specify in advance the covered items and services to be furnished to enrollees and the total amount per enrollee (which may be expressed in a per month or other time period basis) the contract health care provider will be paid by the health plan for furnishing such items and services to enrollees and must set forth any co-payments, if any, to be paid by enrollees to the contract health care provider for covered services;

(C) The payment amount contained in the agreement between the health care plan and the contract health care provider must remain in effect throughout the term of the agreement;

(D) The contract health care provider and the health plan must fully and accurately report to the Medicare and State health care program upon request, the terms of the agreement and the amounts paid in accordance with the agreement; and

(E) The contract health care provider must not claim or request payment in any form from the Department, a State health care program or an enrollee (other than copayment amounts described in paragraph (m)(2)(iv)(B) of this section) and the health plan must not pay the contract care provider in excess of the amounts described in paragraph (m)(2)(iv)(B) of this section for items and services covered by the agreement.

(2) For purposes of this paragraph, the terms contract health care provider, enrollee, and health plan have the same meaning as in paragraph (t)(2) of this section.

(n) Practitioner recruitment. As used in section 1128B of the Act, "remuneration" does not include any payment or exchange of anything of value by an entity in order to induce a practitioner who has been practicing within his or her current specialty for less than one year to locate, or to induce any other practitioner to relocate, his or her primary place of practice into a HPSA for his or her specialty area, as defined in Departmental regulations, that is served by the entity, as long as all of the following nine standards are met—

(1) The arrangement is set forth in a written agreement signed by the parties that specifies the benefits provided by the entity, the terms under which the benefits are to be provided, and the obligations of each party.

(2) If a practitioner is leaving an established practice, at least 75 percent of the revenues of the new practice must be generated from new patients not previously seen by the practitioner at his or her former practice.

(3) The benefits are provided by the entity for a period not in excess of 3 years, and the terms of the agreement are not renegotiated during this 3-year period in any substantial aspect; provided, however, that if the HPSA to which the practitioner was recruited ceases to be a HPSA during the term of the written agreement, the payments made under the written agreement will continue to satisfy this paragraph for the duration of the written agreement (not to exceed 3 years).

(4) There is no requirement that the practitioner make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the entity as a condition for receiving the benefits; provided, however, that for purposes of this paragraph, the entity may require as a condition for receiving benefits that the practitioner maintain staff privileges at the entity.

(5) The practitioner is not restricted from establishing staff privileges at, referring any service to, or otherwise generating any business for any other entity of his or her choosing.

(6) The amount or value of the benefits provided by the entity may not vary (or be adjusted or renegotiated) in any manner based on the volume or value of any expected referrals to or business otherwise generated for the entity by the practitioner for which payment may be made in whole or in part under Medicare, Medicaid or any other Federal health care programs.

(7) The practitioner agrees to treat patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(8) At least 75 percent of the revenues of the new practice must be generated from patients residing in a HPSA or a Medically Underserved Area (MUA) or who are part of a Medically Underserved Population (MUP), all as defined in paragraph (a) of this section.

(9) The payment or exchange of anything of value may not directly or indirectly benefit any person (other than the practitioner being recruited) or entity in a position to make or influence referrals to the entity providing the recruitment payments or benefits of items or services payable by a Federal health care program.

(o) *Obstetrical malpractice insurance subsidies.* As used in section 1128B of the Act, "remuneration" does not include any payment made by a hospital or other entity to another entity that is providing malpractice insurance (including a self-funded entity), where such payment is used to pay for some or all of the costs of malpractice insurance premiums for a practitioner (including a certified nurse-midwife as defined in section 1861(gg) of the Act) who engages in obstetrical practice as a routine part of his or her medical practice in a primary care HPSA, as long as all of the following seven standards are met—

(1) The payment is made in accordance with a written agreement between the entity paying the premiums and the practitioner, which sets out the payments to be made by the entity, and the terms under which the payments are to be provided.

(2)(i) The practitioner must certify that for the initial coverage period (not to exceed one year) the practitioner has a reasonable basis for believing that at least 75 percent of the practitioner's obstetrical patients treated under the coverage of the malpractice insurance will either—

(A) Reside in a HPSA or MUA, as defined in paragraph (a) of this section; or

(B) Be part of a MUP, as defined in paragraph (a) of this section.

(ii) Thereafter, for each additional coverage period (not to exceed one year), at least 75 percent of the practitioner's obstetrical patients treated under the prior coverage period (not to exceed one year) must have—

(A) Resided in a HPSA or MUA, as defined in paragraph (a) of this section; or

(B) Been part of a MUP, as defined in paragraph (a) of this section.

(3) There is no requirement that the practitioner make referrals to, or otherwise generate business for, the entity as a condition for receiving the benefits.

(4) The practitioner is not restricted from establishing staff privileges at, referring any service to, or otherwise generating any business for any other entity of his or her choosing.

(5) The amount of payment may not vary based on the volume or value of any previous or expected referrals to or business otherwise generated for the entity by the practitioner for which payment may be made in whole or in part under Medicare, Medicaid or any other Federal health care programs.

(6) The practitioner must treat obstetrical patients who receive medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(7) The insurance is a bona fide malpractice insurance policy or program, and the premium, if any, is calculated based on a bona fide assessment of the liability risk covered under the insurance. For purposes of paragraph (o) of this section, *costs of malpractice insurance premiums* means:

(i) For practitioners who engage in obstetrical practice full-time, any costs attributable to malpractice insurance; or

(ii) For practitioners who engage in obstetrical practice on a part-time or sporadic basis, the costs:

(A) Attributable exclusively to the obstetrical portion of the practitioner's malpractice insurance and

(B) Related exclusively to obstetrical services provided in a primary care HPSA.

(p) *Investments in group practices.* As used in section 1128B of the Act, "remuneration" does not include any payment that is a return on an investment

interest, such as a dividend or interest income, made to a solo or group practitioner investing in his or her own practice or group practice if the following four standards are met—

(1) The equity interests in the practice or group must be held by licensed health care professionals who practice in the practice or group.

(2) The equity interests must be in the practice or group itself, and not some subdivision of the practice or group.

(3) In the case of group practices, the practice must:

(i) Meet the definition of "group practice" in section 1877(h)(4) of the Social Security Act and implementing regulations; and

(ii) Be a unified business with centralized decision-making, pooling of expenses and revenues, and a compensation/profit distribution system that is not based on satellite offices operating substantially as if they were separate enterprises or profit centers.

(4) Revenues from ancillary services, if any, must be derived from "in-office ancillary services" that meet the definition of such term in section 1877(b)(2) of the Act and implementing regulations.

