UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  23-CR-80211-MARRA

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

ROBERT LEON SMITH, III,

     Defendant.

_____/

## **DEFENDANT'S SENTENCING MEMORANDUM**

The Defendant, Robert Leon Smith, III, through undersigned counsel, submits this sentencing memorandum to the Court.  Mr. Smith seeks a sentence of 96 months.[1]  A sentence of 96 months, or 8 years, is sufficient, but not greater than necessary, to achieve the purposes and goals of sentencing, as set forth in 18 U.S.C. § 3553(a).

## **GENERAL SENTENCING PRINCIPLES**

While the advisory "[g]uidelines should be the starting point and the initial benchmark," they are "not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007). So while this Court must begin by calculating the applicable advisory guidelines range, it also has broad discretion to impose a sentence far below that

---

[1] The undersigned recognizes that the plea agreement in this case indicates that the parties will jointly recommend a sentence within the advisory sentencing guideline range. (DE 337: ¶14).  However, as was discussed during Mr. Smith's change of plea hearing, this was not intended to prevent Mr. Smith from requesting a sentence below the guideline range.  (DE 418: P.6, L.22-25).

range. *See id.* at 49-51; *see also generally United States v. Booker*, 543 U.S. 220 (2005). It may sentence below the advisory guidelines range either (a) because "the case at hand falls outside 'heartland' to which the [Sentencing] Commission intends individual guidelines to apply, U.S.S.G. § 5K2.0," i.e., a downward departure, or (b) because "the Guidelines sentence itself fails properly to reflect the § 3553(a) considerations," i.e., a variance. *Rita v. United States*, 551 U.S. 338, 351 (2007).

After considering the guidelines, a sentencing court "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50. This is based on the "federal judicial tradition" that a court "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Id.* at 52; *see also United States v. Hunt*, 459 F.3d 1180, 1185 (11th Cir. 2006) (stating "a district court may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence").

Section 3553(a) provides that, "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." That section requires the district court to consider (1) the nature and circumstances of the offense and the history and characteristics of the

2

defendant; (2) the need for the sentence imposed to provide just punishment, afford adequate deterrence, protect the public from further crimes, and provide the defendant with needed rehabilitation; (3) the kinds of sentences available; (4) the Guidelines; (5) any policy statements; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). The Eleventh Circuit has affirmed sentences that were less than half of a defendant's guideline range where the sentencing court properly considered the § 3553(a) factors. *See, e.g., United States v. Williams,* 435 F.3d 1350 (11th Cir. 2006) (affirming the defendant's 90 month sentence despite his guideline range of 188 to 235 months); *United States v. Halsema,* 180 Fed. Appx. 103 (11th Cir. 2006) (affirming the defendant's 24 month sentence despite his guideline range of 57 to 71 months).

## APPLICATION OF § 3553(a) FACTORS

### A. The History and Characteristics of the Defendant

Mr. Smith is "a devoted father, a caring member of his community, and a man who has spent most of his life doing the right thing and supporting those around him." (DE 468-1). Mr. Smith is a 50 year old father of three. (*See* DE 374: 3 & ¶¶107&109). This includes his two, adult biological sons and his partner's minor daughter who views him as a stepfather. *Id.* Before this case, Mr. Smith had no prior criminal history. (DE 374: ¶¶94-99). Mr. Smith was born and grew up in Michigan. (DE 374: ¶¶110&119). He graduated high school and completed three semesters of college there. (DE 374: ¶119). He later relocated to Texas, and he has remained there for almost the entirety of the past 16 years. (*See* DE 374: ¶110). Mr. Smith is "deeply

3

loved by the people around him because of the way he cares for others and the way he puts family first." (DE 468-6).