(q) Cooperative hospital service organizations. As used in section 1128B of the Act, "remuneration" does not include any payment made between a cooperative service organization (CHSO) and its patron-hospital, both of which are described in section 501(e) and are tax-exempt under section 501(c)(3) of the Internal Revenue Code, where the CHSO is wholly owned by two or more patron-hospitals, as long as the following standards are met—

(1) If the patron-hospital makes a payment to the CHSO, the payment must be for the purpose of paying for the bona fide operating expenses of the CHSO, or

(2) If the CHSO makes a payment to the patron-hospital, the payment must be for the purpose of paying a distribution of net earnings required to be made under section 501(e)(2) of the Internal Revenue Code of 1986.

(r) Ambulatory surgical centers. As used in section 1128B of the Act, "remuneration" does not include any pay-

ment that is a return on an investment interest, such as a dividend or interest income, made to an investor, as long as the investment entity is a certified ambulatory surgical center (ASC) under part 416 of this title, whose operating and recovery room space is dedicated exclusively to the ASC, patients referred to the investment entity by an investor are fully informed of the investor's investment interest, and all of the applicable standards are met within one of the following four categories—

(1) Surgeon-owned ASCs—If all of the investors are general surgeons or surgeons engaged in the same surgical specialty, who are in a position to refer patients directly to the entity and perform surgery on such referred patients; surgical group practices (as defined in this paragraph) composed exclusively of such surgeons; or investors who are not employed by the entity or by any investor, are not in a position to provide items or services to the entity or any of its investors, and are not in a position to make or influence referrals directly or indirectly to the entity or any of its investors, all of the following six standards must be met—

(i) The terms on which an investment interest is offered to an investor must not be related to the previous or expected volume of referrals, services furnished, or the amount of business otherwise generated from that investor to the entity.

(ii) At least one-third of each surgeon investor's medical practice income from all sources for the previous fiscal year or previous 12-month period must be derived from the surgeon's performance of procedures (as defined in this paragraph).

(iii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor) must not loan funds to or guarantee a loan for an investor if the investor uses any part of such loan to obtain the investment interest.

(iv) The amount of payment to an investor in return for the investment must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(v) All ancillary services for Federal health care program beneficiaries performed at the entity must be directly and integrally related to primary procedures performed at the entity, and none may be separately billed to Medicare or other Federal health care programs.

(vi) The entity and any surgeon investors must treat patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(2) *Single-Specialty ASCs*—If all of the investors are physicians engaged in the same medical practice specialty who are in a position to refer patients directly to the entity and perform procedures on such referred patients; group practices (as defined in this paragraph) composed exclusively of such physicians; or investors who are not employed by the entity or by any investor, are not in a position to provide items or services to the entity or any of its investors, and are not in a position to make or influence referrals directly or indirectly to the entity or any of its investors, all of the following six standards must be met—

(i) The terms on which an investment interest is offered to an investor must not be related to the previous or expected volume of referrals, services furnished, or the amount of business otherwise generated from that investor to the entity.

(ii) At least one-third of each physician investor's medical practice income from all sources for the previous fiscal year or previous 12-month period must be derived from the surgeon's performance of procedures (as defined in this paragraph).

(iii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor) must not loan funds to or guarantee a loan for an investor if the investor uses any part of such loan to obtain the investment interest.

(iv) The amount of payment to an investor in return for the investment must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(v) All ancillary services for Federal health care program beneficiaries performed at the entity, must be directly and integrally related to primary procedures performed at the entity, and none may be separately billed to Medicare or other Federal health care programs.

(vi) The entity and any physician investors must treat patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(3) *Multi-Specialty ASCs*—If all of the investors are physicians who are in a position to refer patients directly to the entity and perform procedures on such referred patients; group practices, as defined in this paragraph, composed exclusively of such physicians; or investors who are not employed by the entity or by any investor, are not in a position to provide items or services to the entity or any of its investors, and are not in a position to make or influence referrals directly or indirectly to the entity or any of its investors, all of the following seven standards must be met—

(i) The terms on which an investment interest is offered to an investor must not be related to the previous or expected volume of referrals, services furnished, or the amount of business otherwise generated from that investor to the entity.

(ii) At least one-third of each physician investor's medical practice income from all sources for the previous fiscal year or previous 12-month period must be derived from the physician's performance of procedures (as defined in this paragraph).

(iii) At least one-third of the procedures (as defined in this paragraph) performed by each physician investor for the previous fiscal year or previous 12-month period must be performed at the investment entity.

(iv) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor) must not loan funds to or guarantee a loan for an investor if the investor uses any part of such loan to obtain the investment interest.

(v) The amount of payment to an investor in return for the investment must be directly proportional to the

amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(vi) All ancillary services for Federal health care program beneficiaries performed at the entity must be directly and integrally related to primary procedures performed at the entity, and none may be separately billed to Medicare or other Federal health care programs.

(vii) The entity and any physician investors must treat patients receiving medical benefits or assistance under any Federal health care program in a nondiscriminatory manner.

(4) *Hospital/Physician ASCs*—If at least one investor is a hospital, and all of the remaining investors are physicians who meet the requirements of paragraphs (r)(1), (r)(2) or (r)(3) of this section; group practices (as defined in this paragraph) composed of such physicians; surgical group practices (as defined in this paragraph); or investors who are not employed by the entity or by any investor, are not in a position to provide items or services to the entity or any of its investors, and are not in a position to refer patients directly or indirectly to the entity or any of its investors, all of the following eight standards must be met—

(i) The terms on which an investment interest is offered to an investor must not be related to the previous or expected volume of referrals, services furnished, or the amount of business otherwise generated from that investor to the entity;

(ii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor) must not loan funds to or guarantee a loan for an investor if the investor uses any part of such loan to obtain the investment interest.

(iii) The amount of payment to an investor in return for the investment must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

(iv) The entity and any hospital or physician investor must treat patients receiving medical benefits or assistance under any Federal health care

program in a nondiscriminatory manner.

(v) The entity may not use space, including, but not limited to, operating and recovery room space, located in or owned by any hospital investor, unless such space is leased from the hospital in accordance with a lease that complies with all the standards of the space rental safe harbor set forth in paragraph (b) of this section; nor may it use equipment owned by or services provided by the hospital unless such equipment is leased in accordance with a lease that complies with the equipment rental safe harbor set forth in paragraph (c) of this section, and such services are provided in accordance with a contract that complies with the personal services and management contracts safe harbor set forth in paragraph (d) of this section.

(vi) All ancillary services for Federal health care program beneficiaries performed at the entity must be directly and integrally related to primary procedures performed at the entity, and none may be separately billed to Medicare or other Federal health care programs.

(vii) The hospital may not include on its cost report or any claim for payment from a Federal health care program any costs associated with the ASC (unless such costs are required to be included by a Federal health care program).

(viii) The hospital may not be in a position to make or influence referrals directly or indirectly to any investor or the entity.