People who know Mr. Smith report the exceptional way he has supported and encouraged his children. Mr. Smith's partner, Ms. Janoe, has seen how he has raised his children with "love, commitment, and guidance" and how "his role as a father has always been one of the most important parts of his life." (DE 468-1). His younger son saw how Mr. Smith valued making memories with him and his brother, and hopes to emulate that quality when he himself has children. (DE 468-3). His older son recounts Mr. Smith taking him and his brother to school. (DE 468-2). Both sons report that Mr. Smith attended every sporting event they had. (DE 468-2 & DE 468-3). He would always be the loudest in the stands showing his support. (DE 468-3). Mr. Smith would take them to ride dirt bikes and engage them in recreational activities that peaked their interests. (DE 468-2). This included trips to Six Flags, cruises during Christmas, going to a skatepark, or going to a movie theater to watch a 4D movie. (DE 468-3). His younger son reports having his dad's support during his entire childhood and describes having a father throughout his childhood as the best part of life for a child. (DE 468-3). He remembers the sacrifices his father made for him and his brother growing up. (DE 468-3). Mr. Smith's sons' mother reports that she "couldn't have asked for a better father for [their] two boys." (DE 468-8). She sees how Mr. Smith was a huge supporter for their sons who encouraged and helped them succeed. (DE 468-8). Her mother, Mr. Smith's former mother-in-law, also

4

reports how supportive Mr. Smith has been for her grandsons.  (DE 468-9).  Mr. Smith's sons "are the center of his world."  (DE 468-6).

His sons viewed Mr. Smith as a role model, and he helped guide them in the right direction to make the right choices.  (DE 468-2).  His older son describes Mr. Smith as being the best dad anyone could ask for.  (DE 468-2).  His younger son hopes to carry forward his father's commitment to building memories with his children when he himself has children.  (DE 468-3).  This son hopes to be the type of man his father has been.  (DE 468-3).

Mr. Smith has been a remarkable father figure, not just to his own biological children, but others, as well.  His partner, Ms. Janoe, has a minor daughter, and her daughter sees him as a father figure.  (DE 468-4).  She describes him as her hero or superhero. (DE 468-4).  She has seen him give food to homeless people and describes him as caring, sharing, and loving.  (DE 468-4).  Her grandparents report how much Mr. Smith's treatment of their granddaughter has meant to them, and how he "has shown [their daughter] what true love, commitment, and respect look like in a relationship."  (DE 468-5).  They attest to how Mr. Smith "has proven himself to be a good, solid, and dependable man" who has consistently shown kindness, patience, and genuine devotion to their granddaughter.  (DE 468-5).  Mr. Smith and Ms. Janoe's friends have seen how he provides guidance and stability to Ms. Janoe's daughter. (DE 468-6 & DE 468-7).

Mr. Smith's partner's lifelong best friend and his friend, Mrs. Park, has seen him treat her best friend with genuine love, respect, kindness, loyalty and form a true

partnership.  (DE 468-6).  She describes their love as "truly special."  (DE 468-6).  Even Mr. Smith's ex-wife, the mother of his sons, reports that the good in their relationship always outweighed the bad.  (DE 468-8).  They continued to be friends after their separation.  (DE 468-8).  Mr. Smith has even maintained a positive relationship with his former mother-in-law.  (DE 468-9).

Mr. Smith made genuine connections to his children's friends and their families.  His older son reports how his friends enjoyed spending time with Mr. Smith and how they would come over to the house and speak to Mr. Smith for hours.  (DE 468-2).  The mother of one of Mr. Smith's son's best friends saw Mr. Smith take care of another young person growing up who still calls Mr. Smith dad.  (DE 468-11).  The parents of other children who grew up around Mr. Smith's kids report how Mr. Smith cared about all of the players on their sports teams, cheered on all of the kids, and supported their successes.  (DE 468-11 & DE 468-12).  He treated their children positively and "was respectful, encouraging, and focused on fostering a supportive environment for the athletes."  (DE 468-11).  Mr. Smith exemplified the "qualities of dedication, positivity, and community spirit."  (DE 468-11).  He would celebrate with the other kids and talk to them about the highlights of the game.  (DE 468-12).

Mr. Smith's older son remembers how much his father cared for the people around them and how he would go out of his way to help everyone around him.  (DE 468-2).  His partner, Ms. Janoe, has seen Mr. Smith consistently put others before himself, and she describes him as "one of the most kind, caring, and selfless individuals [she has] ever known."  (DE 468-1).  Over the years that she has known

him, she has seen him show up for the people around him regardless of whether they were family, friends, or members of the community. (DE 468-1). She knows him as a dependable, compassionate person who is always willing to help others. (DE 468-1). He is the type of person who gives to others without necessarily expecting something in return. (DE 468-1). His friend, Mrs. Park, describes him as "one of the most selfless individuals [she has] ever met." (DE 468-6). She sees his generosity and compassion as an integral part of who Mr. Smith is. (DE 468-6). Mr. Smith's former employee, Mr. Johnson, saw Mr. Smith take on home repair projects for little or no profit when Mr. Smith knew the homeowner could not afford the repair that they so badly needed done. (DE 468-10). Mr. Smith is the type of person who would make a stranger a friend. (DE 468-13).