(5) For purposes of paragraph (r) of this section; *procedures* means any procedure or procedures on the list of Medicare-covered procedures for ambulatory surgical centers in accordance with regulations issued by the Department and *group practice* means a group practice that meets all of the standards of paragraph (p) of this section. *Surgical group practice* means a group practice that meets all of the standards of paragraph (p) of this section and is composed exclusively of surgeons who meet the requirements of paragraph (r)(1) of this section.

(s) *Referral arrangements for specialty services*. As used in section 1128B of the Act, "remuneration" does not include

any exchange of value among individuals and entities where one party agrees to refer a patient to the other party for the provision of a specialty service payable in whole or in part under Medicare, Medicaid or any other Federal health care programs in return for an agreement on the part of the other party to refer that patient back at a mutually agreed upon time or circumstance as long as the following four standards are met—

(1) The mutually agreed upon time or circumstance for referring the patient back to the originating individual or entity is clinically appropriate;

(2) The service for which the referral is made is not within the medical expertise of the referring individual or entity, but is within the special expertise of the other party receiving the referral;

(3) The parties receive no payment from each other for the referral and do not share or split a global fee from any Federal health care program in connection with the referred patient.

(4) Unless both parties belong to the same group practice as defined in paragraph (p) of this section, the only exchange of value between the parties is the remuneration the parties receive directly from third-party payors or the patient compensating the parties for the services they each have furnished to the patient.

(b) *Price reductions offered to eligible managed care organizations.* (1) As used in section 1128(B) of the Act, "remuneration" does not include any payment between:

(i) An eligible managed care organization and any first tier contractor for providing or arranging for items or services as long as the following three standards are met—

(A) The eligible managed care organization and the first tier contractor have an agreement that:

(1) Is set out in writing and signed by both parties;

(2) Specifies the items and services covered by the agreement;

(3) Is for a period of at least one year; and

(4) Specifies that the first tier contractor cannot claim payment in any form directly or indirectly from a Federal health care program for items or services covered under the agreement, except for:

(i) HMOs and competitive medical plans with cost-based contracts under section 1876 of the Act where the agreement with the eligible managed care organization sets out the arrangements in accordance with which the first tier contractor is billing the Federal health care program;

(ii) Federally qualified HMOs without a contract under sections 1854 or 1876 of the Act, where the agreement with the eligible managed care organization sets out the arrangements in accordance with which the first tier contractor is billing the Federal health care program; or

(iii) First tier contractors that are Federally qualified health centers that claim supplemental payments from a Federal health care program.

(B) In establishing the terms of the agreement, neither party gives or receives remuneration in return for or to induce the provision or acceptance of business (other than business covered by the agreement) for which payment may be made in whole or in part by a Federal health care program on a fee-for-service or cost basis;

(C) Neither party to the agreement shifts the financial burden of the agreement to the extent that increased payments are claimed from a Federal health care program.

(ii) A first tier contractor and a downstream contractor or between two downstream contractors to provide or arrange for items or services, as long as the following four standards are met—

(A) The parties have an agreement that:

(1) Is set out in writing and signed by both parties;

(2) Specifies the items and services covered by the agreement;

(3) Is for a period of at least one year; and

(4) Specifies that the party providing the items or services cannot claim payment in any form from a Federal health care program for items or services covered under the agreement;

(B) In establishing the terms of the agreement, neither party gives or receives remuneration in return for or to induce the provision or acceptance of

business (other than business covered by the agreement) for which payment may be made in whole or in part by a Federal health care program on a fee-for-service or cost basis.

(C) Neither party shifts the financial burden of the agreement to the extent that increased payments are claimed from a Federal health care program.

(D) The agreement between the eligible managed care organization and first tier contractor covering the items or services that are covered by the agreement between the parties does not involve:

(1) A Federally qualified health center receiving supplemental payments;

(2) A HMO or CMP with a cost-based contract under section 1876 of the Act; or

(3) A Federally qualified HMO, unless the items or services are covered by a risk-based contract under sections 1854 or 1876 of the Act.

(2) For purposes of this paragraph, the following terms are defined as follows:

(i) *Downstream contractor* means an individual or entity that has a subcontract directly or indirectly with a first tier contractor for the provision or arrangement of items or services that are covered by an agreement between an eligible managed care organization and the first tier contractor.

(ii) *Eligible managed care organization* [1] means—

(A) A HMO or CMP with a risk or cost based contract in accordance with section 1876 of the Act;

(B) Any Medicare Part C health plan that receives a capitated payment from Medicare and which must have its total Medicare beneficiary cost sharing approved by CMS under section 1854 of the Act;

(C) Medicaid managed care organizations as defined in section 1903(m)(1)(A) that provide or arrange for items or services for Medicaid enrollees under a contract in accordance with section 1903(m) of the Act (except for fee-for-service plans or medical savings accounts);

------

[1] The eligible managed care organizations in paragraphs (s)(2)(ii)(A)-(F) of this section are only eligible with respect to items or services covered by the contracts specified in those paragraphs.

(D) Any other health plans that provide or arrange for items and services for Medicaid enrollees in accordance with a risk-based contract with a State agency subject to the upper payment limits in § 447.361 of this title or an equivalent payment cap approved by the Secretary;

(E) Programs For All Inclusive Care For The Elderly (PACE) under sections 1894 and 1934 of the Act, except for for-profit demonstrations under sections 4801(h) and 4802(h) of Pub. L. 105-33; or

(F) A Federally qualified HMO.

(iii) *First tier contractor* means an individual or entity that has a contract directly with an eligible managed care organization to provide or arrange for items or services.

(iv) *Items and services* means health care items, devices, supplies or services or those services reasonably related to the provision of health care items, devices, supplies or services including, but not limited to, non-emergency transportation, patient education, attendant services, social services (e.g., case management), utilization review and quality assurance. Marketing and other pre-enrollment activities are not "items or services" for purposes of this section.

(u) *Price reductions offered by contractors with substantial financial risk to managed care organizations.* (1) As used in section 1128(B) of the Act, "remuneration" does not include any payment between:

(i) A qualified managed care plan and a first tier contractor for providing or arranging for items or services, where the following five standards are met—

(A) The agreement between the qualified managed care plan and first tier contractor must:

(1) Be in writing and signed by the parties;

(2) Specify the items and services covered by the agreement;

(3) Be for a period of at least one year;

(4) Require participation in a quality assurance program that promotes the coordination of care, protects against underutilization and specifies patient goals, including measurable outcomes where appropriate; and

(5) Specify a methodology for determining payment that is commercially reasonable and consistent with fair

1150

**Office of Inspector General—Health Care, HHS** § 1001.952

market value established in an arms-length transaction and includes the intervals at which payments will be made and the formula for calculating incentives and penalties, if any.

(B) If a first tier contractor has an investment interest in a qualified managed care plan, the investment interest must meet the criteria of paragraph (a)(1) of this section.