Mr. Smith's partner's parents have seen how hardworking Mr. Smith is. (DE 468-5). They have been impressed with his perseverance. (DE 468-5). Mr. Smith's friend, Mrs. Park, has seen how he works hard and takes pride in providing for his family. (DE 468-6). Mr. Park, who is a local law enforcement officer in his community, confidently attests that Mr. Smith is a respectful, hardworking, and genuinely good man. (DE 468-7). Mr. Smith has been hired to do work on the Park's home, and Mr. Smith showed up every day and handled the job responsibly with honesty and pride. (DE 468-7). Mr. Park does not believe that Mr. Smith is a danger to others, and is instead a man who loves his family, works hard, and wants to be present for the people who depend on him. (DE 468-7). A former employee of Mr. Smith's, Mr. Johnson, worked for Mr. Smith for 8 years, but feels that Mr. Smith has

had an even larger impact on him.  (DE 468-10).  Mr. Smith even became a father figure to Mr. Johnson.  (DE 468-10).  Mr. Smith demonstrated responsibility and discipline and Mr. Johnson taught him carpentry, woodworking, welding, construction, and other trade skills.  (DE 468-10).  Mr. Johnson does not believe he would be the man who he is today if it were not for Mr. Smith.  (DE 468-10).

Even after his incarceration, Mr. Smith's work ethic has continued to impress those around him.  After his last court date, he was recently transferred to the Federal Detention Center in Miami ("FDC").  Despite being there for a relatively short period of time, he was entrusted with a work assignment.  (DE 469-1).  He received a work evaluation for the first 70 days of the year, and he received consistent outstanding reviews.  (DE 469-1).  This includes for the quality and quantity of his work, his initiative, his interest, willingness, and ability to learn.  (DE 469-1).  He has demonstrated that he needs little supervision and is dependably prompt.  (DE 469-1).  He has been responsive to supervision and instruction, and shown that he can work well with others.  (DE 469-1).  That Mr. Smith has already demonstrated good prison adjustment supports a lesser sentence in his case, because he continues to demonstrate his willingness to work hard while adjusting to incarceration.

### B. The Nature and Circumstances of the Offense

Mr. Smith is charged with nonviolent offenses.  While healthcare fraud is a serious offense, some such offenses are worse than others.  Circuit courts have recognized that when patient care is involved in the offense, the offense is worse than others who may defraud the government in other ways.  *See, e.g., United States v.*

*Moon*, 513 F.3d 527, 543 (6th Cir. 2008) (approving of the district court's reliance on the testimony of the defendant's deceased patients' relatives regarding the impact of the defendant administering partial doses of medication to her patients but reaping the profit from payments for the full doses of the medication).

### C. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment

This Court can fashion a below guidelines sentence that will still reflect the seriousness of the offense, promote respect for the law, and provide just punishment. A sentence of 96 months incarceration is a significant sentence that will adequately provide for just punishment, promote respect for the law, and reflect the seriousness of the offense. A longer sentence is not needed to achieve the goals of sentencing in this case.

### D. The Need to Provide General and Specific Deterrence

Mr. Smith's conduct in this case was aberrant behavior for him consisting of nonviolent offenses. Before this case, he had never even been arrested, much less convicted of a crime. (*See* DE 374: ¶¶94-99). He is nearly 51 years old and has attended some college. (DE 374: 3). All of these circumstances suggest that he will pose less of a risk of reoffending after his release.

Studies lasting over 8 years have shown that older offenders are less likely to recidivate. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), *3,[2] available at

---

[2] References to page numbers in this report refer to the page number in the lower right or left corner.