(C) The first tier contractor must have substantial financial risk for the cost or utilization of services it is obligated to provide through one of the following four payment methodologies:

(1) A periodic fixed payment per patient that does not take into account the dates services are provided, the frequency of services, or the extent or kind of services provided;

(2) Percentage of premium;

(3) Inpatient Federal health care program diagnosis-related groups (DRGs) (other than those for psychiatric services);

(4) Bonus and withhold arrangements, provided—

(i) The target payment for first tier contractors that are individuals or non-institutional providers is at least 20 percent greater than the minimum payment, and for first tier contractors that are institutional providers, i.e., hospitals and nursing homes, is at least 10 percent greater than the minimum payment;

(ii) The amount at risk, i.e., the bonus or withhold, is earned by a first tier contractor in direct proportion to the ratio of the contractor's actual utilization to its target utilization;

(iii) In calculating the percentage in accordance with paragraph (u)(1)(i)(C)(4)(i) of this section, both the target payment amount and the minimum payment amount include any performance bonus, e.g., payments for timely submission of paperwork, continuing medical education, meeting attendance, etc., at a level achieved by 75 percent of the first tier contractors who are eligible for such payments;

(iv) Payment amounts, including any bonus or withhold amounts, are reasonable given the historical utilization patterns and costs for the same or comparable populations in similar managed care arrangements; and

(v) Alternatively, for a first tier contractor that is a physician, the qualified managed care plan has placed the physician at risk for referral services in an amount that exceeds the substantial financial risk threshold set forth in 42 CFR 417.479(f) and the arrangement is in compliance with the stop-loss and beneficiary survey requirements of 42 CFR 417.479(g).

(D) Payments for items and services reimbursed by Federal health care program must comply with the following two standards:

(1) The qualified managed care plan (or in the case of a self-funded employer plan that contracts with a qualified managed care plan to provide administrative services, the self-funded employer plan) must submit the claims directly to the Federal health care program, in accordance with a valid reassignment agreement, for items or services reimbursed by the Federal health care program. (Notwithstanding the foregoing, inpatient hospital services, other than psychiatric services, will be deemed to comply if the hospital is reimbursed by a Federal health care program under a DRG methodology.)

(2) Payments to first tier contractors and any downstream contractors for providing or arranging for items or services reimbursed by a Federal health care program must be identical to payment arrangements to or between such parties for the same items or services provided to other beneficiaries with similar health status, provided that such payments may be adjusted where the adjustments are related to utilization patterns or costs of providing items or services to the relevant population.

(E) In establishing the terms of an arrangement—

(1) Neither party gives or receives remuneration in return for or to induce the provision or acceptance of business (other than business covered by the arrangement) for which payment may be made in whole or in part by a Federal health care program on a fee-for-service or cost basis; and

(2) Neither party to the arrangement shifts the financial burden of such arrangement to the extent that increased payments are claimed from a Federal health care program;

1151

(i) A first tier contractor and a downstream contractor, or between downstream contractors, to provide or arrange for items or services, as long as the following three standards are met—

(A) Both parties are being paid for the provision or arrangement of items or services in accordance with one of the payment methodologies set out in paragraph (u)(1)(i)(C) of this section;

(B) Payment arrangements for items and services reimbursable by a Federal health care program comply with paragraph (u)(1)(i)(D) of this section; and

(C) In establishing the terms of an arrangement—

(1) Neither party gives or receives remuneration in return for or to induce the provision or acceptance of business (other than business covered by the arrangement) for which payment may be made in whole or in part by a Federal health care program on a fee-for-service or cost basis; and

(2) Neither party to the arrangement shifts the financial burden of the arrangement to the extent that increased payments are claimed from a Federal health care program.

(2) For purposes of this paragraph, the following terms are defined as follows:

(i) Downstream contractor means an individual or entity that has a subcontract directly or indirectly with a first tier contractor for the provision or arrangement of items or services that are covered by an agreement between a qualified managed care plan and the first tier contractor.

(ii) First tier contractor means an individual or entity that has a contract directly with a qualified managed care plan to provide or arrange for items or services.

(iii) Is obligated to provide for a contractor refers to items or services:

(A) Provided directly by an individual or entity and its employees;

(B) For which an individual or entity is financially responsible, but which are provided by downstream contractors;

(C) For which an individual or entity makes referrals or arrangements; or

(D) For which an individual or entity receives financial incentives based on its own, its provider group's, or its

qualified managed care plan's performance (or combination thereof).

(iv) Items and services means health care items, devices, supplies or services or those services reasonably related to the provision of health care items, devices, supplies or services including, but not limited to, non-emergency transportation, patient education, attendant services, social services (e.g., case management), utilization review and quality assurance. Marketing or other pre-enrollment activities are not "items or services" for purposes of this definition in this paragraph.

(v) Minimum payment is the guaranteed amount that a provider is entitled to receive under an agreement with a first tier or downstream contractor or a qualified managed care plan.

(vi) Qualified managed care plan means a health plan as defined in paragraph (l)(2) of this section that:

(A) Provides a comprehensive range of health services;

(B) Provides or arranges for—

(1) Reasonable utilization goals to avoid inappropriate utilization;

(2) An operational utilization review program;

(3) A quality assurance program that promotes the coordination of care, protects against underutilization, and specifies patient goals, including measurable outcomes where appropriate;

(4) Grievance and hearing procedures;

(5) Protection of enrollees from incurring financial liability other than copayments and deductibles; and

(6) Treatment for Federal health care program beneficiaries that is not different than treatment for other enrollees because of their status as Federal health care program beneficiaries; and

(C) Covers a beneficiary population of which either—

(1) No more than 10 percent are Medicare beneficiaries, not including persons for whom a Federal health care program is the secondary payer; or

(2) No more than 50 percent are Medicare beneficiaries (not including persons for whom a Federal health care program is the secondary payer), provided that payment of premiums is on a periodic basis that does not take into account the dates services are rendered, the frequency of services, or the extent or kind of services rendered, and

provided further that such periodic payments for the non-Federal health care program beneficiaries do not take into account the number of Federal health care program fee-for-service beneficiaries covered by the agreement or the amount of services generated by such beneficiaries.

(vii) *Target payment* means the fair market value payment, established through arms length negotiations that will be earned by an individual or entity that:

(A) Is dependent on the individual or entity's meeting a utilization target or range of utilization targets that are set consistent with historical utilization rates for the same or comparable populations in similar managed care arrangements, whether based on its own, its provider group's or the qualified managed care plan's utilization (or a combination thereof); and

(B) Does not include any bonus or fee that the individual or entity may earn from exceeding the utilization target.