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9 (last visited Mar. 23, 2026). Lower rates of recidivism were also demonstrated by offenders with less criminal history, as well as more education. *Id.* Offenders convicted of fraud offenses also posed less of a recidivism risk. *Id.* Courts have also recognized that prison terms impact defendants who have not been to prison more than those who have previously been imprisoned. See, e.g., USA v. Baker, 445 F.3d 987, 992 (7th Cir. 2006) (denying government's appeal and affirming defendant's downward departure sentence, in part, because the defendant had not been to prison before and would therefore be more impacted by a prison sentence). Court have also recognized that "offenders over the age of 40 whose crime of conviction was nonviolent recidivated at half the rate of violent offenders, and when nonviolent offenders did recidivate, the new offense was less likely to be violent." *United States v. Ruvel Alfred Smith*, 482 F. Supp. 3d 1218, 1226 (M.D. Fla. Aug. 31, 2020).

**E. The Need to Provide the Defendant with Training, Medical Care, and Other Correctional Treatment**

"[I]mprisonment is not an appropriate means of promoting correction and rehabilitation." § 3582(a). Thus, a court cannot increase a sentence to provide rehabilitation. *Tapia v. United States*, 564 U.S. 319 (2011). This factor should not be given much weight in this case.

**F. The Kinds of Sentences Available, the Advisory Guidelines Range, and Pertinent Policy Statements**

This Court has a wide range of sentences available.  As set forth further below, the defendant in one of the related offenses received a probationary sentence in his case.  (*See* DE 374: ¶17).  Mr. McCormac, who received more than $5.6 million from his related fraud scheme was sentenced to five years of probation.  *USA v. Michael McCormac*, 21-CR-00539-RWS (E.D. Mo.) (DE 124).  In addition to a period of incarceration, this Court can impose up to three years of supervised release in this case.  (DE 374: ¶140).  A period of supervision in the community will ensure that Mr. Smith has successfully reintegrated into the community after the completion of his prison sentence.

**G. The Need to Avoid Unwarranted Sentencing Disparities**

"Proportionality review under [the Eighth Amendment's] evolving standards [of decency] should be informed by objective factors to the maximum possible extent." *Atkins v. Virgina*, 536 U.S. 304, 312, 122 S. Ct. 2242, 2247 (2002).  Mr. Smith agreed to recommend a total offense level of 39 in this case, and based on his lack of any prior criminal history, this produces a guideline range of 262 to 327 months.  "During the last five fiscal years (FY2020-2024), there were 25 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 39 and a Criminal History Category of I, after excluding defendant who received a §5K1.1 substantial assistance departure."  United States Sentencing Commission, Judiciary Sentencing INformation (JSIN), available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited March 19, 2026), Exhibit 1.  All of these 25 similarly situated defendants received a sentence that included imprisonment.  *Id*.  Despite their guideline range

of 262 to 327 months and that they did not receive substantial assistance departures, their average sentence was 145 months imprisonment and their median sentence was 120 months. *Id.*[3] This sentencing data is consistent with sentences generally seen in this District and around the country in fraud cases which are usually set far below the advisory guideline range.

The PSI lists 4 related cases: *USA v. Marc Sporn*, 22-CR-80007-DMM (S.D. Fla.); *USA v. Victor Van Vickery*, 23-CR-80140-RLR (S.D. Fla.); *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.), and *USA v. Michael McCormac*, 21-CR-00539-RWS (E.D. Mo.). (DE 374: 2). These defendants have been sentenced to 84 months, 87 months, 210 months, and 5 years of probation, respectively; however, it is anticipated that the defendant who received the 210 month will be receiving a Rule 35 reduction.

Mr. Vickery was alleged to have owned various businesses with Mr. Smith, and they allegedly used these businesses to pay kickbacks and bribes to call centers to have Medicare beneficiaries referred to their companies for durable medical equipment ("DME") and prescription drugs. (DE 374: ¶¶58-70). Together they were alleged to have submitted at least $61,553,291.55 in false or fraudulent claims to Medicare or which Medicare paid at least $30,158,608.25. (DE 374: ¶¶71-72).

---

[3] The average sentence is found by adding all of the sentences together and dividing that total by the 25 similarly situated defendants. *See* BBC, Mean, median, mode, range, https://www.bbc.co.uk/bitesize/articles/zj6nb7h (last visited March 19, 2026) (explaining that the mean is the most commonly used average and is found by totaling the values and dividing by how many values there are). The median is the thirteen best sentence, out of the 25 similarly situated defendants. *See Id.* (explaining that the median is found by listing the values in order and finding the middle value). Thus, of the 25 similarly situated defendants, at least 13 of them received a sentence of 120 months or less.