(v) *Ambulance replenishing.* (1) As used in section 1128B of the Act, "remuneration" does not include any gift or transfer of drugs or medical supplies (including linens) by a hospital or other receiving facility to an ambulance provider for the purpose of replenishing comparable drugs or medical supplies (including linens) used by the ambulance provider (or a first responder) in connection with the transport of a patient by ambulance to the hospital or other receiving facility if all of the standards in paragraph (v)(2) of this section are satisfied and all of the applicable standards in either paragraph (v)(3)(i), (v)(3)(ii) or (v)(3)(iii) of this section are satisfied. However, to qualify under paragraph (v), the ambulance that is replenished must be used to provide emergency ambulance services an average of three times per week, as measured over a reasonable period of time. Drugs and medical supplies (including linens) initially used by a first responder and replenished at the scene of the illness or injury by the ambulance provider that transports the patient to the hospital or other receiving facility will be deemed to have been used by the ambulance provider.

(2) To qualify under paragraph (v) of this section, the ambulance replenishing arrangement must satisfy all of the following four conditions—

(i)(A) Under no circumstances may the ambulance provider (or first responder) and the receiving facility both bill for the same replenished drug or supply. Replenished drugs or supplies may only be billed (including claiming bad debt) to a Federal health care program by either the ambulance provider (or first responder) or the receiving facility.

(B) All billing or claims submission by the receiving facility, ambulance provider or first responder for replenished drugs and medical supplies used in connection with the transport of a Federal health care program beneficiary must comply with all applicable Federal health care program payment and coverage rules and regulations.

(C) Compliance with paragraph (v)(2)(i)(B) of this section will be determined separately for the receiving facility and the ambulance provider (and first responder, if any), so long as the receiving facility, ambulance provider (or first responder) refrains from doing anything that would impede the other party or parties from meeting their obligations under paragraph (v)(2)(i)(B).

(ii)(A) The receiving facility or ambulance provider, or both, must

(1) Maintain records of the replenished drugs and medical supplies and the patient transport to which the replenished drugs and medical supplies related;

(2) Provide a copy of such records to the other party within a reasonable time (unless the other party is separately maintaining records of the replenished drugs and medical supplies); and

(3) Make those records available to the Secretary promptly upon request.

(B) A pre-hospital care report (including, but not limited to, a trip sheet, patient care report or patient encounter report) prepared by the ambulance provider and filed with the receiving facility will meet the requirements of paragraph (v)(2)(ii)(A) of this section, provided that it documents the specific type and amount of medical supplies and drugs used on this patient and subsequently replenished.

(C) For purposes of paragraph (v)(2)(ii) of this section, documentation may be maintained and, if required, filed with the other party in hard copy or electronically. If a replenishing arrangement includes linens, documentation need not be maintained for their exchange. If documentation is not maintained for the exchange of linens, the receiving facility will be presumed to have provided an exchange of comparable clean linens for soiled linens for each ambulance transport of a patient to the receiving facility. Records required under paragraph (v)(2)(ii)(A) of this section must be maintained for 5 years.

(iii) The replenishing arrangement must not take into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under any Federal health care program (other than the referral of the particular patient to whom the replenished drugs and medical supplies were furnished).

(iv) The receiving facility and the ambulance provider otherwise comply with all Federal, State, and local laws regulating ambulance services, including, but not limited to, emergency services, and the provision of drugs and medical supplies, including, but not limited to, laws relating to the handling of controlled substances.

(3) To qualify under paragraph (v) of this section, the arrangement must satisfy all of the standards in one of the following three categories:

(i) General replenishing. (A) The receiving facility must replenish medical supplies or drugs on an equal basis for all ambulance providers that bring patients to the receiving facility in any one of the categories described in paragraph (v)(3)(i)(A)(1), (2), or (3) of this section. A receiving facility may offer replenishing to one or more of the categories and may offer different replenishing arrangements to different categories, so long as the replenishing is conducted uniformly within each category. For example, a receiving facility may offer to replenish a broader array of drugs or supplies for ambulance providers that do not charge for their services than for ambulance providers that charge for their services. Within

each category, the receiving facility may limit its replenishing arrangements to the replenishing of emergency ambulance transports only. A receiving facility may offer replenishing to one or more of the categories—

(1) All ambulance providers that do not bill any patient or insurer (including Federal health care programs) for ambulance services, regardless of the payor or the patient's ability to pay (i.e., ambulance providers, such as volunteer companies, that provide ambulance services without charge to any person or entity);

(2) All not-for-profit and State or local government ambulance service providers (including, but not limited to, municipal and volunteer ambulance services providers); or

(3) All ambulance service providers.

(B)(1) The replenishing arrangement must be conducted in an open and public manner. A replenishing arrangement will be considered to be conducted in an open and public manner if one of the following two conditions are satisfied:

(i) A written disclosure of the replenishing program is posted conspicuously in the receiving facility's emergency room or other location where the ambulance providers deliver patients and copies are made available upon request to ambulance providers, Government representatives, and members of the public (subject to reasonable photocopying charges). The written disclosure can take any reasonable form and should include the category of ambulance service providers that qualifies for replenishment; the drugs or medical supplies included in the replenishment program; and the procedures for documenting the replenishment. A sample disclosure form is included in appendix A to subpart C of this part for illustrative purposes only. No written contracts between the parties are required for purposes of paragraph (v)(3)(i)(B)(1)(i) of this section; or

(ii) The replenishment arrangement operates in accordance with a plan or protocol of general application promulgated by an Emergency Medical Services (EMS) Council or comparable entity, agency or organization, provided a

copy of the plan or protocol is available upon request to ambulance providers, Government representatives and members of the public (subject to reasonable photocopying charges). While parties are encouraged to participate in collaborative, comprehensive, community-wide EMS systems to improve the delivery of EMS in their local communities, nothing in this paragraph shall be construed as requiring the involvement of such organizations or the development or implementation of ambulance replenishment plans or protocols by such organizations.

(2) Nothing in this paragraph (v)(6)(i) shall be construed as requiring disclosure of confidential proprietary or financial information related to the replenishing arrangement (including, but not limited to, information about cost, pricing or the volume of replenished drugs or supplies) to ambulance providers or members of the general public.

(ii) *Fair market value replenishing.* (A) Except as otherwise provided in paragraph (v)(3)(ii)(B) of this section, the ambulance provider must pay the receiving facility fair market value, based on an arms-length transaction, for replenished medical supplies; and

(B) If payment is not made at the same time as the replenishing of the medical supplies, the receiving facility and the ambulance provider must make commercially reasonable payment arrangements in advance.

(iii) *Government mandated replenishing.* The replenishing arrangement is undertaken in accordance with a State or local statute, ordinance, regulation or binding protocol that requires hospitals or receiving facilities in the area subject to such requirement to replenish ambulances that deliver patients to the hospital with drugs or medical supplies (including linens) that are used during the transport of that patient.

(4) For purposes of paragraph (v) of this section—

(i) A *receiving facility* is a hospital or other facility that provides emergency medical services.

(ii) An *ambulance provider* is a provider or supplier of ambulance transport services that provides emergency ambulance services. The term does not include a provider of ambulance transport services that provides only non-emergency transport services.