Vickery received at least $2,583,332 from his participation in the alleged fraud.  (DE 374: ¶74).  Mr. Vickery was sentenced to 87 months imprisonment for his role in the offense.  (DE 374: ¶15).

Mr. Sporn owned and operated telemedicine and telemarketing businesses using various related entities and nominee owners, and he used these companies to pay and receive kickbacks mainly in exchange for his referral and recruitment of Medicare patients, cancer genetic tests, and prescriptions.  *USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DE 38: 6).  His companies received nearly $10,000,000 in kickbacks and bribes, and Medicare paid approximately $14,000,000 in claims during 2017 through 2019.  *USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DE 16: 7).  Mr. Sporn used funds from these companies to pay personal expenses, purchase an extensive amount of jewelry worth more than $25,000 a piece, purchase four luxury automobiles, and purchase two luxury yachts worth more €1,370,000 and €680,000.  *USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DE 38: 6).  He had previous criminal history involving making false statements on a prior loan application.  *USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DE 16: 2).  Going back to the year 2000 and continuing through 2015, Mr. Sporn routinely failed to pay his income taxes.  *See USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DE 16: 3-5).  Mr. Sporn was ordered to forfeit $11,538,652 to the Government and pay over $28 million in restitution to the Government.  *USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DEs 40: 1 & 44).  Although Mr. Sporn was originally sentenced to 168 months incarceration, his

sentence has since been reduced to 84 months incarceration. *USA v. Sporn*, 22-CR-80007-DMM (S.D. Fla.) (DEs 44 & 81).

Mr. Schwartz and his coconspirators established DME suppliers which submitted false and fraudulent claims to Medicare. *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.) (DE 71: 2). He recruited and paid many other coconspirators, but he only received a two-level increase for being an organizer or leader. *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.) (DEs 71: 2 & 70: ¶13(e)). Mr. Schwartz was a convicted felon who had a criminal history category of VI. *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.) (DE 90: 3). Mr. Schwartz used his proceeds from his health care fraud offense to traffic in five to ten kilograms of cocaine over a two-month period. *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.) (DE 71: 4). Mr. Schwartz was ordered to forfeit $15,194,019 in addition to a Mercedes, a vessel, U.S. currency, and jewelry worth more than $70,000. *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.) (DE 78: 2-3). Although Mr. Schwartz was sentenced to 210 months, it is anticipated that he will receive a Rule 35 motion for sentence reduction. *USA v. Torres et al*, 21-CR-60108-JIC (S.D. Fla.) (DE 90: 13).

Mr. McCormac was charged in the Eastern District of Missouri with healthcare fraud and illegal kickbacks for his role in submitted fraudulent claims to federally funded health insurance plans for expensive topical creams, oral medications, and foot bath drugs. (DE 374: 16). He was sentenced to five years of probation in his case. (DE 374: ¶17). He was ordered to forfeit $5,645,615.53 to the United States. *See USA v. Michael McCormac*, 21-CR-00539-RWS (E.D. Mo.) (DE 124).

14

Looking to other, unrelated fraud cases with similar loss and restitution amounts further supports a below guidelines sentence in this case. Earlier this month, a Texas man was ordered to serve 90 months in prison for a DME fraud scheme that involved nearly $60 million in fraudulent medical claims and was responsible for $25.4 million in restitution. Stephen Feller, *Texas man headed to jail for nearly $60M Medicare fraud,* UPI (Mar. 9, 2026), available at https://www.upi.com/Top_News/US/2026/03/09/medicare-fraud-jail-time-restitution/4301773103314/ (last visited Mar. 23, 2026). He was also ordered to forfeit the $25,402,614.97 he had received based on his criminal conduct. *USA v. Patrick K. Cassells*, 24-CR-00278-CE (S.D. Tex.) (DE 33). Three codefendants were charged in this district in connection to a home health Medicare fraud scheme that involved a $60 million loss amount and $40 million in restitution. Department of Justice Office of Public Affairs, *Three Operators of Miami Home Health Company Sentenced in $60 Million Health Care Fraud Scheme* (Apr. 25, 2012), available at https://www.justice.gov/archives/opa/pr/three-operators-miami-home-health-companysentenced-60-million-health-care-fraud-scheme?bm-verify=AAQAAAAN_____5f07wn_WEw3c1NaS3aVPTsvfNR4UpWtR4bY3aZLXBKR D5A58dFgRcuYsJ7BvYX3rt7yp2kfLNxgs6rBl2TCjO_bee5_fvCXOtHiVrIBJSJtK6K bCLxFCnbS-X0HzxSDYCmX_iU7E69e0HOzSKDmWgzOhDhIx_JmLOQqZWeZ7xeqwduO36oeM WfBnq2FJC9vNMQ948-PEn80Epa84yd7AXpvS662z0iysNP0avGJwQKKhFb5lMI8vfCCEUMaokMeNPMoY