(iii) A *first responder* includes, but is not limited to, a fire department, paramedic service or search and rescue squad that responds to an emergency call (through 9-1-1 or other emergency access number) and treats the patient, but does not transport the patient to the hospital or other receiving facility.

(iv) An *emergency ambulance service* is a transport by ambulance initiated as a result of a call through 9-1-1 or other emergency access number or a call from another acute care facility unable to provide the higher level care required by the patient and available at the receiving facility.

(v) *Medical supplies* includes linens, unless otherwise provided.

(w) *Health centers.* As used in section 1128B of the Act, "remuneration" does not include the transfer of any goods, items, services, donations or loans (whether the donation or loan is in cash or in-kind), or combination therefrom from an individual or entity to a health center (as defined in this paragraph), as long as the following nine standards are met—

(1)(i) The transfer is made pursuant to a contract, lease, grant, loan, or other agreement that—

(A) Is set out in writing;

(B) Is signed by the parties; and

(C) Covers, and specifies the amount of, all goods, items, services, donations, or loans to be provided by the individual or entity to the health center;

(ii) The amount of goods, items, services, donations, or loans specified in the agreement in accordance with paragraph (w)(1)(i)(C) of this section may be a fixed sum, fixed percentage, or set forth by a fixed methodology. The amount may not be conditioned on the volume or value of Federal health care program business generated between the parties. The written agreement will be deemed to cover all goods, items, services, donations, or loans provided by the individual or entity to the health center as required by paragraph (w)(1)(i)(C) of this section if all separate agreements between the individual or entity and the health center incorporate each other by reference or if they cross-reference a master list of

agreements that is maintained centrally, is kept up to date, and is available for review by the Secretary upon request. The master list should be maintained in a manner that preserves the historical record of arrangements.

(2) The goods, items, services, donations, or loans are medical or clinical in nature or relate directly to services provided by the health center as part of the scope of the health center's section 330 grant (including, by way of example, billing services, administrative support services, technology support, and enabling services, such as case management, transportation, and translation services, that are within the scope of the grant).

(3) The health center reasonably expects the arrangement to contribute meaningfully to the health center's ability to maintain or increase the availability, or enhance the quality, of services provided to a medically underserved population served by the health center, and the health center documents the basis for the reasonable expectation prior to entering the arrangement. The documentation must be made available to the Secretary upon request.

(4) At reasonable intervals, but at least annually, the health center must re-evaluate the arrangement to ensure that the arrangement is expected to continue to satisfy the standard set forth in paragraph (w)(3) of this section, and must document the re-evaluation contemporaneously. The documentation must be made available to the Secretary upon request. Arrangements must not be renewed or renegotiated unless the health center reasonably expects the standard set forth in paragraph (w)(3) of this section to be satisfied in the next agreement term. Renewed or renegotiated agreements must comply with the requirements of paragraph (w)(3) of this section.

(5) The individual or entity does not: (i) Require the health center (or its affiliated health care professionals) to refer patients to a particular individual or entity, or

(ii) restrict the health center (or its affiliated health care professionals) from referring patients to any individual or entity.

(6) Individuals and entities that offer to furnish goods, items, or services without charge or at a reduced charge to the health center must furnish such goods, items, or services to all patients from the health center who clinically qualify for the goods, items, or services, regardless of the patient's payor status or ability to pay. The individual or entity may impose reasonable limits on the aggregate volume or value of the goods, items, or services furnished under the arrangement with the health center, provided such limits do not take into account a patient's payor status or ability to pay.

(7) The agreement must not restrict the health center's ability, if it chooses, to enter into agreements with other providers or suppliers of comparable goods, items, or services, or with other lenders or donors. Where a health center has multiple individuals or entities willing to offer comparable remuneration, the health center must employ a reasonable methodology to determine which individuals or entities to select and must document its determination. In making these determinations, health centers should look to the procurement standards for beneficiaries of Federal grants set forth in 45 CFR 75.326 through 75.340.

(8) The health center must provide effective notification to patients of their freedom to choose any willing provider or supplier. In addition, the health center must disclose the existence and nature of an agreement under paragraph (w)(1) of this section to any patient who inquires. The health center must provide such notification or disclosure in a timely fashion and in a manner reasonably calculated to be effective and understood by the patient.

(9) The health center may, at its option, elect to require that an individual or entity charge a referred health center patient the same rate it charges other similarly situated patients not referred by the health center or that the individual or entity charge a referred health center patient a reduced rate (where the discount applies to the total charge and not just to the cost-sharing portion owed by an insured patient).

NOTE TO PARAGRAPH (w): For purposes of this paragraph, the term "health center"

means a Federally Qualified Health Center under section 1905(l)(2)(B)(i) or 1905(l)(2)(B)(ii) of the Act, and "medically underserved population" means a medically underserved population as defined in regulations at 42 CFR 51c.102(e).

(x) *Electronic prescribing items and services.* As used in section 1128B of the Act, "remuneration" does not include nonmonetary remuneration (consisting of items and services in the form of hardware, software, or information technology and training services) necessary and used solely to receive and transmit electronic prescription information, if all of the following conditions are met:

(1) The items and services are provided by a—

(i) Hospital to a physician who is a member of its medical staff;

(ii) Group practice to a prescribing health care professional who is a member of the group practice; and

(iii) A PDP sponsor or MA organization to pharmacists and pharmacies participating in the network of such sponsor or organization and to prescribing health care professionals.

(2) The items and services are provided as part of, or are used to access, an electronic prescription drug program that meets the applicable standards under Medicare Part D at the time the items and services are provided.

(3) The donor (or any person on the donor's behalf) does not take any action to limit or restrict the use or compatibility of the items or services with other electronic prescribing or electronic health records systems.

(4) For items or services that are of the type that can be used for any patient without regard to payer status, the donor does not restrict, or take any action to limit, the recipient's right or ability to use the items or services for any patient.

(5) Neither the recipient nor the recipient's practice (or any affiliated individual or entity) makes the receipt of items or services, or the amount or nature of the items or services, a condition of doing business with the donor.

(6) Neither the eligibility of a beneficiary for the items or services, nor the amount or nature of the items or services, is determined in a manner that takes into account the volume or value of referrals or other business generated between the parties.

(7) The arrangement is set forth in a written agreement that—

(i) Is signed by the parties;

(ii) Specifies the items and services being provided and the donor's cost of the items and services; and

(iii) Covers all of the electronic prescribing items and services to be provided by the donor (or affiliated parties). This requirement will be met if all separate agreements between the donor (and affiliated parties) and the beneficiary incorporate each other by reference or if they cross-reference a master list of agreements that is maintained and updated centrally and is available for review by the Secretary upon request. The master list should be maintained in a manner that preserves the historical record of agreements.