15

RMIc0fxiAxNvDLOOCpAtHOb6u8vvXghfqEJ9NTRSP9HHFConBMg8xMguPRi2e4 BEMbIzlWv2D2uR4d4SOgIxLWsFGyVzKLGAbbq4CQw6iLGhWk9K-Osj0GfRqtsX4MkOa9bU7T0gwwL57vLyKIpxucb (last visited March 23, 2026). The codefendants were sentenced to 120, 87, and 87 months. *Id.* However, their sentences were later reduced to 70, 52, and 44 months. *United States v. Roberto Gonzalez et al*, 11-CR-20621-UU (DEs 105-107). In another case, the operator of a telemedicine network that facilitated in excess of $60 million of DME orders based on paying medical providers kickbacks for prescriptions was sentenced to time served. *USA v. Charlene Frame*, 20-CR-00030-RSB-CLR (DE 52); U.S. Attorney's Office, Southern District of Georgia, *Telemedicine company owner charged in $60 million fraud scheme* (Apr. 23, 2020), available at https://www.justice.gov/usao-sdga/pr/telemedicine-company-owner-charged-60-million-fraud-scheme (last visited March 23, 2026). A sentence significantly below Mr. Smith's guideline range will promote respect for the law, because it would avoid the need for unwarranted sentencing disparities.

### H. The Need to Provide Restitution to Victims

Mr. Smith has agreed to a substantial amount of restitution in this case: $30,158,608.25. (DE 374: ¶9). This greatly exceeds the $9,215,225 amount the Government has alleged Mr. Smith directly received. (*See* DE 374: ¶¶6&73). The restitution amount should be joint and several with the other related defendants, including Victor Van Vickery, Charles Schwartz, Michael McCormac, and Marc Sporn. (*See* DE 374: ¶¶74-77). Additionally, pursuant to Title 18, United States Code

16

3612(f)(3)(A), Mr. Smith would ask this Court to waive interest on the restitution, because he does not have the ability to pay interest.

The need to provide restitution to the victims can support a lesser sentence of imprisonment.  *See, e.g., United States v. Boumenot*, 2010 WL 145848, *3 (E.D. Wisc. Jan. 8, 2010) (placing defendant on probation despite a guideline range of 21 to 27 months imprisonment, in part, in order to facilitate earlier restitution payments). "Restitution is an effective rehabilitative penalty because it forces the defendant to confront, in concrete terms, the harm his actions have caused." *Kelly v. Robinson*, 479 U.S. 36, 49 n.10 (1986).  Mr. Smith's ability to make restitution payments will be significantly greater after he is released from imprisonment.  Fashioning a below guidelines sentence will allow him to more quickly return to the community, obtain employment, and engage in the rehabilitative process of making substantial restitution payments.

## CONCLUSION

Wherefore, for the foregoing reasons, the Defendant, Robert Leon Smith, III, respectfully requests that the Court sentence him to a sentence of 96 months.

Respectfully submitted,

HECTOR A. DOPICO
FEDERAL PUBLIC DEFENDER

By: *s/M. Caroline McCrae*
M. Caroline McCrae
Assistant Federal Public Defender
Attorney for Defendant Smith
Florida Bar No. 72164
250 S Australian Avenue, Suite 400
West Palm Beach, Florida 33401

17

(561) 833-6288 - Telephone
(561) 833-0368 - Facsimile
*caroline_mccrae@fd.org*

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on March 23, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/*M. Caroline McCrae*
M. Caroline McCrae