(8) The donor does not have actual knowledge of, and does not act in reckless disregard or deliberate ignorance of, the fact that the beneficiary possesses or has obtained items or services equivalent to those provided by the donor.

NOTE TO PARAGRAPH (x): For purposes of paragraph (x) of this section, *group practice* shall have the meaning set forth at 42 CFR 411.352; *member of the group practice* shall mean all persons covered by the definition of "member of the group or member of a group practice" at 42 CFR 411.351, as well as other prescribing health care professionals who are owners or employees of the group practice; *prescribing health care professional* shall mean a physician or other health care professional licensed to prescribe drugs in the State in which the drugs are dispensed; *PDP sponsor* or *MA organization* shall have the meanings set forth at 42 CFR 423.4 and 422.2, respectively; *prescription information* shall mean information about prescriptions for drugs or for any other item or service normally accomplished through a written prescription; and *electronic health record* shall mean a repository of consumer health status information in computer processable form used for clinical diagnosis and treatment for a broad array of clinical conditions.

(y) *Electronic health records items and services.* As used in section 1128B of the Act, "remuneration" does not include nonmonetary remuneration (consisting of items and services in the form of software or information technology

and training services, including cybersecurity software and services) necessary and used predominantly to create, maintain, transmit, receive, or protect electronic health records, if all of the conditions in paragraph (y)(1) through (18) of this section are met:

(i) The items and services are provided to an individual or entity engaged in the delivery of health care by:

(i) An individual or entity, other than a laboratory company, that:

(A) Provides services covered by a Federal health care program and submits claims or requests for payment, either directly or through reassignment, to the Federal health care program; or

(B) Is comprised of the types of individuals or entities in paragraph (y)(1)(i)(A) of this section; or

(ii) A health plan.

(2) The software is interoperable at the time it is provided to the recipient. For purposes of this paragraph (y)(2) of this section, software is deemed to be interoperable if, on the date it is provided to the recipient, it is certified by a certifying body authorized by the National Coordinator for Health Information Technology to certification criteria identified in the then-applicable version of 45 CFR part 170.

(3) [Reserved]

(4) Neither the recipient nor the recipient's practice (or any affiliated individual or entity) makes the receipt of items or services, or the amount or nature of the items or services, a condition of doing business with the donor.

(5) Neither the eligibility of a recipient for the items or services, nor the amount or nature of the items or services, is determined in a manner that directly takes into account the volume or value of referrals or other business generated between the parties. For the purposes of this paragraph (y)(5), the determination is deemed not to directly take into account the volume or value of referrals or other business generated between the parties if any one of the following conditions is met:

(i) The determination is based on the total number of prescriptions written by the beneficiary (but not the volume or value of prescriptions dispensed or paid by the donor or billed to a Federal health care program);

(ii) The determination is based on the size of the recipient's medical practice (for example, total patients, total patient encounters, or total relative value units);

(iii) The determination is based on the total number of hours that the recipient practices medicine;

(iv) The determination is based on the recipient's overall use of automated technology in his or her medical practice (without specific reference to the use of technology in connection with referrals made to the donor);

(v) The determination is based on whether the recipient is a member of the donor's medical staff, if the donor has a formal medical staff;

(vi) The determination is based on the level of uncompensated care provided by the recipient; or

(vii) The determination is made in any reasonable and verifiable manner that does not directly take into account the volume or value of referrals or other business generated between the parties.

(6) The arrangement is set forth in a written agreement that—

(i) Is signed by the parties;

(ii) Specifies the items and services being provided, the donor's cost of those items and services, and the amount of the recipient's contribution; and

(iii) Covers all of the electronic health records items and services to be provided by the donor (or any affiliate). This requirement will be met if all separate agreements between the donor (and affiliated parties) and the beneficiary incorporate each other by reference or if they cross-reference a master list of agreements that is maintained and updated centrally and is available for review by the Secretary upon request. The master list should be maintained in a manner that preserves the historical record of agreements.

(7) [Reserved]

(8) For items or services that are of the type that can be used for any patient without regard to payer status, the donor does not restrict, or take any action to limit, the recipient's right or ability to use the items or services for any patient.

(9) The items and services do not include staffing of the recipient's office

and are not used primarily to conduct personal business or business unrelated to the recipient's clinical practice or clinical operations.

(10) [Reserved]

(11) The recipient pays 15 percent of the donor's cost for the items and services. The following conditions apply to such contribution:

(i) If the donation is the initial donation of EHR items and services, or the replacement of part or all of an existing system of EHR items and services, the recipient must pay 15 percent of the donor's cost before receiving the items and services. The contribution for updates to previously donated EHR items and services need not be paid in advance of receiving the update; and

(ii) The donor (or any affiliated individual or entity) does not finance the recipient's payment or loan funds to be used by the recipient to pay for the items and services.

(12) The donor does not shift the costs of the items or services to any Federal health care program.

(13) [Reserved]

(14) For purposes of this paragraph (y), the following definitions apply:

(i) *Cybersecurity* means the process of protecting information by preventing, detecting, and responding to cyberattacks.

(ii) *Health plan* shall have the meaning set forth at § 1001.952(l)(2).

(iii) *Interoperable* shall mean able to:

(A) Securely exchange data with and use data from other health information technology; and

(B) Allow for complete access, exchange, and use of all electronically accessible health information for authorized use under applicable State or Federal law.

(iv) *Electronic health record* shall mean a repository of consumer health status information in computer processable form used for clinical diagnosis and treatment for a broad array of clinical conditions.

(z) *Federally Qualified Health Centers and Medicare Advantage Organizations.* As used in section 1128B of the Act, "remuneration" does not include any remuneration between a federally qualified health center (or an entity controlled by such a health center) and a Medicare Advantage organization pursuant to a written agreement described in section 1853(a)(4) of the Act.

(aa) *Medicare Coverage Gap Discount Program.* As used in section 1128B of the Act, "remuneration" does not include a discount in the price of a drug when the discount is furnished to a beneficiary under the Medicare Coverage Gap Discount Program established in section 1860D–14A of the Act, as long as all the following requirements are met:

(1) The discounted drug meets the definition of "applicable drug" set forth in section 1860D–14A(g) of the Act;

(2) The beneficiary receiving the discount meets the definition of "applicable beneficiary" set forth in section 1860D–14A(g) of the Act; and

(3) The manufacturer of the drug participates in, and is in compliance with the requirements of, the Medicare Coverage Gap Discount Program.

(bb) *Local Transportation.* As used in section 1128B of the Act, "remuneration" does not include free or discounted local transportation made available by an eligible entity (as defined in this paragraph (bb)):

(1) To Federal health care program beneficiaries if all the following conditions are met:

(i) The availability of the free or discounted local transportation services—

(A) Is set forth in a policy, which the eligible entity applies uniformly and consistently; and

(B) Is not determined in a manner related to the past or anticipated volume or value of Federal health care program business;

(ii) The free or discounted local transportation services are not air, luxury, or ambulance-level transportation;

(iii) The eligible entity does not publicly market or advertise the free or discounted local transportation services, no marketing of health care items and services occurs during the course of the transportation or at any time by drivers who provide the transportation, and drivers or others arranging for the transportation are not paid on a per-beneficiary-transported basis;

(iv) The eligible entity makes the free or discounted transportation available only:

(A) To an individual who is:

1159

(1) An established patient (as defined in this paragraph (bb)) of the eligible entity that is providing the free or discounted transportation, if the eligible entity is a provider or supplier of health care services; and

(2) An established patient of the provider or supplier to or from which the individual is being transported;

(B) Within 25 miles of the health care provider or supplier to or from which the patient would be transported, or within 75 miles if the patient resides in a rural area, as defined in this paragraph (bb) except that, if the patient is discharged from an inpatient facility following inpatient admission or released from a hospital after being placed in observation status for at least 24 hours and transported to the patient's residence, or another residence of the patient's choice, the mileage limits in this paragraph (bb)(1)(iv)(B) shall not apply; and

(C) For the purpose of obtaining medically necessary items and services.

(v) The eligible entity that makes the transportation available bears the costs of the free or discounted local transportation services and does not shift the burden of these costs onto any Federal health care program, other payers, or individuals; and

(2) In the form of a "shuttle service" (as defined in this paragraph (bb)) if all of the following conditions are met:

(i) The shuttle service is not air, luxury, or ambulance-level transportation;

(ii) The shuttle service is not marketed or advertised (other than posting necessary route and schedule details), no marketing of health care items and services occurs during the course of the transportation or at any time by drivers who provide the transportation, and drivers or others arranging for the transportation are not paid on a per-beneficiary-transported basis;

(iii) The eligible entity makes the shuttle service available only within the eligible entity's local area, meaning there are no more than 25 miles from any stop on the route to any stop at a location where health care items or services are provided, except that if a stop on the route is in a rural area, the distance may be up to 75 miles be-

tween that stop and any providers or suppliers on the route;

(iv) The eligible entity that makes the shuttle service available bears the costs of the free or discounted shuttle services and does not shift the burden of these costs onto any Federal health care program, other payers, or individuals.

(3) For purposes of this paragraph (bb), the following definitions apply:

(i) An eligible entity is any individual or entity, except for individuals or entities (or family members or others acting on their behalf) that primarily supply health care items;

(ii) An established patient is a person who has selected and initiated contact to schedule an appointment with a provider or supplier, or who previously has attended an appointment with the provider or supplier;

(iii) A shuttle service is a vehicle that runs on a set route, on a set schedule;

(iv) A rural area is an area that is not an urban area, as defined in paragraph (bb)(3)(v) of this section.

(v) An urban area is:

(A) A Metropolitan Statistical Area (MSA) or New England County Metropolitan Area (NECMA), as defined by the Executive Office of Management and Budget; or

(B) The following New England counties, which are deemed to be parts of urban areas under section 601(g) of the Social Security Amendments of 1983 (Pub. L. 98-21, 42 U.S.C. 1395ww (note)): Litchfield County, Connecticut; York County, Maine; Sagadahoc County, Maine; Merrimack County, New Hampshire; and Newport County, Rhode Island.

(cc) Point-of-sale reductions in price for prescription pharmaceutical products. (1) As used in section 1128B of the Act, "remuneration" does not include a reduction in price from a manufacturer to a plan sponsor under Medicare Part D or a Medicaid Managed Care Organization for a prescription pharmaceutical product that is payable, in whole or in part, by a plan sponsor under Medicare Part D or a Medicaid Managed Care Organization, provided the following conditions are met with regard to that reduction in price:

(i) The manufacturer and the plan sponsor under Medicare Part D, a Medicaid MCO, or the PBM acting under contract with either, set the reduction in price in advance, in writing, by the time of the first purchase of the product at that reduced price by the plan sponsor or Medicaid MCO on behalf of an enrollee;

(ii) The reduction in price does not involve a rebate unless the full value of the reduction in price is provided to the dispensing pharmacy by the manufacturer, directly or indirectly, through a point-of-sale chargeback or series of point-of-sale chargebacks, or is required by law; and

(iii) The reduction in price must be completely reflected in the price of the prescription pharmaceutical product at the time the pharmacy dispenses it to the beneficiary.

(2)(i) For purposes of this paragraph (cc), the terms manufacturer, pharmacy benefit manager or PBM, prescription pharmaceutical product, and rebate have the meanings ascribed to them in paragraph (b) of this section.

(ii) For purposes of this paragraph (cc), a point-of-sale chargeback is a payment by a manufacturer made directly or indirectly (through a PBM or other entity) to a dispensing pharmacy equal to the reduction in price agreed upon in writing between the Plan Sponsor under Part D, the Medicaid MCO, or a PBM acting under contract with either, and the manufacturer of the prescription pharmaceutical product.

(iii) For purposes of this paragraph (cc), the term Medicaid Managed Care Organization or Medicaid MCO carries the meaning ascribed to it in section 1903(m) of the Social Security Act.

(dd) *PBM service fees.* (1) As used in section 1128B of the Act, "remuneration" does not include any payment by a pharmaceutical manufacturer to a pharmacy benefit manager (PBM) for services the PBM provides to the pharmaceutical manufacturer related to the pharmacy benefit management services that the PBM furnishes to one or more health plans as long as the following conditions are met:

(i) The PBM has a written agreement with the pharmaceutical manufacturer, signed by the parties, that covers all of the services the PBM provides to the manufacturer in connection with the PBM's arrangements with health plans for the term of the agreement and specifies each of the services to be provided by the PBM and the compensation associated with such services.

(ii) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(iii) The compensation paid to the PBM is:

(A) Is consistent with fair market value in an arm's-length transaction;

(B) Is a fixed payment, not based on a percentage of sales; and

(C) Is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties, or between the manufacturer and the PBM's health plans, for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs.

(iv) The PBM discloses in writing to each health plan with which it contracts at least annually the services rendered to each pharmaceutical manufacturer related to the PBM's arrangements to furnish pharmacy benefit management services to the health plan, and to the Secretary upon request, the services rendered to each pharmaceutical manufacturer related to the PBM's arrangements to furnish pharmacy benefit management services to the health plan and the fees paid for such services.

(2) For purposes of safe harbor in this paragraph (dd), the terms manufacturer, pharmacy benefit manager or PBM, and prescription pharmaceutical product have the meanings ascribed to them in paragraph (b) of this section, and health plan has the meaning ascribed to it in paragraph (l) of this section.

(ee) *Care coordination arrangements to improve quality, health outcomes, and efficiency.* As used in section 1128B of the Act, "remuneration" does not include the exchange of anything of value between a VBE and VBE participant or between VBE participants pursuant to a value-based arrangement if all of